# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| THE KIRK CORPORATION, et al., | ) | Case No. 09-17236 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Eugene R. Wedoff |
| | ) | |
| | ) | Hearing Date: June 17, 2009 at 9:30 a.m. |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on **June 17, 2009 at 9:30 a.m.**, or as soon thereafter as counsel may be heard, we shall appear before the Honorable Eugene R. Wedoff in the courtroom usually occupied by him, Courtroom No. 744, in the United States Bankruptcy Court, 219 South Dearborn Street, Chicago, Illinois, or before any judge who may be sitting in his place or stead, and shall then and there present the **Motion for an Order (i) Authorizing the Debtors to Sell Certain Assets Outside of the Ordinary Course, (ii) Approving Bid and Auction Procedures and (iii) Approving the Form and Manner of Notices Thereof**, a copy of which is attached hereto and hereby served upon you, at which time and place you may appear as you see fit.

Dated: June 12, 2009

**THE KIRK CORPORATION AND ITS AFFILIATED DEBTORS**

By: /s/ David L. Kane
One of Its Attorneys

Forrest B. Lammiman (ARDC No. 6208632)
David L. Kane (ARDC No. 6277758)
MELTZER, PURTILL & STELLE LLC
300 South Wacker Drive, Suite 3500
Chicago, Illinois 60606
(312) 987-9900
(312) 987-9854 (facsimile)

## CERTIFICATE OF SERVICE

I, David L. Kane, an attorney, certify that on June 12, 2009, I caused copies of the **Notice of Motion** and **Motion for an Order (i) Authorizing the Debtors to Sell Certain Assets Outside of the Ordinary Course, (ii) Approving Bid and Auction Procedures and (iii) Approving the Form and Manner of Notices Thereof** to be served (i) via electronic notice on the parties appearing on the Court's CM/ECF notice list and (ii) via First Class U.S. Mail, postage pre-paid, upon the parties set forth on the attached Service List.

By: /s/ David L. Kane
One of Its Attorneys

## SERVICE LIST

| | | |
|---|---|---|
| Donald Kirk<br>1024 Hibbard Rd.<br>Wilmette, IL 60091 | David Kirk<br>5336 N Glenwood Rd.<br>Chicago, IL 60640 | Carrie Reyes<br>Cole Taylor Bank<br>225 W. Washington St. 9th Floor<br>Chicago, IL 60606 |
| Lenny Szarek Inc.<br>c/o Jennifer L. Johnson<br>Zanck, Coen & Wright<br>40 Brink St.<br>Crystal Lake, IL 60014 | Karen Rust<br>Coleman Floor Company<br>1930 N. Thoreau Dr. #100<br>Schaumburg, IL 60173 | Justin Avey<br>Service Drywall & Decorating<br>47 West Irving Park Rd.<br>Roselle, IL 60172 |
| Donald Walsh<br>Professional Plumbing,<br>Inc.<br>1435 S. Barrington Rd.<br>Barrington, IL 60010 | SCE Unlimited, Inc.<br>c/o Brendan G. Best<br>Schafer and Weiner, PLLC<br>40950 Woodward Ave.,<br>Ste. 100<br>Bloomfield Hills, MI<br>48304 | R&D Thiel Inc.<br>c/o Gary Leydig<br>Riordan, Fulkerson, Hupert &<br>Colema<br>30 North LaSalle St, Suite 2630<br>Chicago, IL 60602 |
| Tracey Blanchard<br>Blanchard Electrical<br>Contractors, Inc.<br>920 W. Prairie Dr., Ste. I<br>Sycamore, IL 60178 | Sally Gange<br>Stock Building Supply<br>1331 Davis Rd.<br>Elgin, IL 60123 | Max Ghezzi<br>Ghezzi Masonry Construction<br>P.O. Box 5152<br>Lansing, IL 60438 |
| Gary Doles<br>Tempco Heating & Air<br>Conditioning Company<br>3050 N. Kennicott<br>Arlington Heights, IL<br>60004 | Mike Reagen<br>Alright Concrete<br>1500 Ramblewood Dr.<br>Streamwood, IL 60107 | Glen Nissen<br>Art Nissen & Son<br>Landscaping, Inc.<br>P.O. Box 459<br>Hampshire, IL 60140 |

