UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE KIRK CORPORATION, *et al.*, | ) | Case No. 09-17236 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Carol A. Doyle |

## ORDER APPROVING THE SALE OF THE FREEMAN ROAD PROPERTY PURSUANT TO THE STALKING HORSE AGREEMENT

THIS MATTER having come before the Court upon the Motion for an Order Motion for an Order Authorizing and Approving the Sale of the Freeman Road Property to Pursuant to the Stalking Horse Agreement [resolving Docket Nos. 95 and 192] (the "Motion")[1] filed by The Kirk Corporation and eleven of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively with the Affiliate Debtors, "Kirk" or the "Debtors")[2]; the Court finding that: (i) it has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iv) the relief requested in the Motion is in the best interests of the Debtors, their estates, and their creditors; (v) proper and adequate notice of the Motion and the hearing thereon has been given and that no other or further notice is necessary; (vi) it appearing that notice of the Sale of the Freeman Road Property was in compliance with the Auction Procedures approved by the Court and appropriate under the circumstances, and that no other or further notice is necessary; and (vii) good and sufficient cause exists for the granting of the relief requested in the Motion, after having given due deliberation to the Motion and all of the proceedings had before the Court in connection with the Motion. Therefore,

---

[1]   Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Motion.

[2]   The Debtors are the following companies: The Kirk Corporation; Apple Creek Estates, LLC; Beacon Pointe West, LLC; Bloomfield Estates, LLC; Laurel Meadow, L.L.C.; The Lindens Venture, L.L.C.; Rockwell Place, LLC; Stonegate Village, LLC; Wing Pointe North, L.L.C; and Westland, LLC; Bloomfield West, L.L.C. (filed June 8, 2009); and Freeman Road Development, LLC (filed June 8, 2009). Two affiliates of Kirk are currently non-debtors: Rockwell Utilities, LLC; and Suncrest, L.L.C.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED in its entirety.

2.      The Debtors are authorized to consummate the sale of approximately 164 acres located on Freeman Road, east of Route 47 in unincorporated Kane County (the "Freeman Road Property") pursuant to that certain Stalking Horse Agreement, a true and accurate copy of which is attached hereto as **Exhibit A**.

3.      Upon payment by Com Ed of the easement price of $360,000.00 to such party as the Debtors and Agent may agree or the Court may otherwise order, which payment shall be held in the Net Proceeds/Construction Costs Escrow Account held at First American Title Insurance Company until further order of the Court, the Purchaser is authorized and directed to enter into the Com Ed Easement, in the form attached hereto as **Exhibit B**.

4.      Proceeds of the Sale of the Freeman Road Property, less taxes and closing costs set forth in Section 9 of the Stalking Horse Agreement, shall be deposited in the Net Proceeds/Construction Costs Escrow Account held at First American Title Insurance Company and shall be disbursed pursuant to further order of the Court.

5.      The Debtors are authorized to take all actions necessary to effectuate the Sale and the relief granted pursuant to this Order.

6.      The Purchaser is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.  In the event of a reversal or modification on appeal of this Order, the Purchaser shall be entitled to the protections afforded by section 363(m) of the Bankruptcy Code.

7.      The Purchaser shall take the Freeman Road Property free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and all such liens shall attach with the same priority to the Sale proceeds held pursuant to Paragraph 4

hereof in the Net Proceeds/Construction Costs Escrow Account at First American Title Insurance Company.

8.      Darwin Realty & Development Corporation reserves all of its rights with respect to filing an administrative claim related to its broker's commission arising under Section 9 of the Stalking Horse Agreement.  In addition, the Debtors reserve their right to surcharge the Agent and Lenders pursuant to section 506(c) of the Bankruptcy Code with respect to any such claim.

9.      The Agent and Lenders reserve all of their rights and defenses with respect to any claim filed pursuant to Paragraph 8 hereof.

10.     Notwithstanding the possible applicability of Federal Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be effective as of its entry.

11.     The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: July 30 , 2009

_____
Honorable Eugene R. Wedoff
United States Bankruptcy Judge

# EXHIBIT A

## STALKING HORSE AGREEMENT

5/6/09

## REAL ESTATE PURCHASE AGREEMENT

THIS AGREEMENT, dated as of *MAY 7* , 2009 is made between JOSEPH VALENTE, of Elgin, Illinois (**"Purchaser"**) and FREEMAN ROAD DEVELOPMENT, LLC (**"Seller"**).

### RECITALS

A.    Seller is the fee simple owner of a vacant parcel of real estate consisting of approximately 164 acres located on Freeman Road, east of Route 47 in unincorporated Kane County, Illinois, and legally described on Exhibit A attached hereto (the **"Land"**) (though the Land has been annexed into the Huntley Park District). The Land, together with all right, title and interest of Seller in and to all easements, privileges and appurtenances thereunto belonging, and all right, title and interest of Seller lying in the bed of any street, road, or avenue, adjoining the land, and to the use of all easements of record or not, appurtenant to the land and the use of all strips and rights of way, if any, abutting, adjacent, contiguous or adjoining such Land, shall hereinafter be collectively be referred to as the **"Real Estate."**

B.    Purchaser desires to purchase the Real Estate and Seller desires to sell the Real Estate to Purchaser, all as further provided in this Agreement.

NOW, **THEREFORE,** in consideration of the mutual representations, covenants, undertakings and agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Seller and Purchaser agree as follows:

1.    PURCHASE: EARNEST MONEY

(a)    **Purchase Price:  Payment.**  On the terms and conditions set forth herein, Seller agrees to sell, and Purchaser agrees to purchase the Real Estate for a purchase price (**"Purchase Price"**) equal to Three Million Two Hundred Thousand Dollars ($3,200,000.00). The Purchase Price shall be paid by Purchaser to Seller by wire transfer in United States funds on the Closing Date (as hereinafter defined).

(b)    **Earnest Money.**  On or before 5:00 PM on the second (2nd) business day following the date on which the last of Purchaser and Seller executed this Agreement (the **"Acceptance Date"**, Purchaser shall deposit the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) (the **"Earnest Money"**) into a Strict Joint Order Escrow with the Title Insurer (hereinafter defined) as escrowee (**"Escrow Holder"**), as earnest money, to secure Purchaser's performance hereunder. Following the expiration of the Feasibility Period and assuming that this Agreement has not been terminated prior thereto, the Earnest Money shall be non-refundable to Purchaser except as may otherwise specifically be permitted under this Agreement.

(c)    **Investment of Earnest Money.**  At the direction of Purchaser, the Earnest Money may be invested by the Escrow Holder into any of the customary, daily-redeemable money market funds customarily used by the Escrow Holder for the investment of funds in its

possession, using for such purpose, the tax identification number of the Purchaser.   All investment income earned from the investment of the Earnest Money, if any, shall be added to and become a part of the Earnest Money and shall be applied toward the Purchase Price if Closing is completed in accordance with this Agreement; otherwise all interest shall be payable to the party entitled to the Earnest Money and all investment fees.

## 2.    CLOSING DATE: CONVEYANCE: POSSESSION

(a)    **Closing Date.**  The closing ("Closing") shall be May 29, 2009 (**"Closing Date"**), which is two (2) business days following the expiration of the Feasibility Period.  Closing will occur at the offices of the Title Insurer in Chicago, Illinois.

(b)    **Conveyance.**  At the Closing, Seller shall convey to Purchaser or to Purchaser's nominee title to the Real Estate by recordable Special Warranty Deed, subject only to the Permitted Exceptions, and to such exceptions as may have been created by, through or under the Purchaser free and clear of any other possessory rights of third parties other than those arising under the Permitted Exceptions.

