## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE KIRK CORPORATION, *et al.*, | ) | Case No. 09-17236 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Carol A. Doyle |
| | ) | |
| | ) | |

## DISCLOSURE STATEMENT
## WITH RESPECT TO
## DEBTORS' JOINT PLAN OF REORGANIZATION

Forrest B. Lammiman
David L. Kane
Meltzer, Purtill & Stelle LLC
300 South Wacker Drive, Suite 3500
Chicago, Illinois 60606-6704
Tel: (312) 987-9900
Fax: (312) 987-9854

Counsel for The Kirk Corporation
and Its Affiliate Debtors

Dated: August 4, 2009

{05919: 210: 00459625.DOC :4 }

# I.
## INTRODUCTION

On May 12, 2009, The Kirk Corporation and certain of its Affiliate Debtors[1] (collectively, the "**Debtors**") filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Two other affiliates filed their Chapter 11 petitions on June 8, 2009. The Debtors continue to operate their remaining business and manage their properties as debtors in possession pursuant to Sections 1107(c) and 1108 of the Bankruptcy Code. On May 28, 2009, the Office of the Untied States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.

The purpose of this Disclosure Statement is to provide the Debtors' Creditors with sufficient information about the Debtors' Joint Plan of Reorganization (the "**Plan**") to enable the Creditors to make an informed judgment about the merits of the Plan. The information contained in this Disclosure Statement relies on the Debtors' internal financial records for accuracy and has not been the subject of a certified audit. In addition, the final amounts of Allowed Claims contained in this Disclosure Statement remain subject to adjustment when and as the process of objection to and allowance of claims advances toward completion.

Local Bankruptcy Rule 3016-1 requires that the Debtors file a summary of the Plan (the "**Summary**") that sets forth the nature of the Plan and includes a clear description of the exact proposed treatment of each Class of Creditors, showing total dollar amounts and timing of payments to be made under the plan and all sources and amounts of funding thereof, as well as plainly identifying all classes of creditors, the composition of each class (as to number and type of creditors), the amount of claims (specifying any that are known to be disputed and how they will be treated under the plan), and the amount (dollar and/or percentages) to go to each class. Accordingly, the Debtors submit the following Summary:

# II.
## SUMMARY OF THE DEBTORS' PLAN

**Plan**:                       Joint Plan of Reorganization

**Debtors**:                    The Kirk Corporation; Apple Creek Estates, LLC; Beacon Pointe West, LLC; Bloomfield Estates, LLC; Laurel Meadow, L.L.C.; The Lindens Venture, L.L.C.; Rockwell Place, LLC; Stonegate Village, LLC; Wing Pointe North, L.L.C; Westland, LLC; Bloomfield West, L.L.C. (filed June 8, 2009); and Freeman Road Development, LLC (filed June 8, 2009).

**Plan Proponents**:            The Kirk Corporation; Apple Creek Estates, LLC; Beacon Pointe West, LLC; Bloomfield Estates, LLC; Laurel Meadow, L.L.C.; The Lindens Venture, L.L.C.;

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Debtors' Joint Plan of Reorganization.

Rockwell Place, LLC; Stonegate Village, LLC; Wing Pointe North, L.L.C; Westland, LLC; Bloomfield West, L.L.C.; and Freeman Road Development, LLC.

**General Purpose**: The Plan contemplates the transfer of all of the Debtors' remaining assets to the Reorganized Debtors for the implementation of the Plan, the treatment of creditors under the Plan and the reorganization and continuation of the Debtors' business by the Reorganized Debtors.

**Funding and Financing**: The Plan will be funded by and through the reorganization of the Debtors pursuant to the terms of the Plan. The Reorganized Debtors will receive construction financing from Cole Taylor Bank in the maximum available amount of at least $3,500,000 to finance the construction of new Homes. The sale of these newly constructed Homes will commence in the first quarter of 2010. In addition, the New Equity Purchaser of the Reorganized Debtors will pay for the New Equity on the Effective Date of the Plan, by tendering a purchase price of not less that $500,000 to the Reorganized Debtors, and also will make available to the Reorganized Debtors additional funding in the form of subordinated debt in the amount not less tha $500,000. The New Equity Purchaser shall be a limited liability company in which the Debtors' current CEO and President, John Carroll, will be a member and an investor.

**Summary of Treatment of Classes of Claims**

The Plan provides:
(1) for payment in full of all Administrative Claims, Priority Tax Claims, Priority Real Estate Tax Claims, and Priority Severance Claims; (2) for the granting to Holders of Class 1 Claims of, *inter alia*, the New Secured Note, the New Mortgage, the restriction of their secured claims to the amount set forth in the New Secured Note and the other treatment of the Lenders provided in Section 4.3 of the Plan; (3) for the pass through of all post-closing Class 4 Claims of Homebuyers for payment or defense in the ordinary course of business; (4) for the payment from the Net Proceeds Escrow of all Class 5 Claims determined pursuant to the Lien Resolution Procedures to be entitled to first-priority lien treatment, with any unsecured portion of such claim to be entitled to

receive its Pro Rata Share of GUC Proceeds; (5) for Class 6 Claims of Unsecured ESOP Notes Claim to be paid according to each Claimant's election of either such Holders' Pro Rata Share of GUC Proceeds or such Holders' Pro Rata Share of the Contributed Allocation of the New Equity; (6) for Class 7 Claims to be paid from and pursuant to the terms of the Letter of Credit securing those Holders of Secured ESOP Note Claims; (7) for payment of Class 8 Claims from the GUC Proceeds, as shared to the extent provided under the Plan with certain Holders of Class 5 Claims, Class 6 Claims and Class 11 Claims according to their respective Pro Rata Shares; (8) for Class 9 Claims to receive the Cash Flow Note on the Effective Date, but only if the Lenders choose the Litigation Election; (8) for Class 10 Intercompany Claims to receive no Distribution, save for Kirk's share of the Make-Up Distribution if the Lenders elect the Litigation Election rather than settle with the Debtors as proposed in Section 4.16 of the Plan (the "**Settlement Election**"); (9) for Class 11 Claims to receive either (i) that Holder's respective Pro Rata Share of GUC Proceeds or, alternatively, (ii) enter into a new contract with the Reorganized Debtors under which any right to receive any GUC Proceeds will be waived and released; (10) for Class 12 Interests in the Affiliate Debtors to receive no Distributions under the Plan, but for all such interests to be deemed transferred and assigned to the Reorganized Kirk; and (11) for Class 13 Kirk Interests to receive no Distributions and shall be deemed extinguished on the Effective Date and with all New Equity in Reorganized Kirk to be purchased on the Effective Date by the New Equity Owner for not less than $500,000; provided, however, that the Reorganized Debtors shall be entitled to retain fifty percent (50%) of any net proceeds of the Adversary Proceeding Against the Lenders if that action goes forward after the Effective Date because the Lenders have selected the Litigation Election. The estimated amounts and treatment of each Class of Claims is set forth on the Summary of Proposed Distributions on **Exhibit A** hereto. As used herein, "GUC Proceeds" means either (a) if the Lenders select the Settlement Election, then $400,000 or (b) if the Lenders select the Litigation Election, then it shall mean the greater of (i) $400,000 or (ii) the Alternative GUC Proceeds. The

GUC Proceeds will be made available for payment to Holders of Allowed Class 5, 6, 8 and 11 Claims in accordance with such Holders' respective Pro Rata Shares thereof, to the extent provided in <u>Sections 4.7</u>, <u>4.8</u>, <u>4.10</u> and <u>4.13</u> of the Plan, respectively.

**Effective Date:**    The Plan shall become effective when each of the following conditions has been satisfied:

(a) the Bankruptcy Court shall have entered the Confirmation Order; (b) the Confirmation Order shall have become a Final Order; (c) if the Lenders elect the Settlement Election, then the Lenders and the Debtors shall have effected the settlement of the Adversary Proceeding Against the Lenders and all transactions, documents or requirements provided in Section 4.16 of the Plan; (d) the Lenders and the Reorganized Debtors shall have entered (i) the New Secured Note, and (ii) the New Mortgage; (e) the construction loan agreement and all related loan documents shall have been entered by the Construction Lender and the Reorganized Debtors as contemplated by Section 6.4 of the Plan; (f) the Reorganized Debtors shall have executed and delivered the Replacement Mortgage to the Lenders; (g) the purchase price for the New Equity shall have been paid, and the documents necessary for the operating infusion from the New Equity Purchaser shall have been executed as contemplated by Section 6.5 of the Plan; (h) if the Lenders select the Settlement Election, then the notice of dismissal of the Adversary Proceeding Against the Lenders with prejudice shall have been executed on behalf of the Debtors and delivered to the Agent's counsel to be filed with the Court; (j) the New Equity Purchasers shall have made arrangements for the Contributing Allocation of the New Equity to be contributed one (k) business day after the Effective Date by the New Equity Purchaser for the benefit of Holders of Allowed Class 6 Claims electing treatment under Section 4.7(ii); (l) if the Lenders select the Settlement Election, then the Bankruptcy Court's order dismissing the Adversary Proceeding Against the Lenders with prejudice shall have become a Final Order; (m) the Lenders shall have received all Excess Cash that is available as of the close of business on the business day immediately preceding the Effective Date; and (n) all other actions and documents necessary to implement this Plan as of

the Effective Date shall have been effected or duly executed and delivered. In the absence of unforeseen circumstances, the satisfaction of conditions (a) through (n) above shall take place within two (2) Business Days after the entry of the Confirmation Order.

**Voting:**

Administrative Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims and Class 7 Claims are unimpaired and therefore are deemed to have accepted the Plan and are not entitled to vote. Class 1 Claims, Class 5 Claims, Class 6 Claims, Class 8 Claims, Class 9 Claims and Class 11 Claims are Impaired and are entitled to vote. Class 12 Interests and Class 13 Interests will receive nothing under the Plan and therefore are deemed to have rejected the Plan.

Those creditors entitled to vote on the Plan should complete the ballot accompanying this Disclosure Statement and Plan and return it to the Clerk of the United States Bankruptcy Court for the Northern District of Illinois, 219 S. Dearborn Street, Room 710, Chicago, IL 60604. Ballots should be returned in the envelope that is provided with the ballot. Ballots must be received on or before August ___, 2009 at 5:00 Central Standard Time. Only those ballots returned on a timely basis will be counted in determining whether a particular class of creditors has accepted or rejected the Plan. A class of claims has accepted the Plan if two-thirds in amount and more than one-half in number have voted to accept the Plan.

