**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | Bankruptcy No. 09-17236 |
| THE KIRK CORPORATION, | ) | (Jointly Administered) |
| | ) | |
| | ) | Judge Carol A. Doyle |
| Debtor. | ) | |
| | ) | |

**OBJECTION OF JPMORGAN CHASE BANK, N.A., AS AGENT AND LENDER, TO
CONFIRMATION OF THE DEBTORS'
SECOND AMENDED PLAN OF REORGANIZATION**

NOW COMES JPMorgan Chase Bank, N.A., as Agent for the prepetition lenders (the "*Lenders*") of The Kirk Corporation and certain of its affiliates, and as Lender (in both capacities, "*JPMorgan*"), by and through its undersigned counsel, and objects to the Debtors' Second Amended Plan of Reorganization (the "*Second Amended Plan*"). In support hereof, JPMorgan states as follows:

## I.      INTRODUCTION

1.      The Second Amended Plan cannot be confirmed over the objection of JPMorgan. It does not comport with the requirements of either section 1129(a) or section 1129(b) of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "*Bankruptcy* Code"). The Second Amended Plan proposes that repayment of the Lenders' claims be stretched out over 15 years, in an "interest-free, principal only" loan that (i) does not provide the Lenders' with the present value of their secured claim, and (ii) drastically changes (for the worse) the risk to which the Lenders are exposed. The Lenders are paid only $14 million over the first fourteen years of the loan term, or just a touch over half of the current value of their collateral (approximately $27 million using the Debtors' numbers), not enough even to cover interest on that amount at the

nominal and insufficient rate proposed by the Debtors as the "implied interest rate".  The Plan

then provides for a balloon payment of $38 million in the fifteenth year of the loan term, or over

70% of the total debt of $53 million (again using the Debtors' numbers).  The Second Amended

Plan further permits the sale and use of the Lenders' collateral, including unfettered use of all

cash to pay the costs of the administration of these chapter 11 cases, professional fees, and post-

confirmation overhead, construction and development.  Confirmation should be denied.

## II.      **BACKGROUND**

### A.      **The Bankruptcy Cases**

2.      On May 12, 2009 (the "*Petition Date*"), nine of the Debtors filed voluntary

petitions for relief under chapter 11 of title 11 of the Bankruptcy Code.  Two additional Debtors,

Freeman Road Development, LLC and Westland, LLC,  filed voluntary petitions on June 8,

2009.

3.      On May 28, 2009, the Office of the United States Trustee appointed an Official

Committee of Unsecured Creditors (the "*Creditors' Committee*").

### B.      **The Lenders' Claims**

4.      As of the Initial Petition Date, the Debtors were indebted to JPMorgan in the

amount of at least $52,031,091, plus, without limitation, interest, fees, expenses, and costs that

continue to accrue (to the extent permitted by the Bankruptcy Code) under a loan ("*Loan*")

evidenced by, among other things, an Amended and Restated Borrowing Base Revolving Line of

Credit Agreement dated as of August 25, 2006 (as amended from time to time, the "*Credit

Agreement*") and certain related loan documents, mortgages and security agreements

(collectively with the Credit Agreement, the "*Loan Documents*").  The Loan matured on its own

terms on June 30, 2009.  Long before the Petition Date, the Debtors had defaulted under the

terms of the Loan Documents.

2

5.      The obligations of the Debtors under the Loan Documents are secured by properly perfected first priority security interests in the nearly all of the assets of the Debtors (the "*Collateral*").  More specifically, the Lenders hold a lien in the Apple Creek, Rockwell Place, Bloomfield Estates residential real estate developments, plus a lien in certain commercial properties, including Apple Creek, Freeman/Sheehan, Welch Fields (also referred to as "Westland")[1], and the Debtors' corporate headquarters.  The Lenders also hold a lien in the personal property of the Utility Company, and also hold a replacement lien the real estate of the Utility Company through the Final Cash Collateral Order (Docket No. 155).  The Debtors do not own any other property.

6.      The following is a comparison of the values ascribed to each of the parcels of property by the Debtors and the Lenders:

| Property | Debtors' Value | Lenders' Value |
|---|---|---|
| Rockwell Place | $650,600[2] | $1,630,000 |
| Bloomfield/Herrington | $599,500 | $845,000 |
| Apple Creek | $4,052,000 | $7,242,500 |
| Apple Creek Commercial | $7,515,000 | $7,515,000 |
| Welch Fields Commercial | $2,714,000 | $2,700,000 |

---

[1]      As a preliminary matter, the Debtors have filed an Adversary Proceeding against the Lenders, which is a fraudulent conveyance/preference action seeking to avoid two mortgages that the Lenders received on the Freeman/Sheehan  and Welch Fields properties, as well as the Kirk corporate headquarters.  At the Cash Collateral Hearing held on June 22-23, 2009, Judge Wedoff  made preliminary findings that place doubt on any chance of success of the Debtors' prevailing in the Adversary Proceeding.  (Transcript at pp. 328-330, 344-347)  ("Well, the point I think is that the reason why it's not a fraudulent transfer is that all of these entities support the same basic principal, which is Kirk Corporation.", at p. 328.)

[2]      The Debtors' values for Rockwell Place, Bloomfield/Herrington and Apple Creek are taken from the Renzi & Associates, Inc. appraisals produced by the Debtors.  The Debtors did not have either the Apple Creek Commercial or Welch Fields Commercial appraised, and they appear to be using the values from the Lenders' appraisals.  All the values in the "Debtors' Value" column of this chart are the numbers used by the Debtors in their Business Forecast that was prepared in connection with their Second Amended Plan and that is attached hereto as Exhibit A (the "Debtors' Business Forecast").

DM3\1128868.4

| | | |
|---|---|---|
| **Kirk Office** | **$100,000** | **$100,000**[3] |
| **Cash** | **$9,821,000** | **$9,821,000** |
| **Utility Company** | **$1,500,000** | **$1,500,000**[4] |
| **Total** | **$26,952,100** | **$31,353,500** |

7.     The Debtors are in the home building industry.  The Lenders' primary Collateral (which is substantially all of the Debtors' assets) consists of lots and homes that have been constructed on the lots, or parcels of undeveloped land.  The pool of Collateral is finite and cannot be replaced.  This is not a situation where the Debtors produce a consistent stream of revenue through the use of the Lenders' Collateral and the Collateral is replenished.

8.     The Second Amended Plan lists the obligations of the Debtors to the Lenders, exclusive of the Lenders' $1.5 million claim for the post-petition use of its cash collateral, as $52,031,091.  JPMorgan believes that the Lenders have a total claim of $52,443,560.92, plus additional fees and costs, as of May 12, 2009, but for purposes of this Objection, will use the Debtors' number of $52,031,091.

**B.     The Plan Process**

9.     The Debtors filed their First Amended Plan (Docket No. 265) and their Disclosure Statement with respect to the Plan (Docket No. 267) on August 14, 2009.  A combined hearing on the adequacy of the Disclosure Statement and confirmation of the First Amended Plan was initially set for September 2, 2009 at 10:30, both the First Amended Plan and the Disclosure Statement were served, and ballots were due on August 28, 2009.  This gave creditors only

---

[3]     For convenience, the Lenders use the Debtors' value for the Kirk office building, which they did not have appraised, as well as for the current balance of the Net Proceeds Escrow, both as set forth in the Debtors' Business Forecast.  The Lenders have not been able to confirm the balance of the Net Proceeds Escrow.
[4]     This value was determined by Judge Wedoff at the Cash Collateral Hearing held on June 22-23, 2009.

fourteen days notice by mail of the balloting deadline and nineteen days notice of the plan/confirmation hearing. This accelerated schedule was at the insistence of the Debtors, who were fast approaching administrative insolvency.