| | | |
|---|---|---|
| Larry Boesso<br>Patriot Concrete &<br>Asphalt<br>10S312 Schoger Dr.<br>Naperville, IL 60564 | David Solari<br>CCR Tops Inc.<br>2482 Technology Dr.<br>Elgin, IL 60123 | Bob Shearer<br>Northwest Insulation<br>1615 Dundee Ave., Ste. 1<br>Elgin, IL 60120 |
| Tom Koss<br>Inland Electric Corp.<br>611 W. Jefferson<br>Shorewood, IL 60431 | Jim Link<br>Jim Link Services, Inc.<br>431 Scotland Rd., Ste. B<br>Lakemoor, IL 60051 | Larry Boesso<br>J B Concrete Contractors Inc.<br>10S312 Schoger Dr., Unit B<br>Naperville, IL 60564 |
| Martin T. Burke<br>Mackie  Consultants<br>9575 W. Higgins Rd. #500<br>Rosemont, IL 60018 | Michael E. Bellar,<br>President<br>Harry Wolsky, Inc. of IL<br>547 Motherwell Ave.<br>P.O. Box 967<br>Logan , OH, 43138 | Tim Cote<br>Tim Cote Inc.<br>1075 Manito Trail<br>Algonquin, IL 60102 |
| Frank Zubricki<br>Professional Drywall &<br>Decorating LLC<br>3135 W. 59th St.<br>Chicago, IL 60629 | Tom Manning<br>T. Manning Concrete, Inc.<br>11410 Kreutzer Rd.<br>Huntley, IL 60142 | Mark Wilson<br>Wilkor Construction Inc.<br>700 D Willow Lane<br>Dundee, IL 60118 |
| Jordan Harris<br>Whirlpool<br>1904 Country Dr.<br>Grayslake, IL 60030 | Larry Hill<br>Ryan Incorporated Central<br>P.O. Box 206<br>Janesville, IL 53547 | Earl Sund<br>Sund Masonry<br>116 Birch Lane<br>Cary, IL 60013 |
| Roman Sukley<br>Office of the U.S. Trustee<br>219 South Dearborn St.<br>Room 873<br>Chicago, IL 60604 | Joel Walker, Esq.<br>Duane Morris LLP<br>600 Grant St., Ste. 5010<br>Pittsburgh, PA 15219-2811 | Rosanne Ciambrone, Esq.<br>Matthew Olins, Esq.<br>Duane Morris LLP<br>190 South LaSalle Street<br>Ste. 3700<br>Chicago, IL 60603-3433 |
| Marty Cann<br>First American Title<br>IL Underwriting Counsel<br>27775 Diehl Rd.<br>Warrenville, IL 60555 | David K. Welch, Esq.<br>Crane, Heyman, Simon,<br>Welch & Clar<br>135 South LaSalle St.<br>Ste 3705<br>Chicago, Illinois 60603 | |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| THE KIRK CORPORATION, *et al.*, | ) | Case No. 09-17236 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Carol A. Doyle |
| | ) | |
| | ) | Hearing Date: June 17, 2009 at 9:30 a.m. |

**MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTORS TO**
**SELL CERTAIN ASSETS OUTSIDE OF THE ORDINARY COURSE,**
**(II) APPROVING BID AND AUCTION PROCEDURES AND**
**(III) APPROVING THE FORM AND MANNER OF NOTICES THEREOF**

The Kirk Corporation and eleven of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, "Kirk" or the "Debtors")[1], hereby move this Court (the "Motion") for entry of an order, substantially in the form of the proposed order attached hereto (the "Auction Procedures Order"), (i) authorizing the Debtors to sell certain assets outside of the ordinary course, (ii) approving the proposed bid and auction procedures attached hereto as **Exhibit A** (the "Auction Procedures") and (iii) approving the form and manner of notices thereof. In support of this Motion, the Debtors respectfully represent as follows:

**JURISDICTION**

1.    On May 12, 2009 (the "Initial Petition Date"), nine of the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the

---

[1]  The Debtors are the following companies: The Kirk Corporation; Apple Creek Estates, LLC; Beacon Pointe West, LLC; Bloomfield Estates, LLC; Laurel Meadow, L.L.C.; The Lindens Venture, L.L.C.; Rockwell Place, LLC; Stonegate Village, LLC; Wing Pointe North, L.L.C; and Westland, LLC; Bloomfield West, L.L.C. (filed June 8, 2009); and Freeman Road Development, LLC (filed June 8, 2009). Two affiliates of Kirk are currently non-debtors: Rockwell Utilities, LLC; and Suncrest, L.L.C.

United States Bankruptcy Court for the Northern District of Illinois (the "Court"), commencing the above-captioned Chapter 11 cases. On June 8, 2009 (the "Subsequent Petition Date"; the Initial Petition Date and Subsequent Petition Date are referred to herein as the "Petition Date"), two additional affiliates of the Debtors, Bloomfield West, L.L.C. and Freeman Road Development, LLC ("Freeman Road"), filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(c) and 1108 of the Bankruptcy Code.

2.      An Official Committee of Unsecured Creditors (the "Creditors' Committee") was appointed in these cases on May 28, 2009.

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D) and (M).

4.      The bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Rules 2002, 6004 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

5.      The Kirk Corporation was founded in 1978 as a production homebuilder. Currently, Kirk employs approximately 20 employees.  Kirk's principal office is located in Streamwood, Illinois.

6.      Kirk, an Illinois corporation, is the sole member of eleven limited liability companies and is the manager and one of the members of two limited liability companies. Eleven of these limited liability companies now are also Debtors herein.  One hundred percent (100%)

of the stock of the holding company, Kirk, is owned by the Kirk Corporation Stock Ownership

Plan and Trust, pursuant to two transactions, the first of which occurred in 1998 and the second

of which occurred in 2002. Thus, the ultimate owners of all the Debtors are all of the employees

of the Debtors.

7.      The Debtors together currently have (i) four active residential developments in

Bolingbrook, Hoffman Estates, Lakemoor, and Woodstock, (ii) five residential developments in

Aurora, Bolingbrook, Huntley (unincorporated), New Lenox and Streamwood where

construction of homes is complete, (iii) commercial property in Woodstock, and (iv) two

unentitled parcels which are zoned for commercial use in Elburn (unincorporated) and Huntley

(unincorporated). As of the Petition Date, the Debtors' aggregate assets total approximately

$96,847,300 and the Debtors' aggregate liabilities total approximately $64,537,800, on a

consolidated basis.

8.      The Debtors' operational and profitability problems are principally due to the

sharp and prolonged decline in the Chicago area homebuilding market. In 2006 and 2007, the

Debtors built 328 homes and 305 homes, respectively, and had gross revenues of $113,310,092

and $105,898,302, respectively. In 2008 the Debtors built only 78 homes with gross revenues of

$24,711,670.

9.      The Debtors acknowledge that from time to time prior to the Petition Date, certain

of the Debtors borrowed money and received other financial accommodations from the

JPMorgan Chase Bank, N.A., a national banking association (successor by merger to Bank One,

N.A.), as agent ("Agent") for the Debtors' prepetition secured lenders (collectively, the

"Lenders"), under that certain Amended and Restated Borrowing Base Revolving Line of Credit

Agreement dated as of August 25, 2006 (as amended, the "Credit Agreement"), and incurred

additional obligations in connection therewith, including without limitation, obligations for payment or reimbursement of certain of the Agent's fees, costs and expenses.

## THE FREEMAN ROAD PROPERTY

10.    Prior to June 2008, Freeman Road advised Noel Liston at Darwin Realty that Freeman Road was interested in selling certain property it owned consisting of approximately 164 acres located on Freeman Road, east of Route 47 in unincorporated Kane County (the "Freeman Road Property"). On or about April 8, 2009, Freeman Road received a proposal submitted by Darwin Realty describing terms of an offer being made on behalf of Component Plastics, which Freeman Road accepted on April 13, 2009.