## 3.    FEASIBILITY PERIOD

(a)    **Feasibility Period.**   Notwithstanding anything in this Agreement to the contrary, Purchaser shall have the right to terminate this Agreement by written notice to Seller given on or before 5:00 PM on May 27, 2009 (the **"Feasibility Period"**) based upon whether or not Purchaser is, in Purchaser's sole discretion, satisfied with all aspects of the Real Estate, its physical and environmental condition, and all other matters deemed relevant by Purchaser in determining the suitability of the Real Estate for acquisition by Purchaser. Upon any termination of this Agreement by Purchaser pursuant to the provisions of this Paragraph 4(a) the Earnest Money shall be refunded to Purchaser and thereafter, neither party shall have any further obligation to the other under this Agreement or otherwise in connection with the Real Estate. If Purchaser does not timely give written notice to Seller on or before the end of said Feasibility Period of Purchaser's election to terminate this Agreement, then Purchaser shall be conclusively deemed to have elected to waive its right to terminate this Agreement under this paragraph, and such right of termination shall thereafter permanently lapse and expire.

(b)    **Access.**   Seller shall afford to Purchaser and Purchaser's agents, representatives and contractors reasonable access to the Real Estate during the Feasibility Period for the purpose of making or conducting such soil, environmental and engineering tests and other reasonable inspections and investigations thereof as Purchaser may deem appropriate, all at Purchaser's sole cost and expense, except that Purchaser shall not undertake any Phase II analyses or other invasive testing without Seller's prior written consent. If Purchaser intends to enter upon the Real Estate, Purchaser shall so advise Seller and shall, prior to such entry provide Seller with evidence of commercial general liability coverage maintained by Purchaser insuring against claims arising out of bodily injury, death or property damage based upon acts or omissions of Purchaser, its agents, employees or contractors, in connection with any entry or inspections of the Real Estate pursuant to the provisions hereof, with a combined single limit of not less than $1,000,000.00.

2

(c)   **Indemnity.** Purchaser shall at all times indemnify, defend and hold Seller harmless from and against any costs, damages, liabilities, losses, expenses, liens or claims (including, without limitation, reasonable attorney's fees) arising out of or relating to any entry on the Real Estate by Purchaser, its agents, employees or contractors in the course of performing the inspections, testing, services or other inquiries provided for in this Agreement, including without limitation damage to the Real Estate or release of hazardous substances or materials onto the Real Estate, excluding, however, any costs incurred by Seller in supervising Purchaser's testing, and excluding, further, any damages or liabilities arising from Seller's negligent acts or omissions. The foregoing indemnity survives the termination of this Agreement or Closing.

(d)   **Reports.** All reports and studies obtained by Purchaser during the Feasibility Period shall be at Purchaser's sole cost and expense. Purchaser shall, at Seller's request, provide copies to Seller of all studies and reports completed by Purchaser during the Feasibility Period.

(e)   **Seller to Provide Materials.** Purchaser acknowledges that Seller has provided to Purchaser copies of the materials specified on Exhibit B ("**Ownership Materials**") concerning the Real Estate. All of said Ownership Materials shall be returned to Seller in the event this Agreement is terminated without a Closing.

## 4.   PARTICULAR PROPERTY MATTERS

(a)   **Farm Lease.** Seller shall assign the Farm Lease to Purchaser at Closing. At Closing the rental payable under the Farm Lease shall be prorated as of the Closing Date. Purchaser shall be liable for the payment of all damages or costs payable under the Farm Lease arising from Purchaser's activities on the Land prior to or following Closing.

(b)   **Com Ed Matter.** Purchaser acknowledges that Seller has been engaged in negotiations with Commonwealth Edison ("**Com Ed**") to grant an easement in approximately the location shown on the drawing included with the Ownership Materials (the "**Com Ed Easement**"). Purchaser agrees that it shall take title and possession of the Real Estate subject to the rights of Com Ed to the Com Ed Easement whether or not Seller's agreement with Com Ed is finalized prior to Closing. Further, Purchaser agrees that any monies payable by Com Ed in consideration of the grant of the Com Ed Easement shall belong to and be remitted to Seller if paid by July 1, 2010. If paid after July 1, 2010, any monies or consideration shall be shared equally between Purchaser and Seller, and the party receiving such consideration or monies shall pay the other party one-half of such amount within ten (10) days following receipt therefor. This provision shall survive Closing. If the Com Ed Easement is not recorded prior to the Closing, Purchaser shall execute and deliver to Title Insurer a Joinder to the Com Ed Easement to subject its title to the Com Ed Easement. Purchaser agrees that there shall be no adjustment to the Purchase Price because of any area encumbered by the Com Ed Easement.

## 5.   TITLE INSURANCE AND SURVEY

(a)   **Title Commitment.** On or before May 21, 2009, Seller shall deliver, or cause to be delivered, to Purchaser a title insurance commitment ("**Commitment**") from First American Title Insurance Company (the "**Title Insurer**") for an ALTA owner's title insurance policy ("**Owner's Title Policy**") in the amount of Ten Thousand Dollars ($10,000.00) covering the

3

Real Estate, which shall be issued by Title Insurer. At Closing, Seller shall cause the Title Insurer to issue to Purchaser the Owner's Title Policy in the full amount of the Purchase Price and subject only to the Permitted Exceptions. The Owner's Title Policy shall be conclusive evidence of good title as therein shown, subject only to the exceptions therein stated.

(b)     **Survey.** On or before May 21, 2009, Seller shall deliver a current survey, (to be not more than six (6) months old at the time of Closing) of the Real Estate, prepared in accordance with ALTA standards by a licensed Illinois surveyor and to be of the same type and kind and with the same information as shown on the survey prepared by Smith Engineering Consultants Inc. on September 28, 2004 and designated as Job No. KIRC-040611-4.

(c)     **Permitted Exceptions.** Purchaser shall notify Seller in writing ("**Purchaser Title Defect Notice**") within five days after receipt of the Commitment, (the "**Title Review Period**") of any exceptions disclosed in Schedule B of the Commitment or matters shown on the survey which are objected to by Purchaser. Unless objected to by Purchaser in Purchaser Title Defect Notice delivered during the Title Review Period, all title exceptions and survey matters shall be deemed the "**Permitted Exceptions.**" The Permitted Exceptions shall be deemed to include the Farm Lease and the Com Ed Easement.

(d)     **Title Defects: Correction: Termination.** Seller shall have a period of five days (such time being hereinafter called the "**Title Correction Period**") following receipt of Purchaser Title Defect Notice within which to (i) have the Title Defect removed from the Owner's Title Policy at Closing or (ii) have the Title Insurer commit, by way of endorsement or otherwise on the Owner's Title Policy, to insure Purchaser against loss or damage that may be occasioned by such Title Defect on terms and conditions that are customary (in which case the Title Defect shall be deemed to have been thereby removed and resolved). If Seller fails or refuses to have the Title Defect removed or insured over within the Title Correction Period, then, Seller shall have no liability to Purchaser on account thereof and, instead, Purchaser may, as Purchaser's sole and exclusive remedy, either: (x) terminate this Agreement by written notice to the Seller given prior to the end of the Feasibility Period or, if the Feasibility Period has already expired, then 3 days following the end of the Title Correction Period, in which event the Earnest Money shall be refunded to Purchaser, or (y) elect, upon notice to Seller prior to the expiration of the Feasibility Period, or if the Feasibility Period has already expired, then 3 days following the end of the Title Correction Period, to take title as it then is, subject to such Title Defects, but without the right to deduct from, or set off against the Purchase Price any amount by reason of such Title Defect.