If you have any questions concerning voting procedures, did not receive a ballot, or if your ballot is damaged or lost, please contact counsel to the Debtors: David L. Kane, Meltzer, Purtill & Stelle LLC, 300 S. Wacker Drive, Suite 3500, Chicago, IL 60606; Telephone: (312) 461-4325.

**Objections:**

All objections to Confirmation of the Plan must be in writing, state the basis for the objection, be filed with the Bankruptcy Court, and be served upon the following parties not later than August ___, 2009 at 12:00 p.m. (Central Daylight Time):

Counsel to the Debtors, Meltzer, Purtill & Stelle LLC, 300 S. Wacker Drive, Suite 3500, Chicago, IL 60606

(Attn: Forrest B. Lammiman and David L. Kane);

The Office of the United States Trustee, 219 S. Dearborn Avenue, Chicago, IL 60604 (Attn: Roman L. Sukley);

Counsel to the Agent, Duane Morris LLP, 190 South LaSalle Street, Suite 3700, Chicago, IL 60603 (Attn: Rosanne Ciambrone); and

Counsel to the Official Committee of Unsecured Creditors of The Kirk Corporation, Crane, Heyman, Simon, Welch & Clar, 135 S. LaSalle Street, Suite 3705, Chicago, IL 60603 (Attn: David K. Welch and Jeffrey Dan).

**Cramdown:** In the event that a class of creditors rejects the Plan and one impaired class of creditors votes to accept the Plan, the Plan Proponents reserve the right to seek Confirmation under Section 1129(b) of the Bankruptcy Code.

**Combined Disclosure Statement and Confirmation Hearing:** The combined hearing on the adequacy of this Disclosure Statement and Confirmation of the Plan will be held on September ___, 2009 at ___:00 ___.m. The confirmation hearing will be held before the Honorable Eugene R. Wedoff, Courtroom 742, 219 S. Dearborn Street, Chicago, Illinois.

**Additional Information:** Requests for information regarding the Plan or the Disclosure Statement should be directed to the following counsel for the Debtors: David L. Kane, Meltzer, Purtill & Stelle LLC, 300 S. Wacker Drive, Suite 3500, Chicago, IL 60606.

The Debtors submit that the above Summary meets the requirements of the Bankruptcy Code and applicable Local Bankruptcy Rule 3016-1. After reviewing the Plan and Disclosure Statement, you should vote on the Plan. In reaching your decision to accept the Plan, you should not rely on any representation other than those contained in this Disclosure Statement. As a creditor, your vote is important. As specified in the above Summary, the Bankruptcy Court can confirm the Plan if the holders of two-thirds in amount and more than one-half in number of claims in each impaired class vote to accept the Plan. To vote on the Plan, each Creditor entitled to vote must complete the enclosed ballot and return it to the Bankruptcy Court at the address specified in this Summary.

The Debtors believe that the Plan affords creditors the largest recovery possible under the circumstances. The Plan provides for the liquidation of the Debtors' remaining assets and the

distribution of the proceeds to the Debtors' Creditors pursuant to the priorities of the Bankruptcy Code. ***The Debtors believe that acceptance of the Plan is in the best interests of creditors and recommend acceptance of the Plan.***

## III.
## BACKGROUND

The Kirk Corporation was founded in 1978 as a production homebuilder. Currently, Kirk employs approximately 20 employees. Kirk's principal office is located in Streamwood, Illinois.

Kirk, an Illinois corporation, is the sole member of 11 limited liability companies and is the manager and one of the members of 2 other limited liability companies. Eleven of these limited liability companies also are Debtors herein. One hundred percent (100%) of the stock of the holding company, Kirk, is owned by the Kirk Corporation Stock Ownership Plan and Trust, pursuant to two (2) transactions; the first of which occurred in 1998 and the second of which occurred in 2002. Thus, the ultimate owners of all the Debtors are all of the employees of the Debtors.

In 1998, the Kirk Corporation Stock Ownership Plan and Trust (the "**ESOP**") was created for the purpose of acquiring the stock of Kirk from Mr. Donald Kirk, the company's founder and, at that time, the owner of 100% of the stock of Kirk. The acquisition of the stock took place in two stages. First, the ESOP borrowed funds from the Debtors to purchase 30% of the stock of Kirk in 1998, paying Mr. Kirk $4,110,000 for this initial purchase. Second, the ESOP purchased the remaining 70% of the stock of Kirk for $32,000,000 in Cash in December, 2002. Contemporaneously, Mr. Kirk lent $16,000,000 to the Debtors as subordinated debt. Mr. Kirk received interest payments on the promissory note quarterly, and received a payment from the Debtors on the note of approximately $8,000,000 in April, 2007. As of the May 12, 2009 Petition Date, Mr. Kirk was owed $8,173,589 in principal amount under the promissory note, and the ESOP owed $24,292,219 to the Debtors for the funds the ESOP borrowed to purchase Kirk's stock from Mr. Kirk.

The Debtors together currently have (i) four active residential developments in Bolingbrook, Hoffman Estates, Lakemoor, and Woodstock, (ii) five residential developments in Aurora, Bolingbrook, Huntley (unincorporated), New Lenox and Streamwood where construction of homes is complete, (iii) commercial property in Woodstock, and (iv) two unentitled parcels which are zoned for commercial use in Elburn (unincorporated) and Huntley (unincorporated). As of the Petition Date, the Debtors' aggregate assets totaled approximately $96,847,300 in cost-based book value (based upon preliminary year-end audit figures) and the Debtors' aggregate liabilities totaled approximately $64,537,800, on a consolidated basis.

The Debtors' operational and profitability problems are principally due to the sharp and prolonged decline in the Chicago area homebuilding market. In 2006 and 2007, the Debtors built 328 homes and 305 homes, respectively, and had gross revenues of $113,310,092 and $105,898,302, respectively. In 2008 the Debtors built only 78 homes with gross revenues of $24,711,670. The preliminary drafts of the Debtors' Consolidated Financial Statements for 2007 and 2008 are attached hereto as **Exhibits C** and **D**, respectively; these statements are subject to determinations of additional financial impairments.

## IV.
## DEBTORS' POSTPETITION ACTIVITIES

The Debtors have continued to run their businesses during the Chapter 11 Cases, and by the time of the Confirmation hearing expect to have closed the sale of approximately 25-30 Homes during the pendency of their Chapter 11 Cases. Approximately $5,157,907 in Cash from closings is held in the Net Proceeds Escrow as of July 29, 2009, not including Cash held that may be subject to Mechanic's Lien Claims. In order to facilitate maintaining their business as a going concern, the Debtors have actively sought mechanisms to allow certain creditors to be paid during the pendency of the Chapter 11 Cases. For example, the Debtors and the Committee, together with the Lenders, sought and obtained approval from the Court for certain Lien Resolution Procedures, which are now in place and provide a mechanism for trade vendors with valid first-priority Mechanic's Lien Claims to seek payment from the Net Proceeds Escrow. In addition, the Debtors have obtained from the Bankruptcy Court an Order permitting the payment of warranty claims and related post-closing claims of Homebuyers. The Debtors also obtained a "stalking horse" bid for the sale of the Freeman Road Property, and the closing of the sale of that property is pending. The Bankruptcy Court approved the sale which will yield over $3,000,000 in net sales proceeds that will be deposited in the Net Proceeds Escrow as additional funds available as of the Effective Date to be paid to the Lenders to further reduce their secured claim.

## V.
## THE DEBTORS' REMAINING ESTATES

The assets remaining in the Estates include, but are not limited to: (a) cash and cash equivalents; (b) accounts, accounts receivable, contract rights to payment, notes or accounts receivable owing between or among the Debtors (with the exception of claims of Kirk against Freeman Road and Westland, these other intercompany obligations will be extinguished under the Plan); (c) residual rights to funds held in the Net Proceeds Escrow after payment of all Mechanic's Lien Claims that are Allowed as first-priority liens under the Lien Resolution Procedures; (d) equipment and furniture; (e) certain general intangibles and other rights to payment; (f) remaining Homes, including Homes still to be sold and closed for the benefit of the Lenders and others to be retained by the Debtors as models; (g) developed and non-developed land, all as summarized on **Exhibit B** hereto; (h) Causes of Action; and (i) the Adversary Proceeding Against the Lenders and any other Avoidance Actions that may be identified. Most remaining assets of the Debtors, other than the Adversary Proceeding Against the Lenders, the Avoidance Actions and certain bank accounts, are subject to the Lenders' security interests.

## VI.
## CLASSES OF CLAIMS AND THEIR
## TREATMENT AND DISTRIBUTIONS UNDER THE DEBTORS' PLAN

The Plan will become effective on the Effective Date. **Exhibit A** hereto titled "Summary of Proposed Distributions" summarizes the proposed distributions under the Plan to each Class of Creditors and Equity Holders.

A.    **Administrative Claims and Priority Claims**.   The Plan provides for the payment in full, or on such other terms as may be agreed upon by such Holder and the Debtors,

of all Allowed Administrative Claims on (i) the tenth (10th) Business Day following the later of (b) the Effective Date or (b) the date on which such Claim becomes due, or (ii) as otherwise agreed between the Holder of such Claim and the Debtors.

The Plan also provides that on the tenth (10th) Business Day following the later of (i) the Effective Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim at the election of the Debtors made on or prior to the Effective Date (a) Cash equal to the amount of such Allowed Priority Tax Claim and (b) such other treatment as to which the Debtors and the Holder of such Allowed Priority Tax Claim shall agree upon in writing.

The Plan also provides for the payment in full, or on such other terms as may be agreed upon by such Holder and the Debtors, of all Allowed Priority Claims (other than Priority Real Estate Tax Claims) on the tenth (10th) Business Day following the later of (i) the Effective Date if such Priority Claim is an Allowed Priority Claim as of the Effective Date, or (ii) the date on which such Priority Claim becomes an Allowed Priority Claim.