10.    On Friday, August 28, 2009, in the afternoon, the Debtors informed JPMorgan that they were going to request that the Court bifurcate the combined hearing, and that they were going to move forward on adequacy of the disclosure statement alone on September 2nd. JPMorgan suspects that this continuance was motivated by the Debtors lack of funding for its proposed reorganization. Attached to the First Amended Plan as Exhibit I was a "Construction Loan Letter" from Cole Taylor Bank that was to evidence in some fashion the ability of the Debtors to actually consummate their plan and to finance the building of new homes. The "Construction Loan Letter" stated:

> This letter is a financing proposal <u>representing your application for the proposed Loan and is not a commitment to lend, either expressed or implied, and does not impose any obligation on the Bank</u>. Any commitment that may be issued by the Bank shall be subject to full underwriting and approval procedures of the internal committees of the Bank.

(First Amended Plan at Exhibit I, p. 6 (emphasis added).) In a telephone conference late in the week of August 28th, Debtors' counsel informed JPMorgan that there was no further commitment from Cole Taylor and that none was expected before the September 2, 2009 Hearing.

11.    In any event, this Court allowed (and the Lenders did not object to) the bifurcation, and the hearing went forward as to adequacy of disclosure alone at the September 2nd hearing. At the hearing, the Lenders elected to have their entire claim treated as a secured claim under section 1111(b)(2) of the Bankruptcy Code. The parties agreed that the Debtors would provide JPMorgan with their Second Amended Plan on September 5th, with follow up financial information on or before noon on September 9th. The Second Amended Plan abandons the idea

5

of outside financing in its entirety (certainly supporting JPMorgan's earlier suspicions that the confirmation hearing was postponed due to a lack of financing) and now proposes to use cash held in the "Net Proceeds Escrow," [5] which consists of the proceeds of the Lenders' Collateral, to fund their reorganization, thereby forcing the Lenders to continue to loan money to the Debtors for a term of fifteen years.

### III.   BURDEN OF PROOF

12.     The Debtors bear the burdens of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied.  7 Alan N. Resnick and Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 1129.02[4] (15th ed. 2009).  The Debtors also bear the burden of proof by, at the least, a preponderance of the evidence as to the requirements of section 1129(b). *See, e.g., Grogan v. Garner,* 498 U.S. 279 (1991) (the preponderance of the evidence standard is presumed to be applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake); *7* COLLIER ON BANKRUPTCY ¶ 1129.02[4].

13.     Some courts have found that the requirements of section 1129(b) must be proven by clear and convincing evidence.  *See, e.g., In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr. N.D. Ill. 1990) (noting that the proponent must prove by clear and convincing evidence all elements to meet the requirements of section 1129(b)); *see also In re Bloomingdale Partners*, 155 B.R. 961, 983 (Bankr. N.D. Ill. 1993) (noting both standards, but not deciding issue); 7 COLLIER ON BANKRUPTCY ¶ 1129.02[4], at 1129-22, fn. 18 (noting both standards, but finding preponderance of the evidence to be better reasoned view).  Here, where the property and property rights of the Lenders are clearly being taken by the Debtors, the clear and convincing standard should apply, and the Debtors should be held to the quantum of proof which leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question.

---

[5]     All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

However, the Lenders do not believe that the Debtors can even meet the less stringent preponderance of the evidence standard.

## IV.    THE SECOND AMENDED PLAN

14.    The claims of the Lenders are placed into Class 1, the "Lender 1111(b)(2) Claims." The class is impaired. *See* Section 4.3 of the Plan ("Class 1 Claims are Impaired"). The Lenders have rejected the First Amended Plan, and for the avoidance of doubt, hereby reject the Second Amended Plan.

The Lenders' Secured Class 1 Claim

15.    The Second Amended Plan provides that the Class 1 Secured Claims shall receive the New 1111(b)(2) Secured Note in the principal amount of $53,531,091 (which consists of the Lenders' claim of $52,031,091 plus the $1.5 million of the Lenders' cash collateral that was used by the Debtors during these cases), executed by all of the Reorganized Debtors (other than Freeman Road and Westland), and the Utility Company (which is not a Debtor, but is a borrower under the Credit Agreement).

(A)    The terms of the Note are as follows:[6]

> *    $52,031,091 of the Note earns no interest. The loan is described as "an interest-free, principal-only obligation". The $1.5 million replacement lien obligation bears interest at the Prime Rate. (Second Amended Plan at § 4.3(a)(ii).)

> *    The term is for fifteen years, through December 31, 2024, or earlier if the Debtors elect to repay the loan. (Second Amended Plan at § 4.3(a)(iv).)

(B)    The Debtors will make the following payments under the Note (Second Amended Plan at § 4.3(a)(v)):

---

[6]    The terms of the proposed loan documents provided by the Debtors do not provide the Lenders with the protections to which they are entitled as they do not contain basic lender protections, such as customary affirmative covenants, negative covenants, financial covenants, events of default, and representations and warranties, among other things. At a minimum, these documents must be revised to reflect these standard and customary provisions.

7

(i)     Beginning on December 31, 2010, a "Required Minimum Annual Payment" equal to the greater of (i) $1,000,000 or (ii) all Minimum Lot Release Payments and Market Escalator Lot Release Payments paid during any calendar year.

(ii)    Any then outstanding balance of the Note shall be paid not later than December 31, 2024.

**A review of the Debtors' Business Forecast reveals that only $14,234,296 will be paid over the first fourteen years of the Note term, and that <u>a balloon payment of $38,297,038 is due in the 15th year</u>. (Ex. A, Debtors' Business Forecast at p. 2.)**

(C)     The Debtors will retain and use all of the Collateral, including (Second Amended Plan at § 4.3(a)(iii)):

(i)     All cash, including cash in the Net Proceeds Escrow and the Cash Collateral Account;

(ii)    all real property and improvements;

(iii)   all personal property and other assets that are subject to the Lenders' liens;

(iv)    all real and personal property acquired by the Debtors or Reorganized Debtors, other than that financed by a third-party lender; and

(v)     the Utility Company real and personal property.

(D)     Any existing Homes (other than models) shall be finished, as needed, and sold by the Reorganized Debtors, with 100% of the net proceeds to be deposited into the Net Proceeds Escrow.  (Second Amended Plan at § 4.3(a)(vi).)

(E)     If either of the Westland property or the Apple Creek Commercial property are sold, or if any bulk sale of ten or more residential lots occurs, the net proceeds of any these "Bulk Sales" will be deposited into a "Cash Collateral Account".  (Second Amended Plan at § 4.3(a)(vii).)

(F)     The Lenders will receive a first-priority perfected lien in the cash in the Cash Collateral Account and Net Proceeds Escrow.  (Second Amended Plan at § 4.3(a)(iii).)  However, this lien is illusory as the cash may be used as follows (Second Amended Plan at § 4.3(a)(ix)(2)):

(i)     For "Prepayments" at the Debtors discretion, which will reduce the balance of the Note by an amount that includes the amount of the prepayment PLUS an additional credit for interest on any amount prepaid at the rate of 6%, to

be compounded annually and calculated from the date the Prepayment is made through December 31, 2024;

(ii)     for any expense reasonably incurred to conduct the residential homebuilding business of the Reorganized Debtors;

(iii)     for payment of any administrative priority expense claims incurred during the chapter 11 cases and post-confirmation professional fees;

(iv)     for working capital;

(v)     for construction and development funding;

(vi)     for the purchase and development of additional land; and

(vii)     to retain as Cash Collateral securing the Note.