11.    On or about May 7, 2009, Freeman Road entered into a Real Estate Purchase Agreement with Joseph Valente (the principal of Component Plastics) ("Valente") for the sale of the Freeman Road Property (as amended, and together with all documents contemplated by the Real Estate Purchase Agreement, the "Stalking Horse Agreement"). Valente has offered to purchase the Freeman Road Property for $3,200,000.00 and has deposited earnest money in the amount of $250,000.00 in an escrow established with First American Title Insurance Company.

12.    Since before November 2007, Freeman Road has been negotiating Commonwealth Edison ("Com Ed") to grant an easement to Com Ed over the Freeman Road Property (the "Com Ed Easement"). Com Ed and Freeman Road have agreed on the scope and terms of the easement and Com Ed has agreed to pay Freeman Road an amount equal to $360,000.00 in consideration of the grant of easement.

13.    The Stalking Horse Agreement acknowledges the negotiations with Com Ed and the anticipated grant of the Com Ed Easement. The Stalking Horse Agreement further provides that Valente acknowledges and agrees that if the Com Ed Easement is not recorded prior to the

closing date of the Sale, that Valente will later join in the execution of the Com Ed Easement and that Valente disclaims any rights to the consideration being paid by Com Ed, as long as such consideration is paid prior to July 31, 2010. Any ultimate purchaser of the Freeman Road Property will buy the property subject to the grant of the Com Ed Easement.

## BID AND AUCTION PROCEDURES

14.     The Stalking Horse Agreement recognizes, and is expressly subject to, the right of the Debtors to offer the Freeman Road Property to other parties at an auction sale (the "Auction"). This Motion contemplates that the Debtors will offer the Freeman Road Property for sale at the Auction, subject to Auction Procedures[2] that are set forth in **Exhibit B** hereto.

15.     The Debtors request that this Court schedule a hearing to approve the Sale of the Freeman Road Property to the Winning Bidder (the "Sale Hearing") at which Sale Hearing the Debtors will seek entry of an order (the "Sale Order") authorizing and approving the sale of the Freeman Road Property. The Debtors further request that this Court order that any objections to the entry of the Sale Order must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Northern District of Illinois; (c) set forth the name of the objecting party, the nature and amount of claims or interests held or asserted by the objecting party against the Debtors' estates or property, the basis for the objection, and the specific grounds therefor; and (d) be further served so that they are received not less than three (3) business days prior to the date of the Sale Hearing by counsel for the Debtors.

16.     The Debtors request that this Court order that the failure of any person or entity to timely file its objection in accordance with Paragraph 15 of this Motion shall be a bar to the

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Auction Procedures.

assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the proposed sale of the Freeman Road Property, or the consummation or and performance under the Stalking Horse Agreement and the transactions contemplated thereby.

## NOTICE PROCEDURES

17.    Not later than five (5) business days after the entry of the Auction Procedures Order approving the Auction Procedures, the Debtors, either directly or through their professionals, will cause a copy of the Auction Procedures and the Auction Procedures Order to be served by first-class mail, postage prepaid, upon (a) all parties who have, at that time, requested notice in these cases pursuant to Bankruptcy Rule 2002, (b) all creditors listed on the Debtors' consolidated creditor matrix, and (c) all entities known to have expressed a substantial interest in a transaction with respect to the Freeman Road Property.

## RELIEF REQUESTED

18.    By this Motion, the Debtors seek entry of the Bid Procedures Order (i) authorizing the Debtors to sell certain assets outside of the ordinary course, (ii) approving the Auction Procedures and (iii) approving the form and manner of notices thereof. Additionally, where appropriate, the Debtors will request that the Court make a finding that: (1) Valente or the successful bidder acted in good faith in negotiating the sale price, (ii) the Notice Procedures set forth herein provide sufficient notice for entry of the Sale Order and (iii) the sale price is fair and reasonable.