6.     **REPRESENTATIONS, WARRANTIES AND COVENANTS**

(a)     **Seller's Representations.** Seller hereby represents, warrants and covenants to Purchaser that, except as otherwise set forth, that as of the Acceptance Date and as of the Closing Date:

(i)     Seller owns fee simple marketable and insurable title to the Real Estate and except as arising under the Permitted Exceptions, there are no leases, tenants or other parties in possession of or claiming a right to possession of the Real Estate.

(ii)     The execution of this Agreement has been authorized by Seller and this

4

Agreement is binding on Seller and enforceable against Seller in accordance with its terms.

(iii)    Except for any possible condemnation, easement or right-of-way grant in favor of Com Ed or liens for ascertainable amounts to be satisfied at or prior to Closing, Seller has received no written notice of any condemnation, eminent domain or judicial proceedings, administrative actions, governmental investigations, examinations, claims or demands of any type which have been instituted or are pending against the Real Estate.

(iv)    Seller is a "United States Person" within the meaning of Section 1445 (f)(3) of the Internal Revenue Code of 1954, as amended and shall execute and deliver an "Entity Transferor" certification on the Closing Date;

(v)    Other than documents of record disclosed on the Commitment or in the Ownership Materials, there are no written agreements in effect between the Seller and the Village of Huntley or other governmental authorities which would adversely affect or impair the development of the Property.

(vi)    Seller has not received written notice of the alleged existence of, and has no knowledge that there has been a release on the Real Estate (including the surface or sub-surface of the land, the water thereon or groundwater thereunder) of any Hazardous Materials, nor any written notice from any governmental agency of any pending investigation or the assertion of claims which could result in potential liability relating to the release of Hazardous Materials at, on or from the Real Estate. As used herein, **"Hazardous Materials"** means any: (A) hazardous waste as defined in the federal Resource Conservation and Recovery Act of 1976, as amended, and applicable regulation; (B) hazardous substance as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and applicable regulations; (C) petroleum or liquid petroleum products or wastes; or (D) other toxic or hazardous substance which may be regulated from time to time by federal, state or local environmental laws.

As used in this Agreement, the phrase "knowledge" shall mean the actual knowledge of Paul Rose and John Carroll who are familiar with Seller's past activities and plans for the Land (and not any constructive or imputed notice or knowledge) without any duty of independent investigation, inspection or inquiry.

If Purchaser discovers any occurrence of any event or circumstance that makes any representation or warranty of Seller to Purchaser under this Agreement untrue or misleading in any material respect, Purchaser shall notify Seller within three (3) business days of such discovery. If Seller is not capable of curing such matter, Seller shall notify Purchaser, in which event, in addition to any other rights and remedies under this Agreement, Purchaser shall have the right to terminate this Agreement within five days following Seller's notice. If Purchaser nonetheless proceeds to Closing, Purchaser shall have waived any right it might have to pursue any claim against Seller arising from such breach of a representation or warranty and the representation or warranty of Seller shall be deemed modified to the extent of such information.

(b)    **Purchaser's Representations.**    Purchaser hereby represents, warrants and covenants to Seller that as of the Acceptance Date and on the Closing Date:

5

(i)    That Purchaser is an individual and has full power and authority to purchase the Real Estate and conduct its business as described herein in accordance with the terms of this Agreement;

(ii)    This Agreement has been duly authorized by Purchaser and is binding on Purchaser and enforceable against Purchaser in accordance with its terms.

(c)    **Survival of Representations.**  The representations of Seller and Purchaser as contained in this paragraph or elsewhere in this Agreement shall survive the Closing for a period of 180 days and, thereafter, shall be deemed to have been extinguished.

7.    <u>AS IS</u>

(a)    **Limitation as to Seller's Representations and Warranties.**    Except as expressly set forth in this Agreement and in any other document executed and delivered by Seller to Purchaser at Closing, Seller has not made, and does hereby expressly disclaim, any representations, warranties or other statements as to the Real Estate.  Purchaser acknowledges that (i) it has had full opportunity to inspect the Real Estate and investigate all matters deemed relevant by Purchaser thereto and (ii) Purchaser is relying upon the results of Purchaser's own inspections the documents enumerated on Exhibit B that were delivered by Seller to Purchaser and other information obtained or otherwise available to Purchaser.

(b)    **As-Is.**  Purchaser acknowledges that at the Closing, Purchaser shall be purchasing the Real Estate on an **"AS IS, WHERE IS"** basis and, except for those representations and warranties expressly set forth in this Agreement, without relying on any representations and warranties of any kind whatsoever, express or implied, from Seller, its agents, or brokers as to any matters concerning the Real Estate.  Except as expressly set forth in this Agreement, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or by any partner, officer, person, firm, agent or representative acting or purporting to act on behalf of Seller.  Seller makes no representation as to the accuracy or completeness of any of the Ownership Materials. Without in any way limiting the generality of the foregoing provisions of this Section, Purchaser shall satisfy itself as to such of the following matters it deems relevant: (i) the physical components of all portions of the Real Estate;  (ii) the surface and subsurface of the Real Estate including all soil, engineering, environmental and other matters connected therewith, (iii) such state of facts as an accurate survey would show, (iv) the availability of access to public roads and highways and adequate utilities, water and sewer services, (v) the possible existence of violations of environmental or other laws, statutes, codes or ordinances applicable to the Real Estate, (vi) Purchaser's ability to obtain engineering and site plan approvals, plat of subdivision approvals, building permits, certificates of occupancy and other licenses or permits for the development, marketing, use, and operation of the Real Estate, and (vii) any other state of facts which exists with respect to the Real Estate.  If Purchaser does not terminate this Agreement during the Feasibility Period, Purchaser shall be deemed to have accepted the foregoing condition and matters relating to the Real Estate, subject to the express representations and warranties made by Seller herein.

8.    <u>CLOSING ESCROW</u>

6

The Closing shall be a New York Style closing and take place at the office of the Title Insurer through a deed and money escrow (**"Closing Escrow"**) with the Title Insurer, using escrow instructions then in use by the Title Insurer, modified to conform to the terms and conditions of this Agreement. The parties shall do all that is customarily required so that the Title Insurer will issue the Owner's Title Policy to Purchaser or its designee on the Closing Date upon receipt of all of the Purchaser's and Seller's deposits. The cost of the Closing Escrow and New York Style Closing shall be equally divided between Seller and Purchaser, provided however, Seller shall have no obligation for the payment of any escrow fee relating to Purchaser's lender's escrow, if any. This Agreement shall not merge with the escrow agreement and shall be deemed controlling. The respective attorneys for Seller and Purchaser are hereby authorized to enter into and execute such escrow agreement and any amendments thereto.

9.    **TAXES; COSTS**

        (a)    **Taxes.** All real estate charges and assessments affecting the Real Estate for tax years for which a bill has not been issued shall be prorated on the basis of 105% of the most recent tax bill, said proration shall be final as of the Proration Date.