(i)     **Administrative Claims.**  Administrative Claims, as designated in the Plan, include the unpaid costs and expenses that the Debtors have incurred in connection with these Chapter 11 Cases, such as previously unpaid attorneys', accountants', and financial advisor fees subject to allowance by the Bankruptcy Court. Interim payments of 90% of such professionals' fees, and 100% of their expenses, have previously been paid by the Debtors. Additional payment of professional fees approved by the Bankruptcy Court will be made as soon as practicable after the Bankruptcy Court allows such claims.

Under the Plan, Allowed Administrative Claims for Professionals of the Debtors to the extent remaining unpaid on the Effective Date, may not exceed in the aggregate the portion of the Professionals' Carve-Out (as defined in the Cash Collateral Order) allocated to the Debtors' Professionals. The Allowed Administrative Claims for the Debtors' Professionals and of the Committee, to the extent remaining unpaid on the Effective Date, are anticipated to be in excess in the aggregate of approximately $285,000, less any amounts paid by the Debtors to such Professionals prior to the Effective Date. Such Allowed Administrative Claims for the Debtors' Professionals and of the Committee shall be paid from the proceeds available under the Budgets approved under the Cash Collateral Order from time to time, from approximately $125,000 in retainer funds held by the Debtors' counsel, or as the Debtors might otherwise agree with such Professionals.

The estimated unpaid professional fees that will be remaining to be paid to the Debtors' Professionals as of the Effective Date include: (a) $200,000 to the Debtors' chapter 11 counsel, Meltzer, Purtill & Stelle, LLC; (b) $35,000 to the financial advisors to the Debtors, RSM McGladrey, Inc.; and (c) $50,000 to counsel for the Creditors' Committee, Crane, Heyman, Simon, Welch & Clar.

(ii)    **Priority Tax Claims**. Priority Claims, as designated in the Plan, are any Claims for taxes against the Debtors excluding Priority Real Estate Tax Claims but including,

without limitation, any interest and penalties due thereon, entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. The Debtors are not aware of any Priority Tax Claims.

Priority Tax Claims are not Impaired. Payment of Priority Tax Claims (if any) will be made on (i) the Effective Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim.

(iii)    **Priority Real Estate Tax Claims**. All outstanding real estate taxes including penalties and interest thereon, shall be paid in full to the extent they are entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. Such claims will be paid in sixty (60) equal monthly installments, bearing fixed interest at the Prime Rate plus 2% per annum. The scope and treatment of these claims is more fully addressed in VI.B.(ii) below.

(iv)    **Priority Severance Claims**. All claims for contractual severance entitled to priority under section 507(a)(4) and (a)(5) of the Bankruptcy Code shall be paid in full not later than December 31, 2009, or as a Holder of such priority severance claims shall agree with the Debtors. The Debtors estimate that the amount of such claims aggregate approximately $15,450.

B.    **Classification of Claims; Numbers and Amounts of Claims; Distributions and Other Treatment**. The Plan divides the claims against and interests in the Debtors into separate classes of claims including four classes of secured claims, six classes of unsecured claims, one class of intercompany claims, one class of Affiliate Debtor Interests and one class of Kirk Interests, each of which will receive different treatment under the Plan in accordance with the Bankruptcy Code. A claim or interest will receive a distribution under the Plan only to the extent it is an "Allowed Claim." An Allowed Claim is (a) any Claim or Administrative Claim, proof of which was Filed with the Bankruptcy Court on or before the applicable Bar Date, or which has been or hereafter is Scheduled by the Debtors as liquidated in amount and not disputed or contingent and which, in either case, is a Claim as to which no objection to the allowance thereof has been Filed within the applicable period of limitation (if any) for objection to Claims set forth in the Plan or as otherwise fixed by the Bankruptcy Court, or as to which any objection has been determined by an order or judgment of the Court (allowing such Claim in whole or in part) that is no longer subject to appeal or certiorari proceedings, and as to which no appeal or certiorari proceeding is pending, or (b) a Claim or Administrative Claim that is allowed (i) in a Final Order or (ii) pursuant to the terms of the Plan. In accordance with 11 U.S.C. § 502(d), no Claim held by any party that is subject to an Avoidance Action shall be an Allowed Claim or Allowed Administrative Claim until such time as the avoidable transfer that is the subject of such Avoidance Action is returned or a Final Order has been entered (x) approving the compromise and settlement of the Avoidance Action or (y) determining that no avoidable transfer exists. Any Distributions under the Plan to holders of Allowed Claims will be in full satisfaction of those Allowed Claims.

(i)    **Class 1 – Lender Secured Claims**. Class 1 Claims consist of all Lender Secured Claims. Lender Secured Claims means the Secured Claims of the Agent and any Lender arising under the Credit Agreement and the documents, instruments and agreements related

thereto. Class 1 Claims are Impaired. As of the Petition Date, (i) the total amount of the Debtors' obligations to the Lenders under the Credit Agreement was approximately $52,031,091, (ii) the aggregate outstanding principal amount of Loans (as defined in the Cash Collateral Order) included in the Debtors' obligations under the Credit Agreement was approximately $48,069,309, (iii) the aggregate outstanding amount of accrued and unpaid interest and fees included in the obligations was approximately $549,847, and (iv) the aggregate outstanding undrawn amount of Standby Letters of Credit included in the obligations was $3,411,935, all of which are exclusive of fees, costs and other expenses for which the Lenders may be entitled to payment or reimbursement. The Debtors' obligations under the Credit Agreement are partially secured by security interests and liens in and against substantially all property of the Debtors' Estates in favor of the Agent on behalf of itself and the Lenders, other than Avoidance Actions, certain bank accounts and Affiliate Interests owned by Kirk. Class 1 Claims are Impaired. The ultimate post-Confirmation secured claim of the Lenders is estimated by the Debtors to be $28,052,907, but determination of the final amount of the Class 1 Secured Lender Claims (and thus the Class 9 Lenders' Deficiency Claims) shall be made by the Bankruptcy Court.

The Holders of Allowed Class 1 Claims will receive:

(a)     the New Secured Note in the principal amount of $7,810,000.00 or, if the Debtors elect to be obligated for a different original principal amount, such greater or lesser principal amount as may be established by the Court's determination, pursuant to Federal Rule of Bankruptcy Procedure 3012, of the value of the collateral that will secure the New Secured Note;

(b)     the New Secured Note secured by the New Mortgage;

(c)     the Lenders' Deeds In Lieu, but with respect to the Westland property the Deed in Lieu shall be delivered only if and when the Adversary Proceeding Against the Lenders has been resolved pursuant to a Final Order pursuant to which the Debtors are not entitled to avoid or recover the Lenders' existing mortgage on the Westland property;

(d)     relief from any obligation of the Lenders to pay to the Debtors an amount equal to the purchase price of $3,200,000 for the sale of the Freeman Road property, but only if and when the Adversary Proceeding Against the Lenders has been resolved pursuant to a Final Order relieving the Lenders of any such obligation;

(e)     the Cash Collateral Note secured by the Replacement Mortgage;

(f)     retention of a mortgage on Kirk Office Property, to be amended or replaced on the Effective Date to serve only as additional collateral under the New Mortgage, in the form set forth in Exhibit D to the Plan;

(g)     all Excess Cash that is available at the close of the business day immediately preceding the Effective Date, net of (i) if the Lender select the Settlement Election, the $1,360,000 to be paid to the Debtors under the Settlement Agreement, (ii) a reserve sufficient to pay all pending

Mechanic's Lien Claims and any other pending asserted Secured Claims with respect to the Cash in the Net Proceeds Escrow, and (iii) if the Lenders choose the Litigation Election, a reserve in the amount of the net sale price of the Freeman Road Real Property to be released only pursuant to a Final Order resolving the Adversary Proceeding Against the Lenders;

(h)     additional funds from the Net Proceeds Escrow post-confirmation pursuant to and limited by the provisions of the Inventory Transition Procedures;

(i)     additional funds from the Net Proceeds Escrow as and to the extent that any Mechanic's Lien Claims for which funds in the account are disallowed pursuant to the Lien Resolution Procedures; and

(j)     at the election of the Lenders, either (i) the Adversary Proceeding Against the Lenders shall be settled and dismissed pursuant the Settlement Election set forth in Section 4.16 of the Plan, or (ii) the Lenders may select the Litigation Election, i.e., the Reorganized Debtors as the representative of the Debtors' Estates, shall be vested with all of the Debtors' rights with respect to the Adversary Proceeding Against the Lenders, and shall go forward with such action against the Lenders following the Effective Date. Failure by the Lenders to make an election shall be deemed to be a Litigation Election.

On June 16, 2009 the Debtors filed their complaint to commence the Adversary Proceeding Against the Lenders (the "**Complaint**"). The Complaint included counts for the avoidance and recovery of mortgages on three properties granted by the Debtors to the Lenders on March 31, 2008, namely mortgages on the Freeman Road Real Estate, Westland Real Estate and certain of the commercial property at the Apple Creek location. In addition, the Complaint asserted counts for the avoidance of a mortgage that Kirk granted to the Lenders on the Kirk Office Property on March 9, 2009, asserting avoidability and recovery of that mortgage both as a fraudulent transfer and a preferential transfer. The Debtors intend to amend the Complaint in certain respects, including (without limitation) eliminating any counts relating to the mortgage on the 18 acres of commercial property at the Apple Creek location. The Adversary Proceeding Against the Lenders will be dismissed and settled as of the Effective Date if the Lenders elect the Settlement Election on their ballot with respect to the Plan or otherwise notify the Debtors in writing, in any event, with such election to be made not later than five (5) days before the Confirmation hearing. If the Lenders make the Settlement Election to settle and dismiss the Complaint, the primary consideration paid by the Lenders for settlement and dismissal of the Complaint will be:

(a)     the Lenders and the Debtors shall enter into the Settlement Agreement in the form set forth as Exhibit H to the Plan on the Effective Date.

(b)     on the Effective Date, the Reorganized Debtors shall be paid a Settlement Payment from the Net Proceeds Escrow in an amount equal to $1,360,000, a portion of which may later be repaid to the Net Proceeds

Escrow by the Reorganized Debtors as more fully set forth in the Settlement Agreement; and

(c)     the Lenders shall be deemed to have waived and released all of the Lenders' Deficiency Claims, and shall seek no distribution for the Lenders' Deficiency Claims under this Plan.