(G)     The New Credit Agreement is to have a financial covenant that requires the Reorganized Debtors to achieve a "Minimum Net Improvement", which is an average annual improvement of 3% per calendar year in the "Collateral Surplus/Shortfall" (which is not defined in the Plan, but which appears to be the difference between the value of the Collateral less the loan balance). This covenant is measured only at three-year intervals during the term of the Note, beginning January 1, 2011 through December 31, 2013. (Second Amended Plan at § 4.3(a)(ix)(1).)

(H)     The Reorganized Debtors will execute a New Credit Agreement, a Replacement Note, and the Replacement Mortgage on the Utility Company Property.  (Second Amended Plan at § 4.3(a)(iii)(5), (b) and (c) ).)  It appears that the previous mortgages granted to the Lenders will pass through bankruptcy unaffected.

## V.     __OBJECTION__

16.     The Second Amended Plan does not meet the requirements of either section 1129(a) or section 1129(b).  Section 1129(a) provides that a plan may be confirmed only if certain requirements are met.  The Second Amended Plan does not comply with sections 1129(a)(7), (8) or (11), and cannot be confirmed.  The Plan fails to comply with section 1129(a)(7) because the Debtors cannot and do not provide the Lenders with property of a value, as of the effective date of the Plan, that is not less than the value of the Lenders' interest in the

estate's interest in the property that secures such claims.  Nor does the Plan comply with section

1129(a)(11) in that it is not feasible and is likely to be followed by the liquidation, or the need for

further financial reorganization, of the Debtors.    Moreover, the Plan does not meet the

requirements of section 1129(a)(8) in that the Lenders are impaired and have not accepted the

Plan.  As such the Debtors also are required to meet the "cram down" requirements of section

1129(b), which they do not do as the Second Amended Plan discriminate unfairly against the

Lenders and is not fair and equitable.

> **A.    The Second Amended Plan Impermissibly Provides
> for the Release of the Lenders' Liens**

17.    An over-riding problem with the Second Amended Plan is that it does not provide

for the retention of the Lenders' liens.  It provides for the sale of the Lenders' Collateral, through

the sale of lots (§ 4.3(a)(v) (providing for minimum lot release payments); the sale of existing

homes (§ 4.3(a)(vi)); and potential bulk sales of the Westland and Apple Creek Commercial

properties (§ 4.3(a)(vii)), and the placement of that cash either in the Net Proceeds Escrow or a

"Cash Collateral Account."    In addition, since the Petition Date, the proceeds of the sales of

homes and other land post-petition have been placed in the Net Proceeds Escrow; the proceeds of

future sales of currently existing homes and other land will also be placed in either the Cash

Collateral Account or the Net Proceeds Escrow. [7]  None of this cash will be distributed to the

Lenders either on the Effective Date of the Plan or as the Collateral is sold.  Presumably at time

the collateral is sold, the Lenders will be asked to release their liens on the homes and lots.  The

Debtors will have free reign to utilize this money, eliminating the Lenders' lien in the cash that

serves as their Collateral as that cash is used, and paying the Lenders only a small fraction of the

---

[7]    In 2014, the balance in the Net Proceeds Escrow dips from the initial $9,821,000 to $1,001,487.  (Debtors' Business Forecast at pp. 2 and 13.)  The Debtors do not generate any significant cash until after this point, or more than five years out.

amount owed to it ($1 million per year)—not enough even to cover interest on the value of the

Collateral.[8]  *See* Exhibit B hereto.  This is objectionable on many grounds.

### 1.   **Section 1129(a)(7)**

18.    By eliminating the Lenders' liens in their Collateral, including their cash

collateral, the Second Amended Plan does not meet the requirements of section 1129(a)(7).

Section 1129(a)(7)(B) provides that a court shall confirm a plan only if:

> (7) With respect to each impaired class of claims or interests—
>
> (B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

11 U.S.C. § 1129(a)(7)(B).  The requirements of this section are similar to those contained in

section 1129(b)(2)(A)(i)(II).  *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II) and discussion thereof, *infra*.

The main difference between section 1129(a)(7) and section 1129(b)(2)(A)(i)(II) is that section

1129(a)(7)(B) speaks in terms of "property of a value" whereas section 1129(b)(2)(A)(i)(II)

speaks in terms of "deferred cash payments."  7 COLLIER ON BANKRUPTCY ¶ 1129.03[7][d].

19.    In the context of a section 1129(a)(7) analysis, the focus is thus on the value of

the "property" given to the Lenders under the Second Amended Plan as of the effective date.

This is the "best interests of creditors" test, and judges whether the "property" given to the

Lenders under the Plan has a value, as of the effective date of the plan, that is not less than the

value of the Lenders' interest in the estate's interest in the property that secures such claims.

---

[8]      For the avoidance of any confusion, the Second Amended Plan does provide that the Lenders will retain a first-priority security interest in both the Cash Collateral Account and the Net Proceeds Escrow.  The problem lies when the Debtors use the cash and that lien is obviously released as the cash is depleted.  The fact that the Debtors propose to "pay back" that cash at a later date does not eliminate the problem.

This value is, at a minimum, equal to the present-day liquidation value of the collateral. The Debtors have not met this test (even using the Debtors' number of approximately $27 million).

20.    The Second Amended Plan initially allows the Lenders to retain their liens on the Net Proceeds Escrow ($9,821,000), which represents the proceeds of the Lenders' Collateral that was sold post-petition. However, the Debtors then are permitted to use that cash to operate and for other purposes. The Second Amended Plan further proposes to continue to sell the Lenders' Collateral, place the proceeds in the Cash Collateral Account and the Net Proceeds Escrow, and to utilize those funds as well. On this basis alone, the Lenders are not retaining property of a value as of the effective date of the Second Amended Plan that is not less than the value of their interest in the estate's interest in its Collateral. By eliminating the Lenders' liens in their Collateral through the use of the cash, the Plan fails to comply with section 1129(a)(7).

21.    Significantly, there is no additional collateral provided to make up for the use of the cash. Although the Second Amended Plan does provide that the Lenders' Collateral will include all real and personal property acquired by the Debtors after the Effective Date (except for property purchased with third-party financing), this is entirely speculative and is, in fact, meaningless. (Second Amended Plan, § 4.3(a)(iii)(4).) To begin with, the permissible uses of cash delineated in the Second Amended Plan include many items that will not result in additional Collateral: any expense necessary to conduct the business, administrative expense claims, professional fees, and working capital. (Second Amended Plan, § 4.3(a)(ix)(2).) Moreover, offering additional collateral of an unknown value that may or may not come into existence at some point in the future to make up for the use of cash on hand or cash that comes into the estate as a result of property being sold cannot meet this requirement. The Debtors cannot show that

the Lenders are provided with property of a value that is not less than their interest in the estate's

interest in the cash the Debtors propose to use.  The requirement of section 1129(a)(7) is not met.