## BASIS FOR RELIEF

### A.    The Sale is in the Best Interest of the Debtors' Estates.

19.    Section 363(b)(1) permits a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. A debtor in

{05919: 210: 00448788.DOC : }

6

possession is given these rights by section 1107(a) of the Bankruptcy Code. Moreover, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." "[T]he sale of substantially all of a debtor's assets is a transaction outside of the ordinary course of business, which requires bankruptcy court approval to become effective." *In re O'Brien Env. Energy, Inc.*, 181 F.3d 527, 531 (3rd Cir. 1999).

20.    Courts have uniformly held that approval of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents the exercise of reasonable business judgment on the part of the debtor. Courts generally approve sales outside of the ordinary course of business under section 363(b)(1) of the Bankruptcy Code whenever such a sale is in the best interests of the estate. *See In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994); *In re Apex Oil Co.*, 92 B.R. 847, 866 (Bankr. E.D. Mo. 1988).

21.    Ordinarily, this standard requires: (i) an articulated business justification for the sale and (ii) evidence that the sale occurred in good faith. *See In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993) (*citing In re Met-L-Wood Corp.*, 861 F.2d 1012 (7th Cir. 1988), *cert. denied*, 490 U.S. 1006, 109 S. Ct. 1642, 104 L.Ed.2d 157 (1989)); *see also Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (stating that a sale under section 363 of the Bankruptcy Code involves the exercise of fiduciary duties and requires an "articulated business justification").

22.    Additionally, courts generally require that adequate and reasonable notice of the sale be provided to interested parties, and that the purchase price be fair and reasonable. *See In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Taylor*, 198 B.R. 142,

156-57 (Bankr. D. S.C. 1996); *In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220 (Bankr. N.D. Ohio 1994).

23.     The Debtors submit that a sound business purpose supports the requested relief made in this Motion. The Debtors believe that the purchase price to be paid for the Freeman Road Property is fair and reasonable given the uncertain state of the property and housing markets. Thus, the Debtors believe that the granting of the relief requested herein is the best means of preserving the current value of the Freeman Road Property, and of maximizing its value for the Debtors' estates and their creditors, including the Lenders.

**B.     Valente has Acted in Good Faith.**

24.     Section 363(m) of the Bankruptcy Code, which pertains to a sale such as that proposed in this Motion, incorporates the term "good faith" as a requirement. Specifically, it provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property *in good faith,* whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

I 1 U.S.C. § 363(m) (emphasis added.).

25.     A good faith purchaser under Section 363(m) has been defined by Courts to mean "one who purchases in 'good faith' and for 'value'." *Kabro Assocs. of West Islip, LLC v. Colony Hill Associates. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) (*citing Cumberland Farms Dairy, Inc. v. National Farmers' Org. (Ire re Abbotts Dairies of Penn., Inc.)*, 788 F.2d 143, 147 (3d Cir. 1986)); *Ewell v. Diebert (In re Ewell),* 958 F.2d 276, 281 (9th Cir. 1992); *Badami v. Burgess (In re Burgess)*, 246 B.R. 352, *355-56 (B.A.P.* 8th

Cir. 2000).

26.    The Seventh Circuit has further stated that the "good faith" component of the test:

> ... speaks to the equity of [the bidder's] conduct in the course of sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

27.    The Stalking Horse Agreement was negotiated at arms' length over a period of over ten (10) months, with both parties represented by their own counsel. Although the Debtors engaged in discussions with other parties interested in acquiring certain of their assets, the Debtors submit that the Buyer's proposal as contained in the Stalking Horse Agreement represents the highest and best offer for the Freeman Road Property. Further, neither Valente nor any of its owners or employees have economic interests in the Debtors, and the Debtors believe that all negotiations with the Buyer have been at arms' length and in good faith.

28.    Accordingly, the proposed Sale Order will include a provision that Valente or the successful bidder for the Freeman Road Property is a "good faith" purchaser within the meaning of section 363(m). The Debtors believe that providing the Winning Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Freeman Road Property and closing of the Sale will occur promptly.