        (b)    **Closing Costs.** Seller shall pay the cost of recording any releases, documentary or transfer taxes (imposed at the state or county level) payable in connection with the delivery of any instrument or document provided in or contemplated by this Agreement, and one-half (1/2) of the deed and money escrow charges and one-half (1/2) of the New York Style closing fees, all title charges and expenses of, or relating to, the issuance of the Title Policy in the form required by Paragraph 5, and all other closing costs and expenses normally and customarily paid by sellers of real estate, generally necessary to effectuate the sale contemplated by this Agreement, shall be paid by Seller. Purchaser shall pay one-half (1/2) of any deed and money escrow charges and New York Style closing fee, costs for any transfer taxes imposed at the municipal level, costs for any title endorsements, title charges for any mortgagee's title policy, any money lender's escrow charge, and other costs and expenses normally and customarily paid by purchasers of real estate generally shall be paid by the Purchaser.

10.    **CONDEMNATION**

        (a)    If at any time prior to the Closing all or any significant portion of the Real Estate is condemned or taken by eminent domain proceedings by any public authority, or notice of such an intended condemnation or taking is given by any governmental body having such authority, and Purchaser, in the exercise of commercially reasonable judgment, determines that the portion of the Real Estate so taken shall materially and adversely affect its development of the Real Estate, then Purchaser may terminate this Agreement and the Agreement shall be cancelled with no further liability of either party to the other and the Earnest Money shall be returned to Purchaser.

        (b)    If Purchaser elects not to terminate (or is not permitted to terminate) this Agreement because of any partial or total condemnation or taking, then in any such case, all condemnation and insurance proceeds paid or payable to Seller shall belong to Purchaser and shall be paid over and assigned to Purchaser at closing.

11.  **BROKER'S COMMISSION**

Except for Darwin Realty & Development Corporation (the "**Broker**") who is representing Seller in this transaction, Purchaser and Seller represent to each other that neither of them has used any other real estate broker or agent in connection with this transaction. Seller agrees to pay a commission to Broker pursuant to a separate brokerage agreement. Except for Seller's obligation to pay the commission due Broker, each party hereby agrees to indemnify and hold the other harmless from and against any and all claims, demands, costs, liabilities or expenses asserted by any broker and arising out of any breach by such indemnifying party of the representation contained herein.

12.  **BREACH: REMEDIES**

(a)  **Seller Defaults Discovered Before Closing: Limitation of Remedies.**  Subject to paragraph 12(f) below, if Seller defaults hereunder and Purchaser has knowledge of such default prior to the Closing, except as otherwise expressly provided in Paragraph 12(b) below or elsewhere herein, Purchaser may, as its sole and exclusive remedy, either (i) terminate this Agreement and obtain from Seller the return of the Earnest Money and all interest thereon and be entitled to receive reimbursement for actual out of pocket expenses incurred by Purchaser in connection with this transaction, up to a maximum of Fifty Thousand Dollars ($50,000) to be paid within five (5) days after receipt of appropriate supporting documentation, or (ii) obtain an order of court of competent jurisdiction specifically enforcing this Agreement as against the Seller.

(b)  **Seller Breach First Discovered After the Closing.** Nothing herein shall prohibit Purchaser from seeking actual damages proximately caused by any misrepresentation or breach on the part of Seller first discovered by Purchaser after Closing but before the expiration of the 90th day following said Closing of any of Seller's representations and warranties contained herein, provided that Seller's liability for such actual, out-of-pocket damages shall be limited to $50,000.00 in the aggregate.

(c)  **Purchaser Default.**  Subject to paragraph 12(f) below, if Purchaser defaults hereunder, Seller shall be entitled, as its sole and exclusive remedy, to terminate this Agreement and retain the Earnest Money, and all interest thereon, as liquidated damages as Seller's sole remedy.

(d)  **Damage Limitation.**  Notwithstanding anything to the contrary provided or allowed for herein or under Illinois law, the monetary damages to which any party may be entitled as a result of any breach or default by the other party shall be limited to actual compensatory damages, and no party shall have a right to recover any special, consequential, exemplary or punitive damages.

(e)  **Litigation Costs.**  In any action or proceeding between the parties arising out of or in connection with this Agreement, or the breach or enforcement hereof (i) venue shall lie in the State of Illinois, and (ii) the party prevailing in such proceeding shall be entitled to recover its/their costs and expense, including reasonable attorneys' fees, from the non-prevailing party.

(f)    **Cure.**  Notwithstanding anything to the contrary in this paragraph 12 or elsewhere in this Agreement, neither party shall be deemed to be in default hereunder with respect to any breach of such party's obligations hereunder unless such breach continues for more than ten (10) days following written notice thereof to the party committing such breach.

13.    **NOTICES**

All notices required or desired to be given under this Agreement shall be in writing and delivered personally or sent by recognized overnight delivery by registered or certified mail, postage prepaid, return receipt requested, or by facsimile telecopy addressed as follows:

(a)    If to Seller:

The Kirk Corporation
201 Juniper Circle
Streamwood, Illinois 60107
Attn:   Mr. John P. Carroll
Fax No:  630.830.8339

with a copy to:

Meltzer, Purtill & Stelle LLC
1515 East Woodfield Road
Second Floor
Schaumburg, Illinois  60173
Attn:  Mr. Brian Meltzer/Ms. Joy Goldman
Fax No.  847.330.1231

(b)    If to Purchaser:

Joseph Valente
700 Tollgate Road
Elgin Illinois 60123
Fax No.  847-695-7117

with a copy to:

Marvin H. Glick & Associates
208 S. LaSalle St.
Ste. 1650
Chicago, IL 60604

Attn:  Marvin H. Glick
Fax No. 312-346-3242

9

or to such other address as either party may from time to time designate by written notice given to the other party. Notices shall be deemed properly delivered and received (i) one business day after deposit with overnight courier; or (ii) the same day when sent during a business day by confirmed facsimile between the hours of 9:00 am and 5:00 pm (central time) with a copy sent by overnight courier; or (iii) three business days after mailing, if delivered by registered or certified mail.

14.  **PURCHASE OPTION/RIGHT OF FIRST REFUSAL**

(a)  **Purchase Option.** For a period of five (5) years following the Closing Date (the "**Option Term**"), Seller or any affiliated entity or person (the "**Seller Affiliates**") shall have the option (the "**Purchase Option**") to acquire the Real Estate from Purchaser at a price equal to the Purchase Price, to be increased by an amount equal to thirteen per cent per annum compounded annually, for each year or partial year following the Closing Date, (the "**Option Price**"). For example, if Seller Affiliates exercises the Purchase Option in the thirteenth month following the Closing Date, the Option Price shall equal $3,200,000 + $416,000 (first year adjustment at 13%) + $$470,080 (partial second year adjustment at 13% of $3,616,000). If Seller Affiliates elects to exercise the Purchase Option, Seller Affiliates shall first deliver written notice to Purchaser. The Purchase Option shall become null and void after the expiration of the Fifth anniversary from the date of Closing.

(b)  **Rights of First Refusal.** If at any time during the Option Term, Purchaser received an offer which it intends to accept to sell the Real Estate to an unrelated third party in an arms-length, bona fide transaction (the "**Third Party Offer**"), Purchaser shall notify Seller in writing by delivery of a notice which shall include the Third Party Offer (the "**Sale Notice**"). In the event Purchaser delivers a Sale Notice, the Purchase Option shall not be exercisable, and in lieu thereof, Seller Affiliates shall have the option (the "**First Refusal Option**") to purchase the Property for the price and subject to the terms and conditions set forth in the Third Party Offer (the "**Third Party Price**"). Purchaser agrees that during the first year of the Option Term, Purchaser shall not market the Real Estate nor solicit or accept any offer from any person to acquire the Real Estate, or enter into any other transaction to transfer the Real Estate.