The Debtors believe that the value to their Estates of the Adversary Proceeding Against the Lenders ranges anywhere from $0 to over $5,000,000, which amount is necessarily dependent upon the final outcome of the litigation. The Debtors believe that the proposed Settlement Agreement with the Lenders is reasonable under the circumstances and in the best interests of the Debtors' Estates in that it (i) provides an additional $1,360,000 in Cash to be used for operations going forward and a greater recovery for creditors (with a return of $1,000,000 to the Net Proceeds Escrow by December 31, 2011 for the benefit of the Lenders), (ii) requires a waiver of any distribution on the Lenders' Deficiency Claims in the approximate amount of $23,978,184, (iii) avoids the time and additional expense of ongoing litigation, and (iv) will likely lead to a consensual resolution of these Chapter 11 Cases and confirmation of the Plan.

If the Lenders instead elect the Litigation Election, then the Reorganized Debtors shall proceed to prosecute the Adversary Proceeding Against the Lenders post-confirmation, and fifty percent (50%) of the net proceeds from that Litigation obtained by the Reorganized Debtors shall be used to fund the GUC Proceeds and the Make-Up Distribution to general unsecured creditors of Freeland Road and Westland, if applicable.

In the event that the Plan is not confirmed or does not become effective or the Lenders elect the Litigation Election, then (x) neither the Agent and Lenders or the Committee shall be deemed to have waived any right or remedy with respect to the Adversary Proceeding Against the Lenders, (y) nothing in the Plan or in this Disclosure Statement shall be deemed an admission against interest by any of them, and (z) pursuant to Federal Rule of Evidence 408, the fact or terms of this compromise and settlement shall not be admissible in the Adversary Proceeding Against the Lenders or any other proceeding commenced with respect to the rights of the Agent and Lenders under the Credit Agreement and related documents, instruments, and agreements, or the rights of the Committee. If the Lenders select the election to settle and dismiss the Adversary Proceeding Against the Lenders as of the Effective date then the Plan serves as a motion to approve this compromise and settlement, and entry of the Confirmation Order shall constitute such approval.

(ii)     **Treatment of Class 2 Claims – Real Estate Priority Tax Claims**. Class 2 Claims consist of all Priority Real Estate Tax Claims relating to property to be retained by the Debtors under the Plan. The Debtors estimate that there are 5 Holders of such Claims aggregating approximately $103,658 as of the Petition Date. Class 2 Claims are Unimpaired. Each Holder of an Allowed Class 2 Claim shall receive pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, Cash payments on account of such claim in sixty (60) consecutive monthly installments amortized over five (5) years and bearing fixed interest per annum at the Prime Rate plus 2%; provided, however, that Real Estate Priority Tax Claims for property sold prior to the Confirmation Date or deeded to the Lenders under the Lenders' Deeds in Lieu or otherwise transferred pursuant to the Plan shall be paid by the new owners of such property. Following the

Effective Date, all county or municipal authorities shall provide for real estate taxes for Homes to be divisible and payable by lot and by legal description for said lot at a Home closing and thereafter. Tax payments made from the proceeds of Home closings by the Homebuyer shall be applied as prepayments to reduce the principal balance of Class 2 Claims remaining outstanding to any tax authority.

(iii)     **Treatment of Class 3 Claims – Priority Severance Claims**.   Class 3 Claims consist of all Priority Severance Claims.  The Debtors estimate that there are 4 Holders of such Claims aggregating approximately $15,450 as of the Petition Date.  Class 3 Claims are Unimpaired.  Each Holder of Allowed Class 3 Claims shall receive cash payments not later than December 31, 2009, or on a date to which the Debtor and the Holder may otherwise agree, in an amount equal to such Holder's Allowed Class 3 Claim.

(iv)     **Treatment of Class 4 Claims – Post-Closing Claims of Homebuyers**. Class 4 Claims consist of all Post-Closing Claims of Homebuyers. The Debtors estimate that there are 148 Holders of such Claims aggregating approximately $370,000 as of the Petition Date. Class 4 Claims are Unimpaired. Holders of Allowed Class 4 Claims shall receive payment in cash or in kind of their claims in the ordinary course of the Reorganized Debtors' business, and such claims shall not be discharged under the Plan or be subject to any stay, injunction, exculpation or discharge hereunder, but shall remain otherwise subject to all defenses, setoff or counterclaims. All rights of Holders of Class 4 Claims against Residential Warranty Corporation shall remain in full force and effective before and after the Effective Date.

(v)     **Treatment of Class 5 Claims – Mechanic's Lien Claims**.   Class 5 Claims shall consist of all Mechanics' Lien Claims.  The Debtors estimate that there are 44 Holders of such Claims aggregating approximately $1,800,000 as of the Petition Date.  Class 5 Claims are Impaired.  Each Holder of an Allowed Class 5 Claim shall receive payment of such Claims in full from the closing proceeds of any Home on which such Holder possesses a first-priority Mechanic's Lien that is an Allowed Secured Claim as determined pursuant to the Lien Resolution Procedures.   To the extent that any Holder asserting a Class 5 Claim is instead determined to have an Allowed Class 8 Claim (General Unsecured Claim) rather than a first-priority Allowed Mechanic's Lien Claim, that portion of that Holder's Claim shall receive its Pro Rata Share of GUC Proceeds.

(vi)     **Treatment of Class 6 Claims – Unsecured ESOP Note Claims**. Class 6 Claims consist of all Unsecured ESOP Note Claims.  The Debtors estimate that there are 7 Holders of such Claims aggregating approximately $945,185 as of the Petition Date.  Class 6 Claims are Impaired. Each Holder of an Allowed Class 6 Claim may elect to receive one of the following:

(a)     such Holder's Pro Rata Share of GUC Proceeds; or

(b)     such Holder's Pro Rata Share of the Contributed Allocation of the New Equity.

(vii)     **Treatment of Class 7 Claims – Secured ESOP Note Claims**.  Class 7 Claims consist of all Secured ESOP Note Claims.  The Debtors estimate that there are 13 Holders of such Claims aggregating approximately $843,702 as of the Petition Date.  Class 7

Claim Interests are Unimpaired. Holders of Class 7 Claims shall be paid in full from the proceeds of Standby Letter of Credit No. CLS420344 pursuant to the terms of that letter of credit, and shall thereafter have no Allowed Claim against the Debtors or their Estates.

(viii)  **Treatment of Class 8 Claims – General Unsecured Claims**. Class 8 Claims shall consist of all General Unsecured Claims other than Class 5, 6, 9, 10 and 11 Claims. The Debtors estimate that there are 125 Holders of such Claims aggregating approximately $12,626,997 as of the Petition Date. Class 8 Claims are Impaired. Holders of Allowed Class 8 Claims (including any Holders of Allowed Class 5 Claims to the extent provided in Section 4.7 of the Plan and further including Holders of Allowed Class 6 Claims who elect the treatment provided in Section 4.8(i) of the Plan) shall receive their respective Pro Rata Shares of GUC Proceeds. In addition, Holders of Allowed Class 8 Claims against Freeman Road or Westland shall also receive their respective Pro Rata Shares of the Make-Up Distribution, if applicable.

(ix)  **Treatment of Class 9 Claims – Lenders' Deficiency Claims**. Class 9 Claims shall consist of all Lenders' Deficiency Claims. The Debtors estimate that such Claims will aggregate approximately $23,978,184 as of the Effective Date, net of cash payable from the Net Proceeds Escrow to the Lenders on the Effective Date and subject to further reduction thereafter when and as the Lenders receive further proceeds of their collateral. The ultimate post-Confirmation determination of the Class 9 Lenders' Deficiency Claims shall be made by the Bankruptcy Court. Class 9 Claims are Impaired. Holders of Capital Class 9 Claims shall receive no Distributions under the Plan on account of such Claims unless the Lenders chose the Litigation Election. If the Lenders choose the Litigation Election, then the Debtors shall execute and deliver to the Agent, as the representative of the Lenders, the Cash Flow Note. The terms of the Cash Flow Note, as set forth on Exhibit J to the Plan, provide for payments to the Lenders aggregating a percentage of their Allowed Class 9 Claims equal to 110% of the ratio of the payments received pursuant to the Plan by Holders of Allowed Class 8 Claims divided by the aggregate amount of all Allowed Class 8 Claims. For example, if Holders of Allowed Class 8 Claims are paid 2.0% of the aggregate amount of all Allowed Class 8 Claims, then Holders of Allowed Class 9 Claims will be paid 2.2% of such Claims, payable over time pursuant to the cash flow of the Reorganized Debtors with the first payment to be due on March 31, 2011, and as otherwise provided in the Cash Flow Note.

(x)  **Treatment of Class 10 Claims – InterCompany Claims**. Class 10 Claims consist of all Intercompany Claims. The Debtors estimate that there is 1 Holder of such Claims aggregating approximately $16,318,671 as of the Petition Date. Class 10 Claims are Impaired. Holders of Class 10 Claims shall receive no distribution under the Plan on account of such Claims, except that Kirk may receive its Pro Rata Share of any Distributions from Westland and Freeman Road on account of net proceeds from a settlement or judgment obtained with respect to the Adversary Proceeding Against the Lenders, if applicable, to the extent provided in the Plan. Because Kirk holds the overwhelming majority of claims against Westland and Freeman Road, it will be entitled to the majority of any proceeds obtained in the Adversary Proceeding Against the Lenders.

(xi)  **Treatment of Class 11 Claims – Indemnification Claims**. Class 11 Claims consist of all Indemnification Claims. The Debtors estimate that there are 4 Holders of such Claims aggregating between approximately $2,606,070 and $3,106,070 as of the Petition

Date. Class 11 Claims are Impaired. Each Holder of an Allowed Class 11 Claim shall receive either (i) that Holder's respective Pro Rata Share of GUC Proceeds or, alternatively, (ii) enter a new contract with the Reorganized Debtors under which any right to receive any GUC Proceeds will be waived and released.