## 2.    1129(b): The Plan is not Fair and Equitable

22.    Because Class 1 is impaired and has rejected the Second Amended Plan, the

Debtors have not met the requirement of section 1129(a)(8).  Where all the requirements of

1129(a) are met other than paragraph (8), the court can still confirm a plan if the plan complies

with section 1129(b) and is fair and equitable.  With respect to a class of secured claims, a plan is

fair and equitable if it provides:

> (i)(I)    that the holder of such claims retain the liens securing such claims,
> whether the property subject to such liens is retained by the debtor or transferred
> to another entity, to the extent of the allowed amount of such claims; and
>
> (II)    that such holder of a claim of such class receive on account of such claim
> deferred cash payments totaling at least the allowed amount of such claim, of a
> value as of the effective date of the plan, of at least the value of such holder's
> interest in the estate's interest in such property.
>
> (ii)    for the sale, subject to section 363(k) of this title, of any property that is
> subject to the liens securing such claims, free and clear of such liens, with such
> liens to attach to the proceeds of such sale, and the treatment of such liens on
> proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii)    For the realization of such holders of the indubitable equivalent of such
> claims.

11 U.S.C. § 1129(b)(2)(A).

Section 1129(b)(2)(A)(i)

23.    As with section 1129(a)(7), the Second Amended Plan fails to comport with

section 1129(b)(2)(A)(i) because of the fact the Plan provides for the sale or use of Collateral and

the Lenders do not retain their liens against either their Collateral or the proceeds of their

Collateral.  Instead, the Debtors propose to sell Collateral free and clear of the Lenders' liens and

utilize the cash against which the Lenders hold a lien.  The liens are released and not replaced as

the cash is depleted.  In this manner, the Plan does not provide that the Lenders will retain the

liens securing their claims.  Thus, the Second Amended Plan does not meet the requirements of section 1129(b)(2)(A)(i).  *See, e.g., In re Inv. Co. of the Sw. Inc.,* 341 B.R. 298, 318 (B.A.P. 10th Cir. 2006) (the plan provided that the lots that served as the lenders' collateral would be sold for a release price that was less than the full value of the collateral, with the excess amount of sales proceeds over the release prices to be used to fund the debtor's operations; the court held that the plan did not meet the requirements of either section 1129(b)(2)(A)(i) or (ii) because the plan proposed for the sale of collateral without the secured creditors lien attaching to all of the proceeds of the sale); *In re Keller*, 157 B.R. 680, 683 (Bankr. E.D. Wash. 1993) (finding that plan that forced creditor to partially release its lien against real property without its lien attaching to the proceeds did not satisfy section 1129(b)(2)(A)(i)).

Section 1129(b)(2)(A)(ii)

24.    Nor do the Debtors meet the requirements of section 1129(b)(2)(A)(ii).  While the Second Amended Plan provides for the sale of Collateral, and ostensibly the Lenders' liens will attach to the Net Proceeds Escrow and Cash Collateral Account, the lien is illusory.  The Debtors are free to use the cash proceeds with unfettered discretion, thus stripping the Lenders of their lien in the cash utilized.  *Inv. Co. of the Sw.*, 341 B.R. at 318 . *Keller,* 157 B.R. at 683. ("under § 1129(b)(2)(A)(ii), a creditor's lien must still attach to the proceeds of the sale").

Section 1129(b)(2)(A)(iii): The Indubitable Equivalent

25.    Section 1129(b)(2)(A)(iii) cannot apply because nothing in the Plan proposes to provide the Lenders with replacement collateral for property sold or the cash used.  The key to indubitable equivalence is that the substituted treatment of the creditor be indubitably equivalent to the creditor's secured claim.  "Evidence of the requisite indubitable equivalent is present if, under the treatment proposed in the Plan, there is no reasonable doubt that [the secured creditor]

will receive the full value of what it bargained for when it made its contract with Debtor." *Inv. Co. of the Sw.*, 341 B.R. at 319. Indubitable equivalence "requires more than the payment of interest; it requires the protection of the creditors' rights to get his money or at least the property." *In re Sparks*, 171 B.R. 860, 866 (Bankr. N.D. Ill. 1994). The phrase was coined by Judge Learned Hand in *In re Murel Holding Corp.* 75 F.2d 941 (2d Cir. 1935):

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by substitute of the most indubitable equivalence.

*Murel*, 75 F.2d at 942. The phrase "indubitable equivalent" appears twice in the Bankruptcy Code, once in section 1129(b)(2)(A)(iii), and once in section 361(3) as part of the definition of adequate protection. *Sparks*, 171 B.R. at 866 (denying confirmation, finding that risk of condominium conversion of rental apartment building was significantly greater and could not constitute the indubitable equivalent of the lender's claim).

26.     In analyzing the indubitable equivalence standard, the *Investment Company* court made the following observations:

> When a plan proposes to substitute or alter collateral, however, a secured creditor receives the indubitable equivalent of its claim only if the substituted collateral does not increase the creditor's exposure to risk. Where collateral is to be substituted, two attributes of the substituted collateral-its *value* and the degree of *risk* that it imposes on the secured creditor-determine whether the new collateral is sufficiently "safe" and "completely compensatory."

341 B.R. at 319. *See also Wiersma v. O.H. Kruse Grain and Milling (In re Wiersma)*, 324 B.R. 92, 112 (B.A.P. 9th Cir. 2005), *aff'd in relevant part*, 227 F. App'x 603, 607 (9th Cir. 2007) (finding plan did not provide indubitable equivalent where original collateral (cows) were liquidated and debtor received a settlement of $2.2 million, against which the secured creditor

held a lien; plan proposed to start up a new dairy using settlement proceeds; court noted that collateral against which the lien was held was cash, and plan proposed spending that cash on additional cows; the court held that the plan "neither compensated Bank for the present value of its cash claim nor did it insure the safety of the principal"), and *rev'd in part*, 483 F.3d 933 (9th Cir. 2007).

27.     A similar issue as that presented in this case arose in the cash collateral context in *In re Pacific Lifestyle Homes, Inc.*, Case No. 08-45328, 2009 WL 688908 (Bankr. W.D. Wash. March 16, 2009).  In this case, the court addressed whether the lenders were receiving adequate protection for the use of their cash collateral under the "indubitable equivalent" standard of section 361 of the Bankruptcy Code.  The debtor, a developer, builder, and seller of residential real estate, sought to use certain of its lenders' cash collateral over the objection of its lenders in order to continue its business projects and pay its expenses.  The debtor proposed to take ten percent of the gross sales proceeds from the sale of each home, along with ten percent of an existing account that contained the proceeds of pre-petition sales (all of which the lenders had a lien against).  The debtor offered monthly interest payments, a replacement lien on proceeds from future sales, and a lien on improvements made to the homes.  The debtor's primary adequate protection argument was that its use of the lenders' cash would increase the value of the lenders' other collateral.  *Id.* at *9-10.  The court held that the lenders were not adequately protected and denied the motion for use of cash collateral.

28.     The *Pacific Lifestyle Homes* court observed that the proposed adequate protection must provide the lenders with the value of their bargained for rights. *Id.* at *8.  The court held that indubitable equivalent means "too evident to be doubted," and that it requires that the substitute collateral not increase the creditor's risk exposure.  *Id.* at *9 (citations omitted).  The

*Pacific Lifestyle Homes* court considered the "primary adequate protection" offered by the debtor – the alleged increase in value of the lenders' collateral (distinct from cash collateral) by the use of the lenders' cash collateral – and for this consideration was forced to determine whether the proposed continued construction of homes compensated the lenders for the present value of their cash collateral. *Id.* at *11. The lenders argued that there was no guarantee of success, and that under the debtor's proposal, they would have the risk of further non-profitability at the expense of their existing cash collateral. *Id.* at *11.