**C.    The Expense Reimbursement and Break-Up Fee Are Reasonable.**

29.    The Debtors request that this Court authorize the Debtors to pay to Valente the Break-Up Fee in accordance with the Stalking Horse Agreement and the Auction Procedures without further application to or order of this Court. The obligation to pay the Break-Up Fee

shall survive the termination of the Stalking Horse Agreement and, until indefeasibly paid in full in cash, pursuant to section 503(b) of the Bankruptcy Code, shall constitute an administrative expense of the Debtors' bankruptcy estates ranking of the kinds specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code.

30.    Sellers of assets often employ termination, or break-up fees and other bidding protections to encourage the making of bids. Break-up fees are "important tools to encourage bidding and to maximize the value of the debtor's assets." *The Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992). "A break-up fee, or more appropriately a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." *In re Integrated Resources, Inc.*, 147 B.R. 650, 653 (S.D.N.Y. 1992). A break-up fee is designed, in part, to compensate for the risk of losing a signed deal. *Beebe v. Pacific Really Trust*, 578 F. Supp. 1128, 1150 n.7 (D. Or. 1984).

31.    Agreements to provide break-up fees in the bankruptcy context - particularly where, as here, there will be an Auction based on the proposed transaction - are meant to compensate the potential acquirer who serves as a catalyst or "stalking horse" to attract more favorable offers. *In re S.N.A. Nut Company*, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); *see also In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr.S.D.N.Y. 1992) (stating that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Marrose Corp.*, Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr.S.D.N.Y. 1992) (stating that "[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or `stalking horse' which attracts more favorable offers.").

32.    In the bankruptcy context, the test for determining whether a break-up fee should be approved is whether it is in the best interest of the estate. *S.N.A. Nut Co.*, 186 B.R. at 104. In particular, there must be circumstances "which clearly indicate that payment of the fee would be in the best interests of the estate." *Id.*   Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate. *Calpine Corporation v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999). Courts have identified at least two instances in which bidding incentives may provide benefits to an estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

33.    The Court should consider the potential buyer's investment of both time and money when determining whether a break-up fee is reasonable. In general, a break-up fee is permissible if it is reasonably related to the bidder's efforts and the transaction's magnitude. *Cottle v. Storer Communication Inc.*, 849 F.2d 570, 578 (11th Cir. 1988). This approach encourages the appropriate level of bidding. If a prospective bidder knows that a debtor will agree to a break-up fee after the bidder has investigated the debtor, the bidder is more likely to pursue a bid. If, on the other hand, a prospective bidder knows that courts prevent the debtor from paying a break-up fee, then it is more likely to abandon its bid, or, even worse, never to explore a bid in the first place. *In re Integrated Resources*, 147 B.R. 650 (S.D. N.Y.

1992).

34.    Break-Up Fee was and is a material inducement for, and a condition of, the
Valente's entry into the Stalking Horse Agreement. Valente was unwilling to commit to hold
open its offer to purchase the Freeman Road Property under the terms of the Stalking Horse
Agreement unless he was assured of payment of the Break-Up Fee. The Debtors believe that
the assurance to Valente of payment of the Break-Up Fee has promoted and will promote
more competitive bidding by inducing Valente to bid, which otherwise would not have been
made, and without which bidding may have been and may be limited. Furthermore, because
the Break-Up Fee further induced Valente to conduct extensive due diligence and to submit a
bid that will serve as a minimum or floor bid for the sale of the Freeman Road Property on
which other bidders and the Debtors can rely, Valente has provided a substantial benefit to
the Debtors' estates by increasing the likelihood that the price at which the Freeman Road
Property is sold will reflect its true worth and that value for the Debtors' estates will be
maximized.

35.    The Debtors believe that absent approval of the Break-Up Fee, the Debtors may
lose the opportunity to obtain the highest and best available offer for the Freeman Road Property
and downside protection afforded by the Stalking Horse Agreement. In light of the benefit to the
Debtors' estates realized by having a fully negotiated agreement, the terms of which will enable
the Debtors to preserve the value of the Debtors' business, ample support exists for the approval
of the Break-Up Fee as contemplated by this Motion, the Auction Procedures, and the Stalking
Horse Agreement.