(c)  **Exercise of Option.** Seller Affiliates' rights to purchase the Real Estate, whether pursuant to the Purchase Option or the First Refusal Option, shall be referred to generally herein as the "**Option**". During the Option Term Seller Affiliates may exercise the Option (i) at any time within fifteen (15) days following the delivery of a Sale Notice, with respect to the First Refusal Option or (ii) during the Option Term with respect to the Purchase Option. Seller Affiliates shall exercise the Option by delivering to Purchaser a contract in the form substantially similar to this Agreement to purchase the Real Estate at the Third Party Price or with respect to the Purchase Option, at the Option Price, as the case may be, AS IS, without financing or other contingencies (other than the requirement to deliver a deed, survey and title insurance policy (the "Contract")); provided, however, that if the Option arises as a result of a First Refusal Option, at Seller Affiliate's option, the Contract may include any contingencies, representations, warranties and payment terms included in the Sale Notice. The Contract shall provide that the purchase price shall be paid in cash (or if applicable, the terms in the Third Party Offer) on a closing date selected by Seller Affiliates, which shall be not more than 60 days following the exercise of the Option (the "**Closing Date**"). Seller or Seller Affiliates may assign its rights under this Article.

10

Notwithstanding anything herein contained to the contrary, if Seller Affiliates exercises the Purchase Option, Seller Affiliate shall pay all title costs of Purchaser, transfer stamps, survey costs and all other closing costs and expenses normally and customarily paid by sellers of real estate, generally necessary to effectuate the sale contemplated herein and the Title Insurer shall be selected by Purchaser. In the event of the exercise of the First Refusal Option, such costs shall be allocated between Purchaser and Seller payable in accordance with the terms of the Third Party Offer.

(d)    **Failure of Seller Affiliates to Exercise.** If Seller Affiliates fails to exercise the Option following delivery of a Sale Notice, Purchaser shall have the right to consummate the sale of the Real Estate pursuant to the Third Party Offer within 180 days of the Sale Notice, free of Seller Affiliate's rights under this Article and upon the Closing, the Purchase Option and First Refusal Option shall both expire. If Purchaser fails to consummate the sale to the Third Party Purchaser pursuant to the Sale Notice within such 180 day period, all rights of Seller and Seller Affiliates under this Article shall be reinstated and in full force and effect for the remainder of the Option . If there is any modification to the Third Party Offer which reduces the Third Party Price by more than 10%, then prior to consummating such transaction, Purchaser shall deliver a Sale Notice to Seller with respect to the reduced Third Party Price.

(e)    **Subordination of Purchase Option.** The rights of Seller Affiliates with respect to an Option arising from a Sale Notice shall not be effective with respect to any transfer of the Real Estate arising from the exercise by a mortgagee of its remedies following a default by Purchaser (whether by foreclosure or a deed in lieu of foreclosure), except that any foreclosure purchaser shall, with respect to any subsequent transfer of the Real Estate, be bound by the terms hereof. Further, notwithstanding the foregoing, Seller Affiliates may exercise the Option at any time that foreclosure purchaser holds title to the Real Estate.

(d)    **Recording.**    Purchaser agrees to execute for the benefit of Seller the Memorandum of Option Rights attached hereto as Exhibit C (the **"Memorandum"**). Seller shall at its expense record the Memorandum.

## 15.    <u>MISCELLANEOUS.</u>

(a)    Time is of the essence of this Agreement. In the event the time for performance or the giving of a notice hereunder falls on a Saturday, Sunday or State or Federal or other legal holiday, the time for performance shall be on the next day that is not a Saturday, Sunday, State or Federal or other legal holiday.

(b)    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, personal representatives, successors and permitted assigns.

(c)    This Agreement may be executed in counterparts, each of which shall constitute an original, and all together shall constitute one and the same Agreement.

(d)    The terms, warranties, representations, provisions, covenants and indemnities shall survive the Closing and delivery of the deeds, and this Agreement shall not be merged therein, but shall remain binding upon and for the benefit of the respective parties and their successors, assigns, transferees and designees hereto until fully observed, kept or performed.

11

(e)    The captions at the beginning of the several paragraphs are for convenience exclusively and are not part of the text.

(f)    In the event any terms or provisions of this Agreement shall be held illegal, invalid or unenforceable or inoperative as a matter of law, the remaining terms and provisions of this Agreement shall not be affected thereby, but each such term and provision shall be valid and shall remain in full force and effect.

(g)    This Agreement shall be governed by the internal laws of the State of Illinois.

(h)    By virtue of this Agreement, neither party, in any way or for any purpose shall become or be deemed a partner of the other in the conduct of its business or otherwise, or become or be deemed a joint venturer or a member of a joint enterprise with the other.

(i)    In the event of default hereunder, the parties hereby waive formal tender of deed and money.

(j)    Purchaser shall have the right to assign this Agreement to an affiliated entity in which Purchaser or an affiliate of Purchaser holds an economic interest of such entity. Purchaser shall have the right at Closing to designate a party or entity to which Seller shall convey the Real Estate. Such assignee or designee shall be entitled to all of the benefits of this Agreement. No assignment or designation shall operate to release or relieve Purchaser of any liability or obligation under this Agreement.

(k)    This Agreement is and shall be deemed and construed to be the joint and collective work product of Purchaser and Seller and, as such, this Agreement shall not be construed against either party, as the otherwise purported drafter of same, by any court of competent jurisdiction in order to resolve any inconsistency, ambiguity, vagueness or conflict in terms or provisions, if any, contained herein.

(l)    This Agreement constitutes the entire Agreement of the parties with respect to the subject matter set forth herein, all other and prior agreements and understandings having been merged herein and extinguished hereby.

16.    **NO RECORDING**

Purchaser shall not record this Agreement or any memorandum or declaration concerning this Agreement, and any breach by Purchaser of the foregoing prohibition shall result in an automatic termination of this Agreement (to the extent this Agreement has not, by the date of such recording, already been terminated), except that the foregoing restriction shall not apply to the recording of a Memorandum of Option Rights described in Paragraph 14 hereof.

*(SIGNATURES ON FOLLOWING PAGE)*

12

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date this Agreement is signed by whichever of the signatories herein below is the last to sign this Agreement.

**PURCHASER:**

**JOSEPH VALENTE**

Executed: May 7, 2009

**SELLER:**

**FREEMAN ROAD DEVELOPMENT, LLC**

By: The Kirk Corporation, its manager

By: _____
Name: John P. Carroll, President

Executed: May 7, 2009

**Exhibit A**

LEGAL DESCRIPTION OF REAL ESTATE

That part of the Northeast Quarter and that part of the Northwest Quarter of the Southeast Quarter of Section 16, Township 42 North, Range 7 East of the Third Principal Meridian, lying northerly of the northerly Right-of Way line of the Northwest Toll Highway Excepting therefrom that part of the Northwest Quarter of the Southeast Quarter, lying Easterly of a line that is 145.0 feet Westerly of, measured at right angles thereto, and parallel with the East Line of said Northwest Quarter of the Southeast Quarter, and also Excepting that part of the Northwest Quarter of the Southeast Quarter taken by the Illinois State Highway Commission as Parcel # N-4C-40.1 in the Township of Rutland, Kane County, Illinois.