(xii)    **Treatment of Class 12 Interests – Affiliate Debtor Interests**. Class 12 Interest consist of Affiliate Debtor Interests. The Debtors estimate that there are 2 Holders of such Interests as of the Petition Date. Class 12 Interests are Impaired. Holders of Class 12 Interests shall receive no Distributions under the Plan on account of such Interests, and on the Effective Date, the Class 12 Interests, and all documents and instruments evidencing or governing the same, shall be deemed transferred and assigned to the Reorganized Kirk; provided, however, all membership Interests held by any non-debtor Person or Entity shall be retained by such Person or Entity.

(xiii)    **Treatment of Class 13 Interests – Kirk Interests**. Class 13 Interests consist of all Kirk Interests. Class 13 Interests are Impaired. Holders of Class 13 Interests shall receive no Distributions under the Plan, and on the Effective Date the Class 13 Interests, and all documents and instruments evidencing or governing the same, shall be deemed extinguished and shall be supplanted by New Equity.

## VII.
## THIS CHAPTER 11 PLAN OFFERS RECOVERIES TO CREDITORS THAT ARE HIGHER THAN IF THESE CASES WERE CONVERTED TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

The Debtors and the Lenders believe that recoveries to Creditors will be higher under the Plan than they would be if these Chapter 11 Cases were converted to Cases under Chapter 7 of the Bankruptcy Code for five principal reasons.

First, it is likely that the net proceeds available for distribution to Creditors generally will be higher under the Plan than if these Cases were converted to Cases under Chapter 7 in light of the additional administrative costs of a Chapter 7 case and the reduced asset recoveries as estimated on **Exhibit E** hereto. Specifically, the Debtors have estimated that the aggregate net recoveries under the Plan available for creditors likely will be approximately $31,000,000, whereas the estimated recoveries in Cases under Chapter 7 likely would be not more than $24,900,000, and most likely substantially less than that. This estimated discrepancy is attributable in large measure to the increased disposition costs if these Cases were converted to Cases under Chapter 7, including, without limitation, Chapter 7 Trustee's fees (including the fees of the Trustee's professionals) estimated to be between $747,000 and $900,000.

Second, under the Plan all Allowed Priority Tax Claims and Priority Severance Claims shall be paid in full, thereby meeting the requirement of section 1129(a)(9) of the Bankruptcy Code that Holders of Allowed Priority Claims must be paid in full under the Plan unless they consent to different treatment. In contrast, if these Chapter 11 Cases were converted to Cases under Chapter 7 of the Bankruptcy Code, it is likely that such Holders of Allowed Priority Claims would receive nothing because the requirement of payment in full (or by Creditor consent) is a criterion for confirmation of a plan under Chapter 11, but is not applicable under Chapter 7.

Third, the Plan provides for interest payments to be made monthly to the Lenders under the New Secured Note, whereas the Lenders likely would receive nothing from the properties securing that note for months and perhaps years, absent the provisions of the New Secured Note and the New Mortgage. Moreover, it is unlikely that the three subdivision properties and the Kirk Office Property could be sold immediately upon conversion to Chapter 7 at a price approximately equal to that reflected in the New Secured Note.

Fourth, the Plan provides for GUC Proceeds to be available to Class 8 Creditors and Class 5, Class 6 and Class 11 Creditors that are at least equal to and likely greater than the assets that would be available to such Creditors in the event of a conversion of the Cases to Chapter 7, in that in Chapter 7: (a) the automatic stay would be lifted to permit the Lenders to take back their collateral (perhaps save for the land subject to the Adversary Proceeding Against the Lenders); (b) any assets not subject to the Lenders' liens would be nominal and would be exhausted by Chapter 7 administrative expenses; and (c) the Adversary Proceeding Against the Lenders would be less valuable under the control of a Chapter 7 Trustee than if it remains with the Reorganized Debtors. In Chapter 7, the foregoing factors, combined with Chapter 7 Trustee's fees and other additional Chapter 7 expenses, would virtually assure that the Class 8 and Class 5, Class 6 and Class 11 Creditors would receive nothing, whereas the Plan provides for distributions to all such Creditors.

Fifth, the Plan provides for payments to the Lenders on account of the Lenders' Deficiency Claims. If the Lenders choose the Litigation Election, they will receive payments under the Cash Flow Note. If the Lenders instead elect the Settlement Election, then waiver of the Lenders' Deficiency Claims will be used to effect a settlement of the Adversary Proceeding Against the Lenders, and the Lenders will thus receive a settlement benefit from their Class 9 Claims. Such Class 9 Claims would receive no payment in Chapter 7, however.

Thus, the Debtors submit that it is incontrovertible that the Plan provides more to Holders of certain classes of claims, and in any event not less than would be available to Creditors if the Plan were not confirmed and these Chapter 11 Cases instead were converted to be liquidated under Chapter 7 of the Bankruptcy Code. The Debtors' Liquidation Analysis is attached hereto as **Exhibit E**.

**VIII.**
**SUMMARY OF OTHER PLAN PROVISIONS**

A.      **Bar Date**. Unless otherwise set forth in the Plan or ordered by the Bankruptcy Court, the Bar Date for filing proofs of Claim, or of Interest, as the case may be, against the Debtors shall be **October 15, 2009**. Any Person or Entity that is required to File a proof of Claim or of Interest and fails to timely File such proof of Claim or of Interest, as the case may be, shall be forever barred, estopped and enjoined from asserting such Claim or Interest or participating in Distributions under the Plan on account thereof.

B.      **Funding and Financing**. The Plan will be funded by reorganizing the businesses of the Reorganized Debtors. The Reorganized Debtors will retain four (4) properties: (i) the Apple Creek residential subdivision; (ii) the Rockwell Place residential subdivision; (iii) the Bloomfield Estates residential subdivision; and (iv) the Kirk Office Property. The three

subdivisions collectively encompass more than 250 developed lots. The Debtors have obtained a financing letter from Cole Taylor Bank in the aggregate amount of not less than $3,500,000 to fund new housing starts for the developed lots. Under this facility, funds will be available to build pre-sold Homes, that is against binding purchase contracts for specific lots with agreed predetermined release prices from the Lenders under the New Mortgage, with funding to commence only when all significant contingencies under the contract to purchase have been waived or satisfied. In addition, the New Equity Purchaser will pay not less than $500,000 for all of the New Equity of Reorganized Kirk, and make available $500,000 in additional funding to the Reorganized Debtors to be subordinated to all post-confirmation secured debt contemplated under the Plan. The Reorganized Debtors also may obtain additional sources of funding.

At present, it is anticipated that the principal post-confirmation assets will consist of the following:

(i)   **Existing Homes**.   The Debtors estimate that they will retain approximately 10 to 15 Homes on the Effective Date that will be either ready for closing or still on the market for sale. The Debtors shall conclude the sale of these Homes, and will receive a reasonable fee from the sale proceeds for the prepetition and post-confirmation disposition costs incurred by the Debtors or Reorganized Debtors in selling such Homes. The amount of the fee shall be either agreed upon by the Lenders and the Debtors or, failing that, be determined by the Court pursuant to section 506(c) of the Bankruptcy Code.

(ii)   **Subdivisions and Other Land**.   As described above, the Debtors will retain the residential subdivisions at Apple Creek, Rockwell Place and Bloomfield Estates, plus the Kirk Office Property. The subdivisions at Beacon Pointe and Bloomfield Estate are near completion. When the final closings have occurred at those two subdivisions and the proceeds have been disbursed from the Net Proceeds Escrow, there will be no interest remaining to vest in the Reorganized Debtors or to be subject to any liens on part of the Lenders. The remaining real property, i.e., the commercial property at the Apple Creek location and the Westland property, shall be conveyed to the Lenders by delivery of the Lenders' Deeds in Lieu on the Effective Date; provided, however, that if the Lenders choose the Litigation Election, then the Westland property shall not be conveyed to the Lenders unless the Debtors fail to avoid and recover the Lenders' mortgages on the specific properties in question pursuant to a Final Order resolving the Adversary Proceeding Against the Lenders.

(iii)   **Net Proceeds Escrow**.   The Net Proceeds Escrow holds approximately $5,157,907 in Cash as of July 29, 2009 (which amount includes Cash reserved for payment of potential Mechanic's Lien Claims), and the Debtors estimate that the Net Proceeds Escrow will contain approximately $9,100,000 (which amount will include the net proceeds from the sale of the Freeman Road property) as of the Effective Date. This balance may be reduced by amounts paid from the account to Holders of Class 5 Mechanic's Claims that are deemed to be valid, first-priority liens pursuant to the Lien Resolution Procedures. Conversely, the amounts ultimately available to the Lenders from the Net Proceeds Escrow may become larger to any extent that any Mechanic's Lien Claims are disallowed pursuant to the Lien Resolution Procedures. In addition, the amount in the Net Proceeds Escrow may increase as Home sales are closed post-confirmation; provided, however, that under the Plan, the Debtors retain the right to elect to simply discontinue future work or sales efforts pertaining to the remaining Homes.

(iv)     **Avoidance Actions**. The Plan provides that the Debtors, on behalf of themselves and the Holders of Allowed Claims, will retain all Avoidance Actions (including the Adversary Proceeding Against the Lenders unless settled on the Effective Date pursuant to the Settlement Election) that the Debtors had or had the power to assert immediately prior to the Effective Date. These Avoidance Actions will be deemed assigned to the Reorganized Debtors under the Plan, and the Reorganized Debtors may commence or continue in any appropriate court (including the Bankruptcy Court) or tribunal any suit or other proceeding for the enforcement of such Avoidance Actions. The Debtors have preliminarily reviewed transfers made by the Debtors during the ninety (90) days prior to the Petition Date, as set forth in the Debtors' Statement of Financial Affairs [Docket No. 184], and do not believe that any such transfers (with the exception of the granting of a mortgage on the Kirk Office Property to the Lenders on March 9, 2009) are likely to be subject to avoidance and recovery as preferential transfers under section 547 and 550 of the Bankruptcy Code, as the majority of such transfers are subject to ordinary course defenses or were made on account of payroll payments to Kirk's employees (which would otherwise be subject to priority under the Bankruptcy Code). In addition, the Debtors do not believe that they possess any other Avoidance Actions that have any material value, other than the Adversary Proceeding Against the Lenders. The Reorganized Debtors shall exercise their discretion and business judgment to determine whether pursuit of any Avoidance Actions (other than the Adversary Proceeding Against the Lenders) will be beneficial to the Reorganized Debtors.