29.    The *Pacific Lifestyles* court sided with the lenders, concluding that the debtor was relying on its hopes and projections of future profitability (and doing so during a period of financial crises). The court held that:

> [T]his speculation does not compensate the Lenders for the present value of the use of their Cash Collateral. Even though the Debtor historically ran a successful business and operated at a comfortable profit margin, today's market may no longer support this model. If the Debtor continues to conduct business as usual and construct homes across the board—in Lender Projects both close to and far from completion—there is no guaranty that the homes will sell, or will sell in a timely manner, sufficient to compensate the Lenders for the loss of approximately eight million dollars in cash that is available to them today.

*Id.* at *12. Thus, the debtor did not meet its burden of proof of establishing that it was adequately protecting its lenders. *Id.* at *14. The same situation is present here—the Debtors propose to use the Lenders' cash, but cannot offer them the indubitable equivalent to protect them from dissipation of that cash.

30.    There is no possible way that use of the Lenders' cash for payment of administrative expenses, the Debtors' professional fees, or working capital needs can provide the Lenders with the indubitable equivalent of cash in hand. Nor can the Debtors' offer of additional unspecified collateral of an unknown value that may or may not come into existence at some point in the future constitute the indubitable equivalent. *Inv. Co.,* 341 B.R. at 319 ("a secured

creditor receives the indubitable equivalent of its claim only if the substituted collateral does not increase the creditor's exposure to risk"); *Pacific Lifestyle Homes*, 2009 WL 688908, at *12-14 (purported increase in value of lots and homes was not sufficient to provide the lenders with the "indubitable equivalent").  Not only does it violate the clear phrase "indubitable equivalent", the Plan's proposed taking of the Lenders' cash collateral runs afoul of the constitutional limitations of the Fifth Amendment.  *In re Certified Corp.*, 51 B.R. 154 (Bankr. D. Hawaii 1985) (quoting *U.S. v. Security Industrial Bank*, 459 U.S. 70 (1982)) ("the Court must also protect a secured creditor's collateral, which is being used by the Debtor since it is well established that the 'bankruptcy power is subject to the Fifth Amendment's prohibition against taking of private property without compensation.'")

**B.      The Second Amended Plan Does Not Comply with Section 1129(b)**

31.      With respect to a creditor who has made a section 1111(b) election, section 1129(b)(2)(A)(i)(II) requires that the plan provide for payment to the secured creditor of deferred cash payments equal to no less than the total amount of its allowed claim (rather than payment equal to no less than the value of the collateral), whose present value as of the effective date of the plan is not less than the value of the collateral.  The claim must be secured by a lien for not less than the full amount of the creditor's allowed claim.  In other words:  (1) the simple, arithmetic total of the stream of payments must at least equal the total claim, and (2) those payments must have a present value equal to the value of the collateral.  *In re Bloomingdale Partners*, 155 B.R. 961, 974 (Bankr. N.D. Ill. 1993).  Thus, the Second Amended Plan must provide payments to the Lender equivalent to the present value of at least $26,952,100 if the Debtors' lower value is used, and the total stream of payments must equal $53,531,091, again

using the Debtors' number.[9]  While the Plan ostensibly provides a total stream of payments of $53,531,091 over the fifteen year term, $38 million of this, or over 70%, is provided in the last year through a balloon payment.  Just as troublesome is the fact that the Plan does not expressly provide for any interest rate on the secured portion of the Note, and an implied interest rate of only 5.6%, which is not sufficient.

32.    It is clear that the secured portion of the Lenders' claim must include interest. *See, e.g., Rake v. Wade*, 508 U.S. 464, 472 at n.8 (1993) ("When a claim is paid off pursuant to a stream of future payments, a creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments."); *United Savings Ass'n of Tex. v. Timbers of Inwood Forrest Ass'n*, 484 U.S. 365, 377 (1988) (noting that section 1129(b)(2)(A)(i)(II) requires that "even though the undersecured creditor's interest is regarded (properly) as solely the value of the collateral, he must be rendered payments that assure him that value *as of the effective date of the plan*.") (emphasis in original).

33.    A starting point for determining the appropriate rate of interest is the United States Supreme Court's guidance in *Till v. SCS Credit Corporation*, 541 U.S. 465 (2004).  *Till* was a chapter 13 case, and required a formula approach based on the prime rate of interest, adjusted upward for risk.  *Till* found the following factors are to be used in calculating the premium to add to the prime rate:  (1) the probability of plan failure; (2) the rate of collateral depreciation; (3) the liquidity of the collateral market; and (4) the administrative expenses of enforcement.  541 U.S. at 484.  While *Till* was a chapter 13 case, the Court did indicate that it

---

[9]        As reflected on page 3, *supra*, the Lenders believe that the Collateral has a value of approximately $31,353,500.  Accordingly, the proposed stream of payments is required to have a present value of that amount.

believed its analysis had a broader application. 541 U.S. at 474-75. The Court suggested, however, that "when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." 541 U.S. at 477, fn.14.

34.     Some courts have questioned whether *Till* is applicable to chapter 11 cases.  *See, e.g., In re Nw. Timberline Enter., Inc.*, 348 B.R. 412, 432-33 (Bankr. N.D. Tex. 2006). Nevertheless, those decisions addressing an appropriate interest rate in chapter 11 generally do in some fashion start with or acknowledge *Till*, utilizing a market rate if available, and making requisite adjustments for risk.  *Id.; See also In re Brice Road Dev., LLC*, 392 B.R. 274, (B.A.P. 6th Cir. 2008) (noting that rule in the Sixth Circuit in chapter 11 cases is that where an efficient market exists, the market rate should be applied, and where no efficient market exists, the formula approach endorsed by the Supreme Court in *Till* should be employed).

35.     Particularly relevant to an appropriate interest rate here is Judge Wedoff's decision in *Bank of America, Illinois. v. 203 N. LaSalle Street Partnership*, 190 B.R. 567, 579 (Bankr. N.D. Ill. 1995), *aff'd*, 195 B.R. 692, 712 (N.D. Ill. 1996), *aff'd*, 126 F.3d 955 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434 (1997).  Judge Wedoff addressed how to determine a market rate of interest, and specifically addressed risk and the problem that occurs when no true market exists for a loan.  190 B.R. at 580 ("Accordingly, a market-based, nonrecourse loan for the entire value of real property is the economic equivalent of a flying pig:  it does not and cannot exist.").

36.     Judge Wedoff held that an appropriate market rate of return for a non-recourse loan with a 100% loan to value ratio must be at a <u>minimum</u> the discount rate for purposes of valuation, which determines the price that an owner is willing to pay to receive the expected future cash flows of a particular investment.  190 B.R. at 579.  This, however, would then have

to be adjusted for the increased risk that the lenders would face in a situation in which the risk to the lender was greater than the risk to the owner, either through an increased interest rate over the discount rate used by the owner in valuing the property, or something else of value that would reduce the risk to the secured creditor.  190 B.R. at 759-81.  *See also In re Bloomingdale Partners*, 155 B.R. at 983-86 (using a risk-free rate and making an adjustment for risk, refusing to accept a rate that was below rates on standard loans, and finding that the lender was exposed to above-market risks during the first years of the plan)**.**  Judge Wedoff's analysis is just as pertinent after the *Till* decision, which references assessing a market rate in a chapter 11 case, and also clearly dictates that risk must be taken into account.