36.    The Break-Up Fee is fair and reasonable in relation to the aggregate consideration
under the Stalking Horse Agreement, and the Break-Up Fee is consistent with break-up fees

approved in other cases in this district. *See In re Hedstrom Corporation*, No. 04 B 38543
(Bankr. N.D. Ill. October 19, 2004) (approving a break-up fee of $240,000 (approximately
3% of the purchase price); *In re Big Idea Productions, Inc.*, No. 03 B 35893 (Bankr. N.D. Ill.
November 10, 2003) (approving a break-up fee of $300,000 (approximately 4% of the
purchase price); *In re Comdisco, Inc.*, No 01 B 24795 (Bankr. N.D. Ill. August 9, 2001)
(approving break-up fee of $18.3 million (3% of the purchase price); *In re Outboard Marine
Corporation*, No. 00 B 37405 (Bankr. N.D. Ill. January 12, 2001) (approving a break-up fee
of 3% of the value of a qualified bid).

37.    Accordingly, the Debtors respectfully request that this Court find that the
payment of the Break-Up Fee to Valente, if required by the Stalking Horse Agreement and
the Auction Procedures, is (a) an actual and necessary cost and expense of preserving the
Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code; (b) of
substantial benefit to the Debtors' estates; (c) reasonable and appropriate, including in light
of the size and nature of the proposed sale of the Freeman Road Property and the efforts (and
the significant due diligence costs and expenses) that have been and will be expended by
Valente, notwithstanding that the proposed sale of the Freeman Road Property is subject to
higher or better offers; (d) not a penalty, but a reasonable estimate of the damages to be
suffered by Valente in the event the transactions contemplated by the Stalking Horse
Agreement are not consummated under the circumstances set forth therein and in the Auction
Procedures, and (e) necessary to ensure that Valente will continue to pursue its proposed
acquisition of the Freeman Road Property. The Debtors thus request that the Break-Up Fee
provisions of the Stalking Horse Agreement and the Auction Procedures be explicitly
approved and authorized by the Court.

**D.    The Auction Procedures Will Maximize the Value of the Freeman Road Property**

38.    The Auction Procedures outlined in this Motion are designed to strike a balance between competitive bids and enabling the Debtors to close a sale with Valente within a reasonable time frame. The Auction Procedures in this motion are fair, reasonable, and necessary to promote the highest and best sale price, without imposing undue obstacles to the competitive bid process.

39.    The Debtors believe that the Auction Procedures adequately safeguard the interests of the Debtors' estates and their creditors in achieving a maximum return from the sale of the Freeman Road Property. Accordingly, the Debtors respectfully request that the Auction Procedures be approved and authorized.

**E.    The Sale May be Free and Clear of all Liens under Section 363(f) of the Bankruptcy Code**

40.    The Debtors may sell the Freeman Road Property free and clear of all liens, claims, interests, and encumbrances. Section 363(f) of the Bankruptcy Code governs "free and clear" sales of estate property. This section provides, in relevant part, that:

> [t]he trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; such entity consents;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

41.     The Freeman Road Property is currently encumbered by a mortgage that is subject to avoidance, recovery and lien preservation for the benefit of the estate under Sections 544, 547, 548, 550 and 551 of the Bankruptcy Code. Specifically, pursuant to the Second Amendment to Amended and Restated Borrowing Base Revolving Lien of Credit Agreement between the Lenders and the Debtors dated as of March 31, 2008 (the "Second Amendment"), the Lenders received mortgages on three (3) previously unencumbered parcels of real estate owned by certain of the Debtors, namely, Freeman Road, Westland, LLC ("Westland"), and Apple Creek Estates, LLC, respectively (the "2008 Mortgages"). Freeman Road and Westland were not, and are not, borrowers under any loan documents with the Lenders.

42.     The Lenders obtained contemporaneous appraisals of their new collateral showing that they received more than $14 million dollars in value from the required grant of the 2008 Mortgages. The Debtors, however, received less than reasonably equivalent value in exchange for granting the 2008 Mortgages, receiving only approximately $300,000 in additional cash availability and an accounting credit of up to $2 million dollars on a retroactive basis for purposes of re-calculating certain loan covenants, plus other modest consideration set forth in the Second Amendment.