And

That part of the Northwest Quarter of the Southeast Quarter of Section 16, Township 42 North, Range 7 East of the Third Principal Meridian lying northerly of the northerly right of way line of the Northwest Tollway and lying Westerly of a line 145 feet Westerly, measured at right angles and parallel with the East Line of the West Half of the Northeast Quarter and said line extended southerly (except that part taken for highway), in Rutland Township, in Kane County, Illinois.

{05919: 121: 00434515.DOC :7 }

## EXHIBIT B

### OWNERSHIP MATERIALS

1.  Plat of Survey by Smith Engineering Consultants dated 08/11/2004, revisions 08/28/2004.

2.  Drain Tile Investigation Plan by Huddleston-McBride Co. dated 12/05/2005.

3.  Exhibit C by Mackie Consultants dated 03/11/09 showing Proposed Commonwealth Edison Easement.

4.  IDNR Consultation Renewal dated 08/08/2008.

5.  IHPA Letter dated 07/08/2008.

6.  FAA Determination Letter dated 03/01/2006.

7.  H. H. Holmes Testing Laboratories, Inc. Reports dated 07/14/2004, 03/07/2006, and 09/12/2006.

8.  Phase I Environmental Site Assessment by V3 Consultants dated 11/10/2004.

9.  Army Corps Jurisdictional Determination Letter dated 10/27/2005.

10. Kane-Dupage Soil and Water Conservation District – Land Use Opinion dated 11/24/2004.

11. Phase I Archeological Investigation by Archeological Research, Incorporated dated 11/2005.

12. Final Wetland Delineation and Assessment Report by V3 Consultants dated 11/02/2004, revised 02/17/2005.

13. Farm Lease

**EXHIBIT C**

Form of Memorandum of Option Rights

THIS INSTRUMENT PREPARED
BY AND AFTER RECORDING
RETURN TO:

Joy S. Goldman
Meltzer Purtill & Stelle, LLC
300 South Wacker
Suite 3500
Chicago, Illinois  60606

## MEMORANDUM OF OPTION RIGHTS

This Memorandum of Option Rights (this "Memorandum") is dated as of _MAY 7_, 2009 by and between Freeman Road Development, LLC, an Illinois limited liability company ("Freeman ") and JOSEPH VALENTE as Trustee or the successor trustee of the JOSEPH VALENTE REVOCABLE TRUST dated December 22, 1983 as now or hereafter amended ("Owner").

## RECITALS:

In connection with Owner's acquisition of the certain vacant land consisting of approximately 164 acres located along Freeman Road, east of Route 47 in unincorporated Kane County Illinois and legally described on Exhibit A attached hereto (the "Property"), Owner has granted certain rights to Freeman, its affiliates and assignees to acquire the Property.  For purposes of providing notice to others only, the parties hereby confirm that for a period of five (5) years from the date hereof, Freeman has rights, whether pursuant to the exercise of an  option or a right of first refusal, to acquire the Property.

This Memorandum is made solely for purposes of creating record notice of the rights granted to Freeman and does not in any manner amend, enlarge or reduce the respective rights, privileges, liabilities or obligations of either party.   The rights granted to Freeman, and this Memorandum thereof,  shall be of no further force and effect after the expiration of five years from the date hereof and Freeman has no right to extend the effective period of such option or right of first refusal.

This Memorandum may be signed in multiple counterparts, each of which constitute an original and, taken together, shall constitute a single agreement.

The parties hereto have caused this Memorandum to be executed as of the date first above written.

{05919: 121: 00437605.DOC :2 }                    17

*signatures on the following pages*

OWNER:

By: _____
Joseph Valente as Trustee aforesaid


FREEMAN:

Freeman Road Development, LLC, an Illinois
limited liability company

By:   The Kirk Corporation, its manager

    By: _____
    Name: John Carroll, President

{05919: 121: 00437605.DOC :2 }          19

**EXHIBIT A**

**Legal Description**

LEGAL DESCRIPTION OF REAL ESTATE

That part of the Northeast Quarter and that part of the Northwest Quarter of the Southeast Quarter of Section 16, Township 42 North, Range 7 East of the Third Principal Meridian, lying northerly of the northerly Right-of Way line of the Northwest Toll Highway Excepting therefrom that part of the Northwest Quarter of the Southeast Quarter, lying Easterly of a line that is 145.0 feet Westerly of, measured at right angles thereto, and parallel with the East Line of said Northwest Quarter of the Southeast Quarter, and also Excepting that part of the Northwest Quarter of the Southeast Quarter taken by the Illinois State Highway Commission as Parcel # N-4C-40.1 in the Township of Rutland, Kane County, Illinois.

And

That part of the Northwest Quarter of the Southeast Quarter of Section 16, Township 42 North, Range 7 East of the Third Principal Meridian lying northerly of the northerly right of way line of the Northwest Tollway and lying Westerly of a line 145 feet Westerly, measured at right angles and parallel with the East Line of the West Half of the Northeast Quarter and said line extended southerly (except that part taken for highway), in Rutland Township, in Kane County, Illinois.

PIN:

### FIRST AMENDMENT TO REAL ESTATE PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO REAL ESTATE PURCHASE AGREEMENT, dated as of May 29, 2009 (the "**First Amendment**") is made between JOSEPH VALENTE, of Elgin, Illinois ("**Purchaser**") and FREEMAN ROAD DEVELOPMENT, LLC an Illinois limited liability company ("**Seller**").

### RECITALS

Purchaser and Seller entered into a Real Estate Purchase Agreement dated May 7, 2009 (the "**Agreement**") with respect to the sale of approximately 164 acres of vacant land located on Freeman Road, east of Route 47 in unincorporated Kane County, Illinois and other associated rights.

Purchaser and Seller desire to amend the Agreement to extend the date for Closing and to provide for a possible bankruptcy filing by the Seller.

ACCORDINGLY, Purchaser and Seller agree to amend the Agreement effective as of the date hereof, as follows:

1.   Definitions. All capitalized terms used herein unless otherwise defined shall have the same meaning attributed to them in the Agreement.

2.   Feasibility Period. Purchaser acknowledges that it has waived any rights to terminate the Agreement pursuant to Paragraph 3 thereof.

3.   Closing Date. The Closing Date is hereby extended to June 30, 2009, as may be further adjusted as provided in Paragraph 4 of this First Amendment.

4.   Bankruptcy of Seller. The following is added as Paragraph 17 of the Agreement.

"17. Bankruptcy of Seller.

(a)   Seller and Purchaser agree that if Seller becomes a debtor, whether voluntarily or involuntarily (a "**Bankruptcy Event**") in a bankruptcy proceeding under the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*, including without limitation, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court (collectively, the "**Bankruptcy Code**" )as now constituted or hereafter amended, such event shall not in and of itself constitute a default or breach by Seller of its obligations hereunder.

(b)   Upon the occurrence of a Bankruptcy Event prior to the Closing Date, it shall be a condition precedent to the obligation of the parties to close the transaction contemplated by this Agreement that the Seller first obtain an order of the Bankruptcy Court which approves the sale of the Real Estate to Purchaser pursuant to Section 363 of the Bankruptcy Code. Seller shall file with the Bankruptcy Court a motion(the "**Motion**") to approve the terms of this Agreement and the procedures for the sale of the Real Estate by auction pursuant to Section 363 of the Bankruptcy

Code (the "Auction"). The Motion shall provide for the Real Estate to be sold at the Auction in accordance with specified procedures and shall seek the prompt entry of an Order by the Bankruptcy Court approving the bid and other procedures ("Auction Procedures"). The Auction Procedures shall be consistent with the Bankruptcy Code and shall provide for notice of the Auction as required by the Federal Rules of Bankruptcy Procedure. The Auction Procedures shall designate Purchaser as the qualified "stalking-horse" bidder and provide for certain bid protections, including a minimum overbid of 5% increments and a break-up fee of 2 1/2% payable to Purchaser as an administrative priority expense in the event another qualified bidder prevails at the Auction.