(v)     **Causes of Action**. The Plan provides that the Debtors, on behalf of themselves and the Holders of Allowed Claims, will retain all Causes of Action that the debtors had or had power to assert immediately prior to the Effective Date. Such Causes of Action (if any) will be deemed assigned to the Reorganized Debtors under the Plan, and the Reorganized Debtors may commence or continue in any appropriate court (including the Bankruptcy Court) or tribunal any suit or other proceeding for the enforcement of such Causes of Action. The Debtors do not currently believe, however, that they possess any Causes of Action having a value that is material to the viability or feasibility of the Plan.

C.     **Deemed Consolidation for Distribution Purposes; Make-Up Distribution**. Solely for purposes of determining the distributions of GUC Proceeds to Holders of Class 5, 6, 8 and 11 Claims, the Debtors will be deemed consolidated and treated as equivalent to a single legal entity.

Generally, the substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan. The effect of consolidation is the pooling of the assets of, and claims against, the consolidated debtors, satisfying liabilities from a common fund, and combining the creditors of the debtors for the purpose voting on a plan. The authority of a bankruptcy court to order substantive consolidation is derived from its general equitable powers under section 105(a) of the Bankruptcy Code, which provides that the court may issue orders necessary to implement the provisions of the Bankruptcy Code. As there are no statutorily prescribed standards for deemed consolidation, judicially developed standards control whether deemed consolidation should be granted in any given case.

Unlike in cases of substantive consolidation, the Plan provides that the Debtors will be deemed consolidated solely for the purpose of distributing GUC Proceeds to Holders of Allowed Class 5, 6, 8 and 11 Claims to the extent provided in the Plan. This narrowly limited deemed consolidation under the Plan will not result in the merger of, or the transfer or commingling of any assets of, any of the Debtors. All assets (whether tangible or intangible) will continue to be owned by the respective Debtors or Affiliate Debtors, as the case may be. The deemed consolidation will not affect the legal and organizational structure of the Debtors or pre- and post-Petition Date guaranties, liens and security interests, any financing entered into pursuant to any contract or lease that is assumed under the Plan, or distributions out of any insurance policies or proceeds of policies. The foregoing deemed consolidation of the Debtors will result in the deemed elimination of multiple and duplicative claims, joint and several liability claims and guaranties, and the payment of Allowed Claims against each of the Debtors from a common fund. The Debtors believe that the foregoing deemed consolidation of their respective estates provides the best mechanism for the prompt resolution of distributions of GUC Proceeds to Holders of Allowed Class 5, 6, 8 and 11 Claims to the extent provided in the Plan.

Because some of the funding for the GUC Proceeds may derive from the settlement or other resolution of the Adversary Proceeding Against the Lenders, the Plan provides that the Creditors of the two Debtors who granted the Mortgages that are the primary target of the Adversary Proceeding Against the Lenders, namely, Freeman Road and Westland, should receive an additional distribution under the Plan, if needed, to assure their Pro Rata Treatment as creditors of Freeman Road and Westland. The Make-Up Distribution means a supplemental distribution payable to a Holder of an Allowed Class 8 Claims against Freeman Road or Westland in an amount necessary to assure that such Holder receives from the net proceeds of the Adversary Proceeding Against the Lenders its Pro Rata Share of such net proceeds measured by multiplying its percentage of all Allowed Class 8 Claims (including the Claims of Kirk) against Freeman Road or Westland, as the case may be, times the amount of such net proceeds. For purposes of making this calculation, under the Settlement Election, the net proceeds of the Adversary Proceeding Against the Lenders shall be deemed to be $1,079,346 (i.e., $360,000.00, plus 3% of the estimated amount of the Lenders' Deficiency Claims of $23,978,184). For purposes of calculating the net proceeds if the Lenders choose the Litigation Election, the net proceeds shall be the amount actually received on account of any settlement of or judgment in the Adversary Proceeding Against the Lenders, net of all attorneys' fees and other litigation expenses incurred by the Reorganized Debtors following the Effective Date.

D.      **Executory Contracts**.    Within sixty (60) days of the Effective Date, the Reorganized Debtors shall be authorized, without further order of the Bankruptcy Court, to assume or reject any of the executory contracts or unexpired leases set forth on Exhibit K to the Plan by giving thirty (30) days' prior written notice to the parties thereto, not later than the expiration of the foregoing 60-day period, by which such contract or lease shall be deemed assumed or rejected as the case may be. The notice to the contract counterparty of any executory contract or unexpired lease to be assumed shall contain the Debtors' proposed cure amount for such contract or lease, which such cure amount shall be determined pursuant to agreement of the parties or by further order of the Court if no such agreement can be reached. Any rejection damages arising pursuant to a notice of rejection shall constitute Class 8 Claims. Except for the executory contracts and unexpired leases set forth on Exhibit K to the Plan, each executory contract or unexpired lease of the Debtors that has not expired by its own terms or been assumed

prior to the Effective Date, shall be deemed rejected pursuant to section 365 of the Bankruptcy Code on the Effective Date.

All proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases must, unless another order of the Bankruptcy Court provides for a different date, be filed with the Bankruptcy Court within thirty (30) days of the Effective Date, except that such Claims arising from the rejection of any of the executory contracts or unexpired leases set forth on Schedule K to the Plan shall be filed with the Bankruptcy Court within thirty (30) days after the date such executory contract or lease is deemed rejected. Any such proof of Claim that is not timely filed shall be released, discharged and forever barred from assertion against the Debtors, their Estates or Property.

E.      **Disputed Claims.** Objections to Administrative Claims and all other Claims**,** including claims arising from the rejection of executory contracts and unexpired leases, must be Filed with the Bankruptcy Court and served no later than sixty (60) days after the Bar Date. This deadline, however, may be extended by the Bankruptcy Court upon motion of the Reorganized Debtors, without notice or a hearing. On and after the Effective Date (i) the Reorganized Debtors and any other party in interest may object to any Administrative Claims, and (ii) only the Reorganized Debtors may object to Claims other than Administrative Claims (including those Claims listed in the Debtors' Schedules but excluding any Claims deemed Allowed under the Plan). All such objections must be filed prior to the Claims Objection Deadline, and scheduled claims that are subject to any such objection shall not be deemed Allowed Claims pending resolution of the objection with respect thereto.   Notwithstanding the foregoing, (x) the Bankruptcy Court shall overrule any objections to Claims that are deemed Allowed Claims under the Plan and (y) any proof of Claim Filed after the Bar Date will be automatically disallowed as a late Filed Claim, without any action by Debtors, unless and until the party Filing such Claim obtains the written consent of the Debtors, or after the Effective Date, the Reorganized Debtors, to File such Claim late or obtains an order of the Bankruptcy Court upon notice to the Debtors that permits the late Filing of the Claim, in which event, the Debtors, or after the Effective Date, the Reorganized Debtors, shall have thirty (30) days from the date of such written consent or order to object to such Claim, which deadline may be extended with the written consent of the Holder of such Claim or by the Bankruptcy Court upon motion of the Debtors, or after the Effective Date, the Reorganized Debtors, without notice or a hearing.

On and after the Effective Date, the Reorganized Debtors shall establish and maintain the Disputed Claim Reserve for all Disputed Claims.  For purposes of establishing this reserve, Cash will be set aside in an appropriate deposit account equal to the amount that would have been distributed to the Holders of Disputed Claims in such Class had their Disputed Claims been deemed Allowed Claims on the Effective Date, or such other amount as may be approved by the Bankruptcy Court upon motion of the Reorganized Debtors.  If, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefor shall be distributed by the Debtors to the Claimant. The balance of such Cash, if any remaining after all Disputed Claims have been resolved, shall be distributed Pro Rata to Holders of Claims entitled thereto in accordance with Article 4 of the Plan.  No payments or Distributions will be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by final order of the Court.

F.    **Unclaimed Disbursements**.   Except with respect to property not distributed because such property is being held in a Disputed Claim Reserve, Distributions that are not claimed by the expiration of six (6) months from the later of the (a) Effective Date or (b) the date of final Distributions under the Plan will be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and will be disposed of pursuant to the Reorganized Debtors, and the Claims with respect to which such Distributions are to be made will automatically be canceled and extinguished. After the expiration of the six-month period referenced in the preceding sentence, the claim of any party to such Distributions will be discharged and forever barred, and the unclaimed property as well as further Distributions to the party will be Distributed to Holders of Allowed Claims as provided in the Plan.  Nothing contained in the Plan requires the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

G.    **Status of Creditors' Committee Post-Effective Date**.   Except for any ministerial duties or any duties imposed pursuant to the Plan (including, without limitation, Filing applications regarding the fees and expenses of its Professionals), the Committee shall cease operating and dissolve on the Effective Date.

H.    **Injunction**.   Pursuant to 28 U.S.C. § 1651 and sections 105, 1123(b)(3) and 1123(b)(6) of the Bankruptcy Code, and except as otherwise provided in the Plan, the Confirmation Order, or the Lien Resolution Procedures (or proceedings or orders entered pursuant to such Lien Resolution Procedures), on and after the Confirmation Date (subject to the occurrence of the Effective Date) all parties, Persons and Entities who have held, hold or may hold Liens, Claims or Interests in or against the Debtors or Interests in the Debtors are, with respect to any such Liens, Claims or Interests, permanently enjoined from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors or any officer, director, member, shareholder, attorney, other professional or other representative of the Debtors or the Reorganized Debtors, or any of their Property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons and Entities, or any property of any such transferee or successor, (b) enforcing against, levying upon or attaching (including, without limitation, any pre-judgment attachment) the foregoing Persons and Entities, or any property of any such transferee or successor, (c) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment) collecting or otherwise recovering by any manner or means whether directly or indirectly, of any judgment, award, decree or order against the Debtors, the Reorganized Debtors, any of their Property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to any of the foregoing Persons and Entities, (d) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Liens, Claims or Interests of any kind against or in the Debtors, the Reorganized Debtors, any of their Property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons and Entities, (e) asserting, maintaining or failing to withdraw any right of setoff, subordination, or recoupment of any kind, directly or indirectly, against any obligation due the Debtors, the Reorganized Debtors, any of their Property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons and Entities, and (f) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of this Plan.