37.    Here, the Debtors indicate that the Note is "an interest-free, principal-only obligation".  This obviously does not comport with the clear requirement that the Lenders receive the present value of its secured claim.  However, the Debtors' Business Forecast includes an "Implied Interest Rate" of 5.6%.  There are several problems with such an implied rate.  First, the probability of plan failure is high.  Second, the residential real estate market is in the midst of a severe crisis.  Third, when considering what rate an efficient market would produce, a distressed residential real estate developer could not obtain a $27 million loan with a fifteen-year term and a 100% loan to value ratio at a rate of 5.6%.

38.    The insufficiency of the 5.6% interest rate is illustrated by the Debtors' own appraiser, Renzi & Associates, Inc., who used a discount rate of 12% in each of its appraisals.  In accordance with Judge Wedoff's analysis in the *203 North LaSalle* decision, this 12% rate would be the <u>minimum</u> interest rate that could be appropriate.  190 B.R. at 580-81, *aff'd*, 195 B.R. at 711-12.  The Lenders' appraisers used a discount rate of 10%.  At a 12% interest rate, the present value of the Second Amended Plan's proposed repayment to the Lenders is only $13.9 million.

DM3\1128868.4

At an 8% interest rate, the present value is $20,740,587, and at a 10% interest rate, the present value is $16,864,164. At a 14% interest rate, the present value is $11,570,367.

39.     The Second Amended Plan provides nothing to the Lenders to compensate for the risk that they face. For a borrower such as the Debtors, obtaining a loan at all would be difficult at best. The Lenders do not believe that the Debtors were able to obtain even a $3.5 million loan to finance their reorganization from an outside source, and as such, their proposal to force the Lenders to continue to loan to them on the proposed terms cannot be confirmed.[10]

### C.     The Treatment of the Lenders in the Plan is An Impermissible Use of the Lenders' Cash Collateral

40.     The Second Amended Plan does not provide for the payment of interest to the Lenders; only an "implied interest rate" is used in the Debtors' Business Forecast, presumably for meeting the requirement of section 1129(b)(2)(B), which implied interest rate is insufficient in any event as set forth above. The truth is that the proposed treatment of the Class 1 Claim includes actual payment of only approximately $14 million over the first fourteen years of the Note term, or $1 million per year, with an entirely speculative balloon payment of over $38 million in the last year of the loan. Even assuming only a 6% interest rate (which, as discussed above, is not close to adequate), interest-only payments on the approximately $27 million in secured debt would be approximately $1.6 million per year. Thus, the Second Amended Plan does not under any approximation of a rational interest rate even pay the Lenders' interest during the plan term. In addition, the "Collateral Surplus/Shortfall" calculation presented by in the Debtors' Business Forecast shows that the Lenders' "Collateral Shortfall" *increases* over the first year of the plan—through the end of 2010.

---

[10]     It is important to note that the outside financing that the Debtors were unable to obtain was for construction of homes and not for real estate development. Construction financing is less risky than real estate development financing. The Debtors intend to use Lenders' cash collateral for both construction and real estate development.

DM3\1128868.4

41.    Moreover, the Debtors are *keeping* the Lenders' cash collateral and using it for their own purposes without providing anything in return. The Second Amended Plan and Debtors' Business Forecast rely entirely on the use of the Lenders' cash and not on any third-party financing.  The Second Amended Plan definitively states that the Lenders' cash will be used to fund their operations and continued developments, as well as the estates' administrative expenses and professional fees.  This is not permissible  First, it violates section 506(c) of the Bankruptcy Code, and thereby does not comport with section 1129(a)(1), which requires that any plan comply with the applicable provisions of the Bankruptcy Code.  Second, it is not "fair and equitable" and does not comply with section 1129(b).

**1.**    **By Forcing the Lenders to Bear the Administrative Costs of the Chapter 11 Cases, The Plan Violates Section 1129(a) of the Bankruptcy Code and Is Not Fair and Equitable in Violation of Section 1129(b)**

42.    It has long been the rule that unsecured creditors must assume the costs of administering a bankruptcy estate and that the administrative expenses of a bankruptcy (including attorneys' fees) are not to be charged against a secured creditors' collateral.  Where a plan provides for the payment of administrative expenses out of a secured creditors' collateral, it violates section 506(c), and as such violates section 1129(a)(1).  *In re Nat'l/Northway L.P.*, Case No. 02-4118, 2002 WL 32397224 (Bankr. D. Mass. Dec. 20, 2002) ("Because the Debtor may not use Cash Collateral to pay its professional fees, the Plan does not satisfy section 1129(a)(1).").

43.    Such improper treatment further violates section 1129(b) as it "discriminates unfairly" against the Lenders.  *In re Pullman Constr. Indus., Inc.*, 107 B.R. 909, 940-42 (Bankr. N.D. Ill 1990) (denying confirmation; finding that plan discriminated unfairly against secured creditor under section 1129(b) as it improperly sought to charge secured creditors' collateral with

professional fees and tax claims where such claims could not be charged against the secured

creditors' collateral under section 506(c)).  *See also In re Visual Indus., Inc.,* 57 F.3d 321, 324

(3d Cir. 1995) (trade creditor's claim could not be charged against secured creditor's collateral);

*In re Flagstaff Foodservice Corp.,* 739 F.2d 73, 76 (2d Cir. 1984) ("payment of administrative

expenses traditionally has been the responsibility of the debtor's estate, not its secured creditors";

professional fees could not be charged against secured creditor's collateral under section 506(c));

*In re Trim-X, Inc.,* 695 F.2d 296, 301 (7th Cir. 1982) (discussing when trustee's expenses are

properly chargeable to secured creditor under section 506(c); "traditionally administrative

expenses have not been charged against secured creditors").  Because the Debtors may not use

the Lenders cash collateral to pay their professional fees and fund their operating overhead

expenses, the Plan does not satisfy section 1129(a)(1) or section 1129(b).

## 2. The Treatment of the Lenders in the Second Amended Plan is Not Fair and Equitable and Violates Section 1129(b)

44.    Section 1129(b) provides that a plan must "not discriminate unfairly" and must be

"fair and equitable."  While section 1129(b) does set forth particular requirements that must be

met for a plan to be fair and equitable, these requirements are not exclusive, and a plan that

otherwise meets the requirements of section 1129(b) may still not be fair and equitable.  *Federal

Savings & Loan Ins. Corp. v. D&F Constr., Inc. (In re D&F Constr., Inc.)*, 865 F.2d 673, 675

(5th Cir. 1989); *see also Pullman*, 107 B.R. at 939.  In *D&F Construction*, the secured creditor

had made a section 1111(b) election.  The plan provided for payment of monthly payments to the

secured creditor, but in the first four years of the plan, the monthly payments were not sufficient

to cover the interest accruing.  At the end of the plan period, out of a debt of $7 million, a

balloon payment was to be made of $4.74 million.  The court held that the effect of the negative

amortization was to force the Lender to make a post-confirmation loan to the debtor, and stated that:

> While this speculation may be wholly acceptable from the standpoint of the debtor and the other classes of creditors, it is an altogether impermissible speculation from the standpoint of [the secured creditor], which is effectively denied access to the security it contracted for during the next fifteen years and must furnish further funding to the project.