43.     The 2008 Mortgages were granted at a time when the Debtors were in deep financial distress, such that one or more of the alternative financial elements of a constructively fraudulent transfer under Subsections 548(a)(1)(B)(ii)(I)(II), and (III) of the Bankruptcy Code are likely to be readily established. Similarly, under Section 544 of the Bankruptcy Code the Debtors also may avoid the 2008 Mortgages pursuant to the provisions of the Uniform Fraudulent Transfer Act as adopted in Illinois. Indeed, by September, 2008, only six (6) months

after the Lenders obtained the 2008 Mortgages from the Debtors, the Lenders declared the

Debtors to be in default under the Credit Agreement and the Second Amendment thereto on the

ground that the Debtors had breached a covenant that ostensibly was to be satisfied as part of the

grant of the 2008 Mortgages to the Lenders.

44.     The 2008 Mortgages are the subject of a bona fide dispute between the Debtors

and the Agent as that term is used in section 363(f)(4) of the Bankruptcy Code.  In the unlikely

event that the 2008 Mortgages are not eventually avoided, the Debtors submit that the proceeds

of the sale of the Freeman Road Property are greater than any claim for lien the Agent may have

on the Freeman Road Property.  Other than the 2008 Mortgages on the Freeman Road Property,

the Debtors are unaware of any other liens, claims, interests, and encumbrances thereon.

45.     Accordingly, pursuant to either section 363(f)(3) or 363(f)(4), the Debtors

respectfully request that the Court permit the transfer of the Freeman Road Property to the

Winning Bidder free and clear of all liens, claims, interests, and encumbrances with such

liens, claims, interests, and encumbrances attaching to the sale proceeds.

**F.     The Notice Procedures are Adequate and Reasonable**

46.     The Notice Procedures, together with the other notices described in this Motion,

constitute good and proper notice to all interested parties. The Debtors believe that if the Notice

Procedures are approved and authorized, creditors and other parties in interest will receive

adequate notice of the sale of the Freeman Road Property and the Auction. Under these

procedures, notice of the sale is reasonably calculated to provide timely and adequate notice to

all of the Debtors' creditors, those parties most interested in the Debtors' cases, and those parties

potentially interested in bidding for the Freeman Road Property. In the event that the Notice

Procedures are not approved, the sale of the Freeman Road Property to Valente will not be

{05919: 210: 00448788.DOC : }

16

closed, resulting in a substantial loss to the value of the Debtors' estates.

## REQUEST FOR RELIEF UNDER BANKRUTPCY RULES 6004(H)

47.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that any order approving the sale of the Freeman Road Property in accordance with the Auction Procedures and pursuant to the Stalking Horse Agreement be effective immediately upon entry of such order by providing that the ten-day stay shall not apply.

## NOTICE

48.     Notice of this Motion has been given to: (a) the Office of the United States Trustee; (b) counsel for JPMorgan Chase, N.A., as Agent for the prepetition Lenders; (c) counsel to the Creditors' Committee and (d) the Debtors' thirty (30) largest unsecured creditors as set forth in the consolidated list filed with the Debtors' petitions. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter the Bid Procedures

Order (i) authorizing the Debtors to sell certain assets outside of the ordinary course, (ii)

approving the Auction Procedures, (iii) approving the form and manner of notices thereof,

and (d) grant such other relief as the Court may deem just and appropriate.


Dated: June 12, 2009                      Respectfully submitted,

                                          **THE KIRK CORPORATION**
                                          **AND ITS AFFILIATED DEBTORS**

                                          By:  /s/ Forrest B. Lammiman
                                                 One of Its Attorneys

Forrest B. Lammiman (ARDC No. 6208632)
David L. Kane (ARDC No. 6277758)
MELTZER, PURTILL & STELLE LLC
300 South Wacker Drive, Suite 3500
Chicago, Illinois 60606
(312) 987-9900
(312) 987-9854 (facsimile)