(c)     If a Bankruptcy Event has occurred and Purchaser is the successful bidder then the Closing Date shall be a date which is seven (7) business days after entry of a final order confirming the results of the auction.

(d)     If the Auction has not occurred by July 31, 2009, Purchaser may, upon written notice to Seller, terminate this Agreement and all Earnest Money shall be refunded to Purchaser.

(e)     The provisions of this paragraph shall govern, prevail and control over any conflicting provision of the Agreement."

5.     Continuation.  Except as specifically modified and amended as set forth in this First Amendment, the Agreement is hereby ratified and confirmed by Seller and Purchaser and shall remain in full force and effect and enforceable in accordance with its terms.

6.     Counterparts.  This First Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute one agreement.  To facilitate execution of this First Amendment, the parties may execute and exchange by facsimile or e-mail counterparts of the signature pages, which shall have the same effect as an original.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Real Estate Purchase Agreement on the date first above written.

PURCHASER:                    SELLER:

_____       FREEMAN ROAD DEVELOPMENT LLC, an
Joseph Valente                Illinois limited liability company

                              By: The Kirk Corporation, its manager

                              By: _____
                                  John P. Carroll

(05919: 121: 00443982.DOC :4 )

**EXHIBIT B**

COM ED EASEMENT AGREEMENT

After completion of construction of the Facilities and following any other work in the Easement Area, Grantee will promptly restore the surface of the portions of the Easement Area subject to such construction to as near as reasonably possible its condition when first entered upon by Grantee.

The Grantor reserves the right to use the surface of the Easement Area for open space purposes only, and such use shall be subject to the rights and easements herein granted to Grantee, and shall be exercised in such manner as not to interfere with the construction, operation, maintenance, patrol and use of the Facilities by Grantee. No building, structure or obstruction shall be placed, erected or used by Grantor on the Easement Area. Grantor shall make no changes in the grade that would increase or decrease the existing ground elevation of the Easement Area by more than 1.5 feet, except in the storm water detention pond and compensatory storage areas shown on Exhibit C. The high water line of the proposed storm water detention pond in Exhibit C is outside of the Easement Area, but the grading transition away from the storm water detention pond will include a portion of the Easement Area. Other than as shown on Exhibit C, no ponds, ditches, water storage facilities, irrigation systems, underground pipe or other facilities (other than nonmetallic farm drainpipe) shall be placed in the Easement Area by Grantor without obtaining the prior written consent of the Grantee. Grantor shall not permit any burning or composting to be done in the Easement Area without obtaining the prior written consent of the Grantee.

No flammable or explosive materials or hazardous waste shall be used, brought, stored or burned by Grantee or any other person or entity (including Grantor) on the Easement Area. No vehicles, equipment or anything else (including, but not limited to, any equipment attached to vehicles or equipment such as antennas) having a height which exceeds the maximum allowable height under applicable OSHA height standards in effect from time to time shall be driven, moved or transported on the Easement Area by anyone other than Grantee without Grantee's prior written consent.

This Easement constitutes the entire agreement, expressed or implied, between the parties hereto with respect to the subject matter hereof, and shall be binding upon and inure to the benefit of, Grantor and Grantee and their respective legal representatives, heirs, successors, assigns, lessees and licensees (including, without limitation, any and all successors to Grantor in title to the Easement Area and the property adjacent thereto). This Easement and the terms, conditions and rights contained herein shall run with the land and shall be perpetual. Grantee shall not be permitted to grant any sub-easements or grant any rights of use to the Easement Area to any other person or entity, except as part of Grantee's business operations or as part of assigning all of Grantee's right, title and interest in and to this easement.

If any term, provision or condition in this Easement shall, to any extent, be invalid or unenforceable, the remainder of this Easement (or the application of such term, provision or condition to persons or circumstances other than in respect of which it is invalid or unenforceable) shall not be affected thereby, and each term, provision and condition of this Easement shall be valid and enforceable to the fullest extent permitted by law. The terms and provisions of this Easement shall be governed by and construed in accordance with the laws of the State of Illinois. The rule of strict construction does not apply to the rights and easements contained herein. Such rights and easements shall be given a reasonable construction in order that the intention of the parties to confer a commercially useable right of enjoyment to Grantee without imposing any burden on Grantor which was not contemplated by this Easement shall be effectuated. The parties acknowledge that the parties and their counsel have reviewed and revised this Easement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Easement or any exhibits hereto. It is expressly agreed that no breach of this Easement shall entitle any party to cancel, rescind or otherwise terminate this Easement, but such limitation shall not impair the ability of any party to exercise any and all remedies available at law or in equity in any legal proceeding related thereto. This Easement cannot be changed orally or by course of conduct, and no executory agreement, oral agreement or course of conduct shall be effective to waive, change, modify or discharge it in whole or in part unless the same is in writing and is signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

*(continued on next page)*

2

This Instrument was Prepared by
and After Recording Return to:

Ronald Dyslin
ComEd Real Estate & Facilities
Three Lincoln Centre, 4th Floor
Oakbrook Terrace, IL 60181

## GRANT OF RIGHT-OF-WAY EASEMENT

_____, [the person or entity who is the successful bidder at the bankruptcy court auction ] ("Grantor"), of the County of Cook, State of Illinois, having an address at 502 Philip Drive, Bartlett, Illinois 60103, in consideration of the sum of TEN DOLLARS ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby grant and convey to COMMONWEALTH EDISON COMPANY, an Illinois corporation, having an address at P.O. Box 767, Chicago, Illinois 60690-0767, together with its licensees, lessees, grantees, successors and assigns (collectively, "Grantee"), hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois, a non-exclusive perpetual right and easement in, over, under, upon and across the real property described in **Exhibit A** attached hereto and made a part hereof (the "Easement Area") to: install, construct, reconstruct, erect, operate, use, patrol, maintain, repair, relocate, replace, rebuild, enlarge, renew and remove overhead and underground electrical (whether consisting of one or more circuits) and communication, transmission and distribution lines and other overhead and underground transmission, distribution, communication and related facilities and structures (whether any or all of the foregoing now exist or are installed by Grantee, in its sole discretion, in the future); including, without limitation, cables, conduits, wires, towers (both electric and communications towers and related equipment structures and facilities), poles, pole structures, foundations, cooling oil, gas and other cooling medium, pipes, ducts, pumps, controls, switches, relays, circuit breakers, monitoring devices, underground counterpoise, anchors, underground ground grid, manholes, transformers, pedestals and necessary fixtures, conductors and appurtenances attached thereto or adding to the number of such enumerated facilities, together with any bridge or other structures or improvements deemed necessary or useful by Grantee in order to cross any creek or other body of water in order to get access to any part of the Easement Area (all of the foregoing, whether now existing or installed in the future, being collectively referred to in this Easement as the "Facilities"), together with the right to cut down, trim or otherwise control the growth of all trees and bushes growing upon or over the Easement Area and to clear obstructions from the surface and subsurface. Grantee shall have a right of ingress and egress to the Easement Area for such purposes, including patrolling, repairing, removing, renewing or adding to the number of the Facilities. Each and all of the rights, privileges and easements conferred upon Grantee pursuant to this Easement may be exercised by Grantee from time to time and at any time, without any notice (prior or subsequent) to Grantor, subject to the limitations set forth herein. Prior to Grantor's development of Grantor's adjacent property described on **Exhibit B** attached hereto and made a part hereof (the "Site"), Grantee shall have the temporary right of ingress and egress to the Easement Area over other portions of the Site as reasonably determined by Grantee. In the event that the public roads to be installed as part of the development of the Site do not provide appropriate ingress and egress to the Easement Area as Grantee reasonably determines, then Grantor shall grant such additional unimproved easement over portions of the Site as reasonably necessary to provide such access; provided, however, that Grantee's temporary access rights to the Easement Area set forth above shall not terminate until such time as Grantor grants to Grantee permanent access rights to the easement area.