I.    **Contractor and Supplier Injunction**. Pursuant to 28 U.S.C. § 1651 and sections 105, 1123(b)(3) and 1123(b)(6) of the Bankruptcy Code, and except as otherwise provided in the Plan, the Confirmation Order, or the Lien Resolution Procedures (or proceedings or orders entered pursuant to such Lien Resolution Procedures), on and after the Confirmation Date (subject to the occurrence of the Effective Date) all Contractors, Subcontractors and Suppliers are enjoined from the following: (a) commencing, conducting, or continuing in any manner any action or proceeding of any kind (including any action or proceeding in a judicial, arbitral, administrative, or other forum) against Homebuyers, the Debtors or the Reorganized Debtors or any officer, director, member, shareholder, attorney, other professional or other representative of the Debtors or the Reorganized Debtors (i) any property of the Debtor; (ii) any Home; or (iii) any other property on or to which work or material was performed or provided by the Debtors or any of them ((i), (ii), (iii), and (iv), the "Enjoined Property"), or any direct or indirect successor in interest to the Debtors or the Homebuyers, that in any way results from the Debtors' non-payment for goods or services provided by such party or any other creditor of the Debtor that in any way relates to a Home; (b) enforcing, levying, attaching (including pre-judgment attachment), collecting or otherwise recovering, by any manner or means, any judgment, award, or decree against a Homebuyer or the Debtors, Reorganized Debtors or a Homebuyer, any Enjoined Property, or any direct or indirect successor in interest to the Debtors, Reorganized Debtors or a Homebuyer, that in any way results from the plaintiff's non-payment for goods or services provided by such defendant or any other creditor of any of the Debtors, Reorganized Debtors or a Homebuyer, that in any way relates to a home purchased by a Homebuyer; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien against a Homebuyer or the Debtors, or any property of the Debtors, Reorganized Debtors or a Homebuyer, any Enjoined Property, or any direct or indirect successor in interest to the Debtors or a Homebuyer, that in any way results from the Debtors' non-payment for goods or services provided by such Defendant or any other creditor of the Debtors or the Reorganized Debtors or any officer, director, member, shareholder, attorney, other professional or other representative of the Debtors or the Reorganized Debtors that in any way relates to a home purchased by a Homebuyer; (d) asserting any setoff, right of subrogation, or recoupment of any kind in connection with the assertion of a lien claim, directly or indirectly, against a Homebuyer or the Debtors or the Reorganized Debtors or any property of the Debtors or Reorganized Debtors or a Homebuyer, any Enjoined Property, or any direct or indirect successor in interest to the Debtors, Reorganized Debtors or a Homebuyer that in any way results from the Debtors' non-payment for goods or services provided by such defendant or any other creditor of the Debtor that in any way relates to a home purchased by a Homebuyer; (e) asserting, maintaining or failing to withdraw lien rights of any kind, directly or indirectly, against a Homebuyer or the Debtors, any property of either the Debtors, Reorganized Debtors or a Homebuyer, any Enjoined Property, or any direct or indirect successor in interest to the Debtors or a Homebuyer, that in any way relates to a home purchased by a Homebuyer; (f) asserting any future lien rights of any kind, directly or indirectly, against a Homebuyer or the Debtors or the Reorganized Debtors, or any property of either the Debtors, Reorganized Debtors or a Homebuyer, any Enjoined Property, any property of the Debtors or a Homebuyer's successors, or other property on which any work was performed or to which supplies were delivered or pursuing any remedy against the owner, developer, tenant, or trustee of any such property or their principals. On and after the Confirmation Date (subject to the occurrence of the Effective Date), all Contractors, Subcontractors and Suppliers must take any and all actions necessary or required to release any

and all liens against a Homebuyer or the Debtors or Reorganized Debtors, or any property of the Debtors, Reorganized Debtors or a Homebuyer, any Enjoined Property, or any direct or indirect successor in interest to the Debtors or a Homebuyer, that in any way results from the Debtors' non-payment for goods or services provided by such defendant or any other creditor of the Debtors that in any way relates to a Home.

J.    **Exculpation**. Pursuant to 28 U.S.C. § 1651 and sections 105, 1123(b)(3) and 1123(b)(6) of the Bankruptcy Code, and except as otherwise provided in the Plan, the Confirmation Order, or the Lien Resolution Procedures (or proceedings or orders entered pursuant to such Lien Resolution Procedures), upon confirmation of this Plan (subject to the occurrence of the Effective Date) all Persons and Entities shall be conclusively presumed to have released each of the Debtors, the Reorganized Debtors or any officer, director, member, shareholder, attorney, other professional or other representative of the Debtors or the Reorganized Debtors, the Estates, the Committee, the Agent, the Lenders, and the Reorganized Debtors, and any of their respective past or present officers, directors, managers, members, employees, representatives, counsel, advisors, consultants or other agents, successors or assigns (collectively, the "Releases") of and from any claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Cases, including, without limiting the generality of the foregoing, the negotiation, formulation and preparation of the Plan and this Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the pursuit of the Adversary Proceeding Against the Lenders, the consummation of this Plan, the administration of this Plan or the property to be distributed under this Plan, retention payments and other compensation and bonuses paid to directors, officers and other key employees of the Debtors, whether before or after the Petition Date, except for acts or omissions that constitute actual fraud or criminal conduct under any applicable statute, as determined in a Final Order, and all such Releases, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code and Bankruptcy Rules. Notwithstanding this Section, the parties in these Chapter 11 Cases shall remain bound by the terms and provisions of the Court's orders entered in these Chapter 11 Cases, as applicable.

K.    **Debtors' Release and Injunction**. Pursuant to 28 U.S.C. § 1651 and sections 105, 1123(b)(3) and 1123(b)(6) of the Bankruptcy Code, and except as otherwise provided in the Plan, the Confirmation Order, or the Lien Resolution Procedures (or proceedings or orders entered pursuant to such Lien Resolution Procedures), upon confirmation of the Plan (subject to the occurrence of the Effective Date) each of the Debtors, or any officer, director, member, shareholder, attorney, other professional or other representative of the Debtors or the Reorganized Debtors on their own behalf, as the Reorganized Debtors and as the representative of the Debtors' Estates, shall be deemed to have waived, released and discharged, and shall be permanently enjoined from initiating or continuing, any claim, action, employment of process, or any act to collect, offset, or recover, any and all claims, obligations, rights, Causes of Action, Avoidance Actions and liabilities, whether based in tort, fraud, contract or otherwise, known or unknown, that they possessed, possess or may possess prior to the Effective Date, and whether arising before or after the Petition Date, against Releases, or any of their respective past or present officers, directors, managers, members, employees, representatives, counsel, advisors, consultants or other agents, successors or assigns, and that arise from or are related to such Claims or Interests, including, without limitation, with respect to retention payments and other

compensation and bonuses paid to directors, officers and other key employees of the Debtors, whether before or after the Petition Date, derivative claims, claims under section 506(c) of the Bankruptcy Code and the matters described in Section 4.16 of the Plan, provided that the foregoing release shall not apply to any action or omission that constitutes actual fraud or criminal conduct under any applicable statute.

L.   **Accepting Holders' Release and Injunction**. Pursuant to 28 U.S.C. § 1651 and sections 105, 1123(b)(3) and 1123(b)(6) of the Bankruptcy Code, each Holder of a Claim who votes in favor of this Plan, who accepts any Distributions pursuant to Article 4 of the Plan, or who does not object to this Section (each an "Accepting Holder") shall be conclusively deemed to have unconditionally waived, released and discharged, and shall be permanently enjoined from initiating or continuing, any claim, action, employment of process, or any act to collect, offset, or recover, any and all claims, obligations, rights, Causes of Action and liabilities, whether based in tort, fraud, contract or otherwise, known or unknown, that they possessed, possess or may possess prior to the Effective Date, and whether arising before or after the Petition Date, against any of the Releases, including, without limitation, with respect to retention payments and other compensation and bonuses paid to directors, officers and other key employees of the Debtors, whether before or after the Petition Date, provided that the foregoing release shall not apply to any action or omission that constitutes actual fraud or criminal conduct under any applicable statute.

M.   **Discharge of Claims; Termination of Equity Interests and Rights**.   Except as otherwise expressly provided in the Plan or the Confirmation Order, pursuant to Section 1141(d)(1) of the Bankruptcy Code, all Claims against the Debtors arising before the entry of the Confirmation Order shall be discharged as of the Effective Date, regardless of whether the Holder of the Claim or any other Person filed a proof of claim based on the debt, and whether or not a Claim is allowed under Section 5.02 of the Bankruptcy Code or whether the Holder of the Claim has accepted this Plan.   In addition, as of the Effective Date, the rights and interests of all equity security holders are extinguished and terminated with respect to the Kirk Interests and all New Equity interests in Reorganized Kirk shall be vested in the New Equity Purchaser. Nonetheless, the membership interests owned by Kirk shall remain in full force and effect: Affiliate Debtors' Interests and Kirk's interests in non-debtor affiliates of Kirk shall remain in effect and in force and shall not be terminated, but shall be deemed vested in and transferred and assigned to the Reorganized Kirk as of the Effective Date.

N.   **Retention of Claims**.   The Plan provides that pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, but subject to any limitation in the Plan, the Debtors, on behalf of themselves and the Holders of Allowed Claims, shall retain all Causes of Action, including the Adversary Proceeding Against the Lenders, and all Avoidance Actions that in either case the Debtors had or had power to assert on the Effective Date, which Causes of Action and Avoidance Actions shall be deemed assigned to the Reorganized Debtors as provided in the Plan, and the Reorganized Debtors may commence or continue in any appropriate court or tribunal (including the Bankruptcy Court) any suit or other proceeding for the enforcement of such Causes of Action and Avoidance Actions. The Reorganized Debtors may in their sole discretion elect not to pursue any Avoidance Action or Cause of Action the pursuit of which they deem not to be in the best interests of the Estates.