865 F.2d at 676.  The court found that regardless of whether the plan met the literal requirements of section 1129(b)(2), it was not fair and equitable as to the secured creditor and could not be confirmed.  *See also In re Lakeside Global II, Ltd.*, 116 B.R. 499, 513 (Bankr. S.D. Tex. 1989) (finding that plan did not meet requirements of section 1129(b)(2)(A)(i)(II) where the cash payments to be made under the plan were "a minimum, interim action, designed not to pay down the total debt").

45.     The situation in the present case is even more egregious that that in *D&F Construction*.  The Lenders are provided with payments of only $1 million per year—far less than the $1.62 million that would be required to cover interest on $27 million assuming only a 6% interest rate.  The balloon payment of $38 million at the end of the plan term equals over 70% of the face amount of the Note.  The Lenders' loan in this case matured in June of this year, and historically was never renewed for more than two years.  The Second Amended Plan requires that the Lenders continue to loan to the Debtors for fifteen additional years, and provides for negative amortization through payments insufficient to even cover interest on the secured portion of the Note during this time period.  Further, and incredibly, the Debtors propose to use the Lenders' cash collateral to fund operations, construction, the costs of their Chapter 11 cases and other expenses.

46.     Simply put, the Second Amended Plan proposes that to force the Lenders to make an exceptionally risky post-confirmation loan.  The Second Amended Plan is not fair and

25

equitable. While the bankruptcy court may be sympathetic with the plight of home builders like

Kirk caused by the current severe recession, such market conditions do not justify confirmation

of the Plan and exposing the Lenders to risks never contemplated. As stated in *In re D & F*

*Construction*:

> A plan that is not fair and equitable with respect to an impaired secured creditor
> cannot be confirmed on the basis that such inequity is necessary to protect junior
> creditors. If market conditions are such that an effective plan of reorganization
> cannot be developed that is fair and equitable to dissenting creditors, [the secured
> creditor] is entitled to foreclose on its liens.

865 F.2d at 676 (citations omitted).

### D.     Section 1129(a)(11): The Plan is Not Feasible

47.     Section 1129(a)(11) provides that a court shall confirm a plan only if:

> (11) Confirmation of the plan is not likely to be followed by the liquidation, or the
> need for further financial reorganization, of the debtor or any successor to the
> debtor under the plan, unless such liquidation or reorganization is proposed in the
> plan.

11 U.S.C. § 1129(a)(11). This is what is referred to as the feasibility requirement and it requires

a plan to offer a reasonable prospect of success and a workable framework for reorganization. 7

COLLIER ON BANKRUPTCY ¶ 1129.03[11]. "The purpose of section 1129(a)(11) is to prevent

confirmation of visionary schemes which promise creditors and equity security holders more

under a proposed plan than the debtor can possibly obtain after confirmation." 7 COLLIER ON

BANKRUPTCY ¶ 1129.03[11].

48.     A reasonable assurance of commercial viability is required:

> The court must be reasonably satisfied that the business is likely to perform in the
> real world as well as the proponent projects it will in the courtroom. Once
> reorganized, the business must be able to be economically viable under the
> repayment provisions of the plan. Where the financial realities do not accord with
> the proponent's projections or where the proposed assumptions are unreasonable,
> the plan should not be confirmed. The court should not confirm a reorganization
> plan in the face of a hopeless situation or where the court believes, after proper
> inquiry, that liquidation is inevitable.

26

*In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989).  Factors that are considered in determining feasibility include:   the prospective earnings of the business or its earning power; the soundness and adequacy of the capital structure and working capital for the business; the prospective availability of credit; whether the debtor will have the ability to meet its requirements for capital expenditures; economic and market conditions; the ability of management and whether current management will continue; and any other related factors that would materially reflect on the company's ability to operate and implement its plan.  *In re Repurchase Corp.*, 332 B.R. 336, (Bankr. N.D. Ill. 2005), *aff'd*, Case No. 05 C 7075, 2008 WL 4379035 (N.D. Ill. March 24, 2008) (denying confirmation and finding that plan was not feasible).

49.     When determining whether a plan is feasible, courts often consider a debtor's cash flow projections.  The projections must be based upon evidence of financial progress and must not be speculative, conjectural, or unrealistic.  A debtor must be able to sustain its burden to prove that it will be able to perform all obligations it is assuming under the plan.  Projections must be derived from "realistic and reasonable assumptions which are capable of being met."  *In re Inves. Co. of the Sw., Inc.*, 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006) (district court reversed bankruptcy court's finding of feasibility); *Lakeside Global*, 116 B.R. at 508 (denying confirmation where plan was not feasible; "This court is not reasonably convinced that the market will so dramatically improve that it is legally proper to keep the lienholders in suspense while the investors bide for time.").  In *Investment Company*, the court found that where a plan was premised on the sale of real estate, "there must be some evidence that Debtor's overall plan to sell part or all of its inventory is reasonable, based on either past performance or identifiable factors indicating the likelihood of probability of future performance, or both."  341 B.R. at 315.

In the case before it, the judge noted the debtor's weak sales history for the same kinds of properties that it proposed to sell in the plan, and that no change in management was likely.

50.     The Debtors projections are unrealistic for a number of reasons.  First, the Second Amended Plan is based upon the overriding assumption that the Debtors' projects, particularly those with substantial inventory of undeveloped lots, will not only recover, but effectively return to the economic conditions of the recent housing bubble.   Out of the cash (net proceeds) generated by the Debtors through the build-out of homes, 87% is related to the undeveloped lots, or $88 million out of $102 million.

51.     By way of comparison, note that this economic profit purportedly is generated based upon undeveloped lots that are listed in the Debtors' Business Forecast as having a value of only $4.3 million (Debtors' Business Forecast at p. 15, referencing "Part/Undev Lots".)  It is also worth noting that these lots are valued at a mere fraction of their original book value (as low as 5% of their original book value).   This substantial decrease in value is due to the overall evaporation of a market for these lots.   Referencing the Debtors' appraisal of the Apple Creek properties (where the majority of the undeveloped lots are located), Renzi & Associates states:

> As stated within the Area Overview (section), demand is currently limited throughout the Chicago Metropolitan Area, and more specifically, the City of Woodstock and the subject's immediate area, for new residential development. While residential development is considered to be the ultimate Highest and Best Use of the subject property, **it is unlikely that development of Phases II, III, and IV will be financially feasible in the foreseeable future** due to limited demand, current market pricing/values, and the costs associated with the construction of the proposed residences and necessary infrastructure.   Giving consideration to the preceding, we conclude that the Highest and Best Uses of Phases II, III, and IV is to hold until such time as demand increases to a level that renders new construction financially feasible.

Renzi & Associates Appraisal, Remaining Unsold Lots at Apple Creek Estates Phase I, and Phases II, III and IV, at p. 27.   Nevertheless, the Debtors' Business Forecast shows that the

Debtors intend to spend over $7 million over the next five years to develop the Apple Creek unimproved lots and, considering all of the Debtors' projects, approximately $42 million on land development. This makes no economic sense, and the only party to bear the risk of such a course of action will be the Lenders.

52.     In addition to Apple Creek, a considerable component of the Debtors' Business Forecast is related to the Westland Property ($27.2 million of the total $102 million of net proceeds). This property is currently active farm land and has not been through the entitlement (annexation and zoning) process. According to the Debtors' President John Carroll, the entitlement process would take approximately two and a half years and will utilize the Lenders' cash collateral. Additionally, the entitlement process is not without risk—certain of Kirk's other developments went through the process but were eventually denied. (John Carroll 9/11/09 Deposition Transcript at pp. 36-37 and 38, lines 1-17.) While the ability to entitle this parcel and the underlying demand for homes at this site are extremely speculative, the Debtors propose to spend over $11 million in development and entitlement costs on this project.