Grantee will pay Grantor for all damages done to crops, if any, by Grantee at the rate set forth in any farm lease in effect from time to time, and will repair or replace all damaged fences, gates, drains, drain tiles and ditches which may result from Grantee's installation and maintenance of the Facilities. In the event an existing fence is cut for construction purposes by Grantee, Grantee will provide a temporary fence, which will be replaced by a permanent fence installed in a workmanlike manner after completion of construction of the Facilities.

{05919: 210; 00461683.DOC : }

IN WITNESS WHEREOF, Grantor has caused this Grant of Right-Of-Way Easement to be executed and delivered as of the _____ day of _____, 20__.


                                      Grantor:


                                      _____

STATE OF _____)
                                                    ) SS
COUNTY OF _____)

I, the undersigned, a Notary Public in and for the State and County aforesaid, do hereby certify that
_____I, personally known to me to be the _____ of _____
whose name is subscribed to the foregoing instrument, appeared before me this day in person and severally
acknowledged that as such officer/manager, signed and delivered the said instrument of writing on behalf of such
limited liability company/corporation, as his free and voluntary act, and as the free and voluntary act and deed of
such limited liability company/corporation, for the uses and purposes therein set forth.

Given under my hand and notarial seal this _____ day of _____ 20____.


_____                          _____
My Commission Expires                           Notary Public

## MORTGAGEE CONSENT

The undersigned_____, in his/her capacity as _____ of _____ ("Mortgagee"), which has an interest in the Easement Area above described pursuant to that certain Mortgage and Security Agreement made by Grantor dated _____ and recorded as _____ Document No._____ , in _____ County, does hereby consent to the foregoing Easement and subordinates Mortgagee's interest in the Easement Area to such Easement.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Consent as of this _____day of _____ 20__.

By: _____

Name: _____

Title: _____


STATE OF _____)
                                              )SS
COUNTY OF _____)


I, _____ a Notary Public in and for the State and County aforesaid, do hereby certify that _____ personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered such instrument as his/her free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this ____ day of _____, 20__.


_____          _____
My Commission Expires                                    Notary Public

Tax Parcel Index Number: 02-16-200-003, 004
                                        02-16-400-009, 010

Address: Freeman Road, Kane County, Illinois

{05919 210: 00461683.DOC : }

**TENANT CONSENT**

The undersigned tenant(s) and person(s) in possession of all or a portion of the Easement Area above described does hereby consent to the foregoing Easement and subordinate its interest in the Easement Area to such Easement.

The undersigned has executed and delivered this Consent as of this _____ day of _____, 20__.

By: _____

Name: _____

STATE OF _____)
                                           )SS
COUNTY OF _____)

I, _____ a Notary Public in and for the State and County aforesaid, do hereby certify that _____ personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this ____ day of _____, 20__.

_____          _____
My Commission Expires                           Notary Public

**EXHIBIT A**

**EASEMENT AREA**

THAT PART OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 42
NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN DESCRIBED AS
FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID NORTHEAST
QUARTER; THENCE NORTH 89 DEGREES 39 MINUTES 11 SECONDS EAST
(BEARINGS BASED ON ILLINOIS STATE PLANE COORDINATES EAST ZONE
1983 DATUM) ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER, A
DISTANCE OF 50.00 FEET; THENCE SOUTH 0 DEGREES 12 MINUTES 49
SECONDS WEST ALONG A LINE 50.00 FEET EAST OF AND PARALLEL WITH
THE WEST LINE OF SAID NORTHEAST QUARTER, A DISTANCE OF 1,209.04
FEET; THENCE SOUTH 89 DEGREES 47 MINUTES 11 SECONDS EAST, A
DISTANCE OF 40.00 FEET; THENCE SOUTH 0 DEGREES 12 MINUTES 49
SECONDS WEST ALONG A LINE 90.00 FEET EAST OF AND PARALLEL WITH
SAID WEST LINE, A DISTANCE OF 1,358.18 FEET TO A POINT OF
INTERSECTION WITH THE NORTHERLY RIGHT-OF-WAY LINE OF THE
NORTHWEST TOLL HIGHWAY (INTERSTATE 90); THENCE NORTH 56
DEGREES 54 MINUTES 16 SECONDS WEST ALONG SAID NORTHERLY RIGHT-
OF-WAY LINE, A DISTANCE OF 107.17 FEET TO THE POINT OF
INTERSECTION WITH SAID WEST LINE OF SAID NORTHEAST QUARTER,
SAID LINE BEING THE EAST LINE OF THE FIRST RESUBDIVISION OF UNIT
NO. 1 HUNTLEY, ACCORDING TO THE DOCUMENT RECORDED DECEMBER 2,
1994 AS DOCUMENT NO. 94K087427; THENCE NORTH 0 DEGREES 12 MINUTES
49 SECONDS EAST ALONG SAID WEST LINE, A DISTANCE OF 2,508.55 FEET
TO THE POINT OF BEGINNING, IN KANE COUNTY, ILLINOIS.

PIN:     Part of 02-16-200-003

Address: Freeman Road, Kane County, Illinois

6

## EXHIBIT B

### GRANTOR'S ADJACENT PROPERTY

THAT PART OF THE NORTHEAST ¼ AND THAT PART OF THE NORTHWEST ¼
OF THE SOUTHEAST ¼ OF SECTION 16, TOWNSHIP 42 NORTH, RANGE 7 EAST
OF THE THIRD PRINCIPAL MERIDIAN, LYING NORTHERLY OF THE
NORTHERLY RIGHT OF WAY LINE OF THE NORTHWEST TOLL HIGHWAY
(EXCEPTING THEREFROM THAT PART OF THE NORTHWEST ¼ OF THE
SOUTHEAST ¼ LYING EASTERLY OF A LINE THAT IS 145.00 FEET WESTERLY
OF, MEASURED AT RIGHT ANGLES THERETO, AND PARALLEL WITH THE
EAST LINE OF SAID NORTHWEST ¼ OF THE SOUTHEAST ¼, AND ALSO
EXCEPTING THAT PART OF THE NORTHWEST ¼ OF THE SOUTHEAST ¼
TAKEN BY THE ILLINOIS STATE HIGHWAY COMMISSION AS PARCEL #N-4C-
40.1) IN THE TOWNSHIP OF RUTLAND, IN KANE COUNTY, ILLINOIS.


PIN:    02-16-200-003, 004
        02-16-400-009, 010

Address: Freeman Road, Kane County, Illinois

7

{05919: 210: 00461683.DOC : }

## EXHIBIT C

### STORM WATER DETENTION POND AND COMPENSATORY STORAGE GRADING TRANSITION