O.     **Retention of Jurisdiction.**  The Plan provides that following the Confirmation Date and until such time as all payments and Distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by the Debtors initiated in the Bankruptcy Court are resolved, the Bankruptcy Court shall retain sole jurisdiction to the full extent that retention thereof is legally permissible, including, without limitation, for the following purposes:

(i)     **Claims**.     To determine the amount, allowability, allocability, classification, or priority of Claims against the Debtors, including (without limitation) rejection claims arising pursuant to section 502(g) of the Bankruptcy Code, upon motion or upon objection to any Claim by the Debtors or any other party in interest;

(ii)     **Claims Estimation**.  To estimate Claims for purposes of allowance pursuant to section 502(c) of the Bankruptcy Code, including (without limitation) estimation of Claims of parties asserting setoff or rights of recoupment against amounts owed to the Debtors;

(iii)     **Injunction, etc**.  To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person or Entity;

(iv)     **Professional Fees**.  To determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods before the Effective Date, as provided for in this Plan;

(v)     **Certain Priority Claims**.  To determine any Priority Tax Claims, Priority Claims, Administrative Claims or any requests for payment of Administrative Claims;

(vi)     **Lien Resolution Proceedings**.  To make determinations of Liens pursuant to the Lien Resolution Proceed;

(vii)     **Dispute Resolution**.  To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of this Plan and the making of Distributions thereunder, including, without limitation, any dispute concerning payment of Professional Fees and expenses;

(viii)     **Leases and Executory Contracts**.  To determine any and all motions for the rejection of executory contracts or unexpired leases, and to determine the allowance of any Claims resulting from the rejection of executory contracts and unexpired leases or cure Claims resulting from the assumption of executory contracts and unexpired leases;

(ix)     **Actions**.  To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted prior to the closing of the

Chapter 11 Cases, except any action in which the Debtors are a plaintiff in any state or federal court (other than the Bankruptcy Court) as of the Effective Date;

   (x) **363 Sales**.  To hear and determine motions by the Reorganized Debtors to sell assets of the Estate pursuant to section 363 of the Bankruptcy Code and all issues and contested matters relating thereto;

   (xi) **General Matters**.  To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order as may be authorized under provisions of the Bankruptcy Code;

   (xii) **Deadlines**.  To extend any deadline, timetable or timeline set forth in the Plan upon the filing of a motion by any party in interest.

   (xiii) **Plan Modification**.  To modify this Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order so as to carry out its intent and purposes;

   (xiv) **Aid Consummation**.  To issue such orders in aid of consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

   (xv) **Implementation of Confirmation Order**.  To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; and

   (xvi) **Final Order**. To enter a Final Order confirming substantial consummation of the Plan and closing the Chapter 11 Cases.

## IX.
## CONFIRMATION AND ACCEPTANCE

  To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including that: (i) the Plan has classified all claims in a permissible manner; (ii) the contents of the Plan comply with the technical requirements of chapter 11 of the Bankruptcy Code; (iii) the Debtors have proposed the Plan in good faith; and (iv) the Debtors' disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and the Debtors' Chapter 11 Cases. The Debtors believe that all of these conditions have been met or will be met and will seek rulings of the Bankruptcy Court to this effect at the hearing on confirmation of the Plan.

  The Bankruptcy Code also requires that the Plan be accepted by the requisite votes of holders of claims, that the Plan be feasible, and that entry of a Confirmation Order, absent unanimity, be in the best interests of the holders in each impaired class of claims. To confirm the Plan, the Bankruptcy Court must make independent findings that all of these conditions are met, even if all classes of creditors accept the Plan by the requisite votes. The classification, feasibility, and acceptance conditions to confirmation are discussed below.

A.    **Classification of Claims.** The Bankruptcy Code requires that the Plan place each claim or interest in a class with other claims or interests that are substantially similar. The Debtors believe that the Plan satisfies the Bankruptcy Code's standards for appropriate classification.

B.    **Feasibility.** As a condition to Confirmation, the Bankruptcy Code generally requires that confirmation is not likely to be followed by a chapter 7 liquidation or the need for further financial reorganization. This requirement is generally referred to as the feasibility test of section 1129(a)(11) of the Bankruptcy Code. The Debtors submit that the Plan is feasible and otherwise complies with section 1129(a)(11) of the Bankruptcy Code. The Debtors have prepared financial projections running through June 2011 that evidence the feasibility of the Plan. The Debtors also have obtained letters from one or more financial institutions showing that construction financing will be obtained.  In addition, the New Owner will purchase 49% of the stock of the Reorganized Debtor, and also provide additional liquidity for the business post-confirmation. The Debtors' Business Plan, including cash flow and budget, is attached hereto as **Exhibit F**.

C.    **Acceptance.** As another condition to entry of a Confirmation Order, the Bankruptcy Code requires that each impaired class of claims or interests accepts the Plan. The Bankruptcy Code defines acceptance of the Plan by a class as acceptance by the holders of two-thirds in dollar amount and a majority in the number of claims in that class, but for this purpose only counts those who actually vote to accept or reject the Plan.  Holders of Class 1, 5, 6, 8, 9 and 11 Claims are Impaired Classes under the Plan and therefore are entitled to vote.  Holders of Class 12 Interests and Class 13 Interests do not receive any Distribution and are deemed to have rejected the Plan.

If any Impaired Class of Claims or Interests entitled to vote does accept the Plan by the requisite majorities provided in sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Debtors reserve the right (i) to amend the Plan, (ii) to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or (iii) both to amend the Plan and to seek Confirmation of any amended plan pursuant to section 1129(b) of the Bankruptcy Code.

## Alternatives, Best Interests of Creditors and Liquidation Analysis

The only realistic alternative to the Plan is a liquidation of the Debtors' remaining assets through a conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code as described in the Liquidation Analysis set forth in **Exhibit E** hereto. The Debtors believe that such a conversion of these cases would result in a delayed distribution to creditors and a smaller percentage recovery for unsecured creditors than would be realized under the Plan, since, among other reasons, (a) a chapter 7 trustee, not having been previously acquainted with the cases, would require additional time to learn the necessary details of the cases; and (b) the trustee's fees, and the fees of its own professionals would be payable ahead of the claims of the unsecured creditors pursuant to the provisions of the Bankruptcy Code. Thus, the Plan represents the best alternative for the unsecured creditors.

Moreover, the Plan is in the best interests of creditors. The "best interests" test requires a finding that the Plan will provide to each member of each impaired class of claims and interests property of a value, as of the Effective Date of the Plan, at least equal to the amount such member would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Debtors submit that the Plan provides a recovery to impaired classes that is equal to or greater than the amount each class member would receive as a result of liquidation under chapter 7 of the Bankruptcy Code. In the event that the Debtors' cases were converted to a chapter 7 liquidation, the additional costs arising from the appointment of a trustee completely unfamiliar with the Debtors' business and the proceedings in these cases would impose further administrative expenses upon the estates, not limited to professional fees earned and expenses incurred by the trustee. Any proceeds realized from the liquidation by a chapter 7 trustee would first be used to pay all costs and expenses incurred from and after the date of conversion to chapter 7, including the trustee's fees and the fees of all professionals retained by such trustee.

Pursuant to section 326 of the Bankruptcy Code, the statutory chapter 7 trustee fee shall not exceed 25% of the first $5,000 disbursed, 10% on any amount disbursed in excess of $5,000 but not in excess of $50,000, 5% on any amount disbursed in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3% on any amounts in excess of $1,000,000. Due to this additional administrative cost and the other additional administrative expenses entailed by a conversion to Chapter 7, the Debtors believe that Creditors holding Unsecured Claims stand to receive more under the Plan than they would pursuant to a liquidation under chapter 7 of the Bankruptcy Code.

The Debtors further maintain that if the Lenders elect the Litigation Election, then the Reorganized Debtors are better suited to pursue the Adversary Proceeding Against the Lenders than a Chapter 7 trustee would be. The officers of the Reorganized Debtors are familiar with the underlying transactions and factual issues, and the Reorganized Debtors will be better situated financially to fund the litigation than would a Chapter 7 trustee.

Pursuant to Local Bankruptcy Rule 3016-1, the Debtors are required to provide a summary exhibit setting forth a Liquidation Analysis as if the Debtors assets were liquidated under chapter 7 of the Bankruptcy Code. This summary is attached to this Disclosure Statement as **Exhibit E**.

## X.
## CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any other alternative because it will result in the greatest recovery to holders of all claims. Other alternatives would involve significant delay, uncertainty, and substantial additional administrative costs. The Debtors therefore recommend voting to accept and confirm the Plan. Please fill out the enclosed ballot and mail it in the enclosed addressed envelope in accordance with the instructions provided with the ballot. Ballots must actually be received by August ___, 2009 at 5:00 pm (Central Standard Time).

Dated: August 5, 2009                    Respectfully submitted,

**THE KIRK CORPORATION**

By: __/s/ John Carroll_____
Its: President and Chief Executive Officer

- and-

**APPLE CREEK ESTATES, LLC; BEACON
POINTE WEST, LLC; BLOOMFIELD
ESTATES, LLC; LAUREL MEADOW, L.L.C.;
THE LINDENS VENTURE, L.L.C.;
ROCKWELL PLACE, LLC; STONEGATE
VILLAGE, LLC; WING POINTE NORTH,
L.L.C; WESTLAND, LLC; BLOOMFIELD
WEST, L.L.C.; AND FREEMAN ROAD
DEVELOPMENT, LLC**

By: __/s/ John Carroll_____
Its: President and Chief Executive Officer of
    The Kirk Corporation, Member


By: __/s/ Forrest B. Lammiman_____
    One of Their Attorneys

Forrest B. Lammiman (ARDC No. 6208632)
David L. Kane (ARDC No. 6277758)
MELTZER, PURTILL & STELLE LLC
300 South Wacker Drive, Suite 3500
Chicago, Illinois 60606
(312) 987-9900
(312) 987-9854 (facsimile)

# DISCLOSURE STATEMENT

### with respect to

### DEBTORS' JOINT PLAN OF REORGANIZATION

## LIST OF EXHIBITS

**Exhibit A**:  Summary of Proposed Distributions

**Exhibit B**:  Developed and Undeveloped Land

**Exhibit C**:  Consolidated Financial Statements for 2007

**Exhibit D**:  Consolidated Financial Statements for 2008

**Exhibit E**:  Liquidation Analysis

**Exhibit F**:  Cash Flow and Budget for Plan

**Exhibit G**:  Officers & Directors of Reorganized Debtors; Insiders