53.     The Debtors' Business Plan also contemplates an unrealistic improvement in gross margin, which is the key driver of profitability and thus an important element of the feasibility of the Second Amended Plan. As shown in Exhibit C, the Debtors are forecasting that gross margin is going to improve from 19.3% in the first five years of the Business Plan (which is equivalent to the Debtors' actual gross margin from last fiscal year and slightly higher than the gross margin from the previous fiscal year), up to 33% in the last five years of the Business Plan. There is no basis for the assumption that gross margin will be anywhere close to 33%. The standard industry gross profit margin ranges from approximately 18% to 24%; this is widely supportable and well

DM3\1128868.4

known.  A review of U.S. public homebuilders over the past sixteen years shows an average gross profit margin of 19%.

54.     The Second Amended Plan assumes that real estate appreciation will be more than twice inflation.  With the exception of the most recent housing bubble, home prices tracked inflation fairly consistently.  *See* Exhibit D.  The benefit of this flawed assumption as to real estate appreciation results in $55 million of incremental value in the Second Amended Plan.  *See* Exhibit E.

55.     Finally, the Second Amended Plan does not provide for adequate liquidity to execute on the Debtors' Business Plan.  The Debtors make aggressive assumptions regarding credit from vendors and with respect to the funding and repayment cycle that suggest the actual funding requirements will be a much greater strain on available cash than what is predicted. Further considering the Debtors aggressive sales, pricing, absorption, and margin assumptions, the prospect of supporting this business based on the projected liquidity is not feasible.

## VI.    CONCLUSION

WHEREFORE, for the reasons stated above, JPMorgan respectfully requests that this Court deny confirmation of the Plan and grant such other and further relief as the Court deems just and proper.

Respectfully Submitted,

**JPMORGAN CHASE BANK, N.A., AS AGENT AND LENDER**

By: /s/ Rosanne Ciambrone
            One of its Attorneys

Rosanne Ciambrone (A.R.D.C. #6199456)
Matthew A. Olins (A.R.D.C. #6275636)
DUANE MORRIS LLP

DM3\1128868.4

190 South LaSalle Street, Suite 3700
Chicago, Illinois  60603
Telephone:  (312) 499.6700
Facsimile:  (312)  499.6701

And

Joel M. Walker (Admitted Pro Hac Vice)
DUANE MORRIS LLP
Suite 5010
600 Grant Street
Pittsburgh, Pennsylvania 15219-2811
Telephone:  (412) 497-1042
Facsimile:  (412) 202-4706

DM3\1128868.4

## **EXHIBIT A**

**Debtors' Business Forecast**

DM3\1128868.4

## EXHIBIT B

## THE PLAN ALLOWS FOR FREE AND UNRESTRICTED
## USE OF THE LENDER'S CASH

- Over the first 14 years of the Second Amended Plan, the Debtors have free and unrestricted use of (according to their projections) $385MM of sale proceeds, of which they plan to spend $53MM on overhead, $243MM on new construction, $40MM on new land development, and only make $14MM of payments to the Lenders.

- The Second Amended Plan calls for the accumulation of $44.2MM of cash through year 15, effectively providing the Debtors with a fifteen-year unrestricted revolving loan without any controls or covenants. Based on this Plan, the Debtors will not need to raise any external financing until 2024.

- Due to the minimal amount of the annual principal payments ($1 million) during years 1 through 14 and the large $38 million balloon payment in 2024, the Second Amended Plan effectively provides the Debtors with the unfettered use of the Lenders' cash to spend at their discretion, whether it be for additional land development, acquisitions of new residential projects, or potentially even for extremely generous equity distributions.

- The terms of the Second Amended Plan (essentially a 100% loan to value loan) are inconsistent with standard lending practices, whereby developers typically must put as much as 50% equity into land development projects and 25% into new construction projects.

### Sources & Uses of Cash

|  | Effective Date | 2009-2023 | 2024 | Total |
|---|---|---|---|---|
| **Beginning Cash** | $ 10,081,000 | $ 10,481,000 | $ 45,909,094 | $ 10,081,000 |
| Payments to GUC, Priority Claims | (600,000) | (107,069) | - | (707,069) |
| New Money Infusion | 1,000,000 | - | - | 1,000,000 |
| Sale Proceeds (after closing costs) | - | 387,089,470 | 21,457,383 | 408,546,854 |
| Overhead/Payroll/Taxes | - | (53,218,973) | (4,070,951) | (57,289,924) |
| Cost of New Construction | - | (244,447,038) | (11,330,230) | (255,777,268) |
| Development of new lots | - | (39,654,000) | (2,000,000) | (41,654,000) |
| Payout to Lenders | - | (14,234,296) | (39,296,795) | (53,531,091) |
| **Ending Cash** | $ 10,481,000 | $ 45,909,094 | $ 10,668,502 | $ 10,668,502 |

DM3\1128868.4

## EXHIBIT C

| Forecasted Improvement in Gross Margin | | | | | |
|---|---|---|---|---|---|
| | **Actual (from audits)** | | **Plan Projections** | | |
| | *FY 2007* | *FY 2008* | *5 years 2010 - 2014* | *5 years 2015 - 2019* | *5 years 2020 - 2024* |
| Revenue | 105,040,864 | 23,976,382 | 132,475,470 | 182,396,472 | 99,029,029 |
| Closing Costs | (4,101,168) | (1,436,572) | (2,855,967) | (3,386,606) | (1,570,330) |
| Construction Costs | (57,827,569) | (11,923,601) | (90,348,972) | (110,955,623) | (54,472,673) |
| Lot Costs | (24,033,964) | (5,985,611) | (13,705,558) | (24,656,704) | (10,439,895) |
| **Gross Profit** | $ 19,078,163 | $ 4,630,598 | $ 25,564,972 | $ 43,397,540 | $ 32,546,132 |
| **Gross Margin** | **18.2%** | **19.3%** | **19.3%** | **23.8%** | **32.9%** |

DM3\1128868.4

## EXHIBIT D



## EXHIBIT E

| Impact of Appreciation > Inflation | | | |
|---|---|---|---|
| | **Plan** | **Adjusted** | **Impact** |
| ***Interest Rate Assumptions:*** | | | |
| Cost Inflation | 2.0% | 2.0% | |
| Real Estate Appreciation (2010-2013) | 3.0% | 2.0% | |
| Real Estate Appreciation (2014-2024) | 5.0% | 2.0% | |
| | | | |
| ***Financial Projections*** | | | |
| *Units Closed* | *1,338* | *1,338* | - |
| Revenue | 413,900,972 | 358,605,148 | 55,295,824 |
| Closing Costs | (7,812,902) | (7,812,902) | - |
| Construction Costs | (254,812,372) | (254,812,372) | - |
| Lot Costs | (49,767,053) | (48,839,095) | (927,958) |
| **Gross Profit** | **$ 101,508,644** | **$ 47,140,778** | **$ 54,367,866** |

*The Plan assumes real estate appreciation will be significantly higher than inflation, meaning home prices will increase at a greater rate than underlying costs. As shown, this assumption accounts for almost $55 million of incremental value

DM3\1128868